# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

### Northern Division

MACKINAC CENTER FOR PUBLIC POLICY,

*Plaintiff*,

v.

U.S. DEPARTMENT OF EDUCATION;

MIGUEL CARDONA, Secretary, U.S. Department of Education, in his official capacity;

RICHARD CORDRAY, Chief Operating Officer of Federal Student Aid, U.S. Department of Education, in his official capacity;

*Defendants*.

CIVIL CASE NO. _____

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF**

JURY TRIAL DEMANDED

## <u>INTRODUCTION</u>

Congress responded to the Covid-19 pandemic by providing trillions of dollars of relief to affected Americans. One legislative relief measure was the suspension of monthly payment obligations and interest accrual on federally held student loans for a period limited to six months. That temporary suspension began on March 27, 2020, and it expired on September 30, 2020. Yet, without any lawful basis or congressional appropriation, Defendant Department of Education ("Department") has repeatedly extended the suspension for 30 months beyond its statutory expiration date and counting—at enormous expense to taxpayers.

The Department initially claimed a short extension was needed to enable Congress to decide whether to extend the suspension legislatively. But electorally accountable lawmakers in Congress

1

declined to extend the suspension of payment obligations and interest accrual any further, even as they repeatedly legislated all manner of other forms of Covid-19 relief. So, the Department apparently decided to ignore the law and extended the Payment-and-Interest Pause by administrative fiat.

So far, the Department has issued eight separate extensions—most recently in November 2022—asserting an ever-shifting foundation of purported legal justifications. At first, the Department relied on economic hardship provisions of the Higher Education Act of 1965; then it pivoted to the HEROES Act of 2003; then it stopped citing legal authorities altogether and stopped publishing new extensions in the Federal Register; and finally, it most recently claimed (falsely) that it had been relying on the HEROES Act all along.

None of these justifications holds water. Only Congress can categorically suspend repayment obligations for all student-loan borrowers nationwide. And only Congress can cancel the accrual of interest on student debt owed to the United States. Congress never suspended repayment obligations nor canceled the accrual of interest on student loans beyond September 30, 2020. The Department's eight subsequent administrative extensions of the Payment-and-Interest Pause beyond that statutory expiration date have constituted unlawful agency action, so they must be set aside.

## PARTIES

1.     Plaintiff Mackinac Center for Public Policy is a § 501(c)(3) organization that is incorporated in Michigan and has its headquarters in Midland, Michigan. With 45 employees, Plaintiff regularly competes to recruit and retain college-educated employees for staff positions, helped by the incentives Congress provided through the Public Service Loan Forgiveness ("PSLF") program. *See* Declaration of Joseph G. Lehman ("Lehman Decl.") (Attached as Exhibit 1).

2.     Defendant U.S. Department of Education is an agency of the United States.

3.     Defendant Miguel Cardona is sued in his official capacity as Secretary of the U.S. Department of Education ("Secretary").

2

4.      Defendant Richard Cordray is sued in his official capacity as Chief Operating Officer of Federal Student Aid of the U.S. Department of Education.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 5 U.S.C. §§ 702 and 703 and 28 U.S.C. §§ 1331, 1361, and 2201.

6.      This Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. §§ 1361 and 2201-2202, and under its inherent equitable powers.

7.      Venue is proper within this district pursuant to 28 U.S.C. § 1391. Defendants are United States agencies or officials sued in their official capacities. Plaintiff has its principal place of business in this judicial district and substantial parts of the events or omissions giving rise to the Complaint occurred within this district.

## STATEMENT OF FACTS

### I.     LEGAL BACKGROUND

8.      The Department administers student loan programs under Title IV of the Higher Education Act ("HEA") of 1965, 20 U.S.C. § 1070 et seq. Federal student debt exceeds $1.6 trillion and is owed by approximately 45 million borrowers. Alexandra Hegji, Kyle D. Shohfi & Rita R. Zota, Cong. Rsch. Serv., R47196 *Federal Student Loan Debt Cancellation: Policy Considerations* 1 (2022).

9.      Under the Federal Direct Loan program, which now accounts for most federal student debt, "the federal government makes loans" directly to borrowers "using federal capital (*i.e.*, funds from the U.S. Treasury), and once made, outstanding loans constitute an asset of the federal government." *Id.* at 2.

10.     Direct-loan borrowers generally must make monthly loan payments to the United States under a repayment plan. *See* 20 U.S.C. § 1087e(d). Interest on such loans accrues at rates specified by Congress. *See Id.* § 1087e(b).

3

11. Borrowers may be eligible for deferment on monthly payments and the accrual of interest under certain conditions. *Id.* § 1097e(f). Deferment is available to individual borrowers experiencing "economic hardship," which the HEA and the Department's regulations define as occurring when a borrower works a full-time job while earning extremely low wages; receives means-tested public assistance; or serves in the Peace Corps. 20 U.S.C. §§ 1085(o), 1087e(f)(2)(D); 34 C.F.R. § 682.204(g).

12. The Department has never determined that all borrowers nationwide, regardless of individual economic circumstances, are entitled to a deferment for economic hardship under the HEA.

13. In 2003, Congress enacted the Higher Education Relief Opportunities for Students ("HEROES") Act, Pub. L. No. 108-76, 117 Stat. 904 (2003), in the wake of the September 11 terrorist attacks "to support the members of the United States military and provide assistance with their transition into and out of active duty and active service." 20 U.S.C. § 1098aa(b)(6).

14. The HEROES Act states that the Secretary may "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs" under the HEA when "necessary in connection with a war or other military operation or national emergency." *Id.* § 1098bb(a)(1). Any such waiver or modification must be "necessary to ensure that" certain statutory objectives are achieved, including to ensure that "recipients of student financial assistance … are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." *Id.* § 1098bb(a)(2)(A).

15. Until December 2020, the Department had never invoked the HEROES Act's "waive or modify" authority to extend the deadline of a student-loan relief program beyond the expiration date set by Congress.

16.     Nor had the Department previously invoked the HEROES Act's "waive or modify" authority to provide debt relief to all borrowers nationwide, without regard to how a national emergency has affected each borrower's financial position in relation to his or her loans.

17.     The College Cost Reduction and Access Act of 2007 established the PSLF program "to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of this section." 34 C.F.R. § 685.219(a), as authorized by 20 U.S.C. § 1087e(m).

18.     Under PSLF, a borrower who makes 120 monthly payments while working full time for a qualified public-service employer will have the remainder of his or her loan balance cancelled. 20 U.S.C. § 1087e(m)(1)(A), (B).

19.     PSLF "promotes the interests of public service employers by providing significant financial subsidies to the borrowers they hire on the condition they remain employed in public service," thereby "increasing recruitment and lowering labor costs" for those employers. *ABA v. Dep't of Educ.*, 370 F. Supp. 3d 1, 19 (D.D.C. 2019).

20.     Qualified employers include nonprofit organizations under § 501(c)(3) of the Internal Revenue Code. 20 U.S.C. § 1087e(m)(1)(B). Plaintiff is a qualified employer.

## II.   DEFENDANTS HAVE REPEATEDLY AND UNLAWFULLY EXTENDED A CONGRESSIONALLY-ENACTED PAUSE ON STUDENT LOAN MONTHLY PAYMENTS AND INTEREST ACCRUAL PAST CONGRESS'S END DATE

21.     On March 20, 2020, near the outset of the Covid-19 pandemic in the U.S., the Department announced in a press release that it would set interest rates on federally held student loans at zero percent for "a period of at least 60 days" and would allow borrowers with such loans to suspend

their payments "for at least two months."[1] The Department did not identify any statutory or other legal authority under which it was granting this relief.

22.     This Department press release was soon overtaken by events on March 27, 2020, when Congress enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. *See* Pub. L. No. 116-136, 134 Stat. 281 (2020). Section 3513 of the CARES Act instructed the Department to "suspend all payments" for federally held student loans until September 30, 2020, and it provided that no interest would accrue for such loans during that period. *Id.* § 3513(a)–(b). This statutory pause on monthly payments and interest accrual is referred to hereinafter as the "Payment-and-Interest Pause."

23.     The Department has repeatedly extended the Payment-and-Interest Pause for a total of two-and-a-half years (and counting) beyond the six-month period Congress authorized. The Department has shifted among different purported legal authorities for these extensions and, for some extensions, has failed to invoke any legal authority at all.

24.     The first extension came in August 2020. As the CARES Act's September 30, 2020 end date for the relief approached, Congress was debating whether to extend the Payment-and-Interest Pause and, if so, whether to amend its scope.[2]

25.     While that debate was ongoing, President Trump ordered his Secretary of Education to extend the Payment-and-Interest Pause through December 31, 2020. *Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic*, 85 Fed. Reg. 49,585 (Aug. 13, 2020). Politico reported that "Trump's order is aimed at circumventing Congress to extend the emergency student

---

[1] Press Release, U.S. Dep't of Educ. (Mar. 20, 2020), available at: https://content.govdelivery.com/accounts/USED/bulletins/2823e37 (last visited Apr. 5, 2023).

[2] Michael Stratford, *Trump Extends Student Loan Relief Through Year's End*, Politico (Aug. 8, 2020), available at: https://www.politico.com/news/2020/08/08/trump-extends-student-loan-relief-through-years-end-392724 (last visited Apr. 5, 2023).

loan relief granted in March under the CARES Act. That payment leeway is set to expire for roughly 40 million Americans on Sept. 30, just weeks before the presidential election."[3]

26.     As legal authority for this first suspension, President Trump's order cited economic hardship deferment under "section 455(f)(2)(D) of the Higher Education Act of 1965, as amended, 20 U.S.C. 1087e(f)(2)(D)." 85 Fed. Reg. at 49,585.

27.     On August 21, 2020, the Department announced in a press release that it would comply with President Trump's order and extend the Payment-and-Interest Pause until December 31, 2020. Press Release, Dep't of Educ. (Aug. 21, 2020).[4] That press release cited President Trump's memorandum, and thus economic-hardship deferment under the HEA, as the purported legal authority for extending relief. *Id.*

28.     The August 21, 2020 press release further announced that "[n]on-payments by borrowers working full-time for qualifying employers will count toward the 120 payments required by the Public Service Loan Forgiveness program and as payments that are required to receive forgiveness under an income-driven repayment plan." *Id.* The Department has similarly allowed non-payments to count as payments needed for PSLF forgiveness during all subsequent extensions of the Payment-and-Interest Pause.

29.     By law, the Department must undertake notice-and-comment and negotiated rulemaking procedures to issue any rule affecting the provision of financial assistance to student borrowers under the HEA. *See* 5 U.S.C. § 533; 20 U.S.C. § 1098a. However, no Federal Register publications explained the Department's reasoning—let alone invited public comment—for the first extension of the Payment-and-Interest Pause announced in August 2020.

---

[3] *Ibid.*
[4] Available at: https://content.govdelivery.com/accounts/USED/bulletins/29b4634 (last visited Apr. 5, 2023).

30.     By December 2020, Congress was again debating whether to provide debt relief to student-loan borrowers as part of a new round of pandemic-relief legislation.

31.     On December 4, 2020, the Department announced in a press release a second administrative extension of the Payment-and-Interest Pause, this time extending the pause from December 31, 2020, to January 31, 2021. Press Release, Dep't of Educ. (Dec. 4, 2020).[5] The Department explicitly acknowledged that "Congress, not the Executive Branch, is in charge of student loan policy," but said another short extension would "allow[] Congress to do its job and determine what measures it believes are necessary and appropriate." *Id.*

32.     On December 11, 2020, the Department published a related notice in the Federal Register announcing that it was exercising power "under the HEROES Act to modify the terms of the benefits provided under section 3513 of the CARES Act such that they will continue to be provided to borrowers until January 31, 2021." 85 Fed. Reg. 79,856, 79,863 (Dec. 11, 2020); as corrected, 86 Fed. Reg. 5,008, 5008 (Jan. 19, 2021).[6] This Federal Register notice was the first time the Department invoked the HEROES Act to extend the Payment-and-Interest Pause.

33.     Upon taking office on January 20, 2021, President Biden and the Acting Secretary of Education announced a third extension of the Payment-and-Interest Pause, this time for an unspecified, indefinite period. *Pausing Federal Student Loan Payments*, White House (Jan. 20, 2021).[7] The

---

[5] Available at: https://content.govdelivery.com/accounts/USED/bulletins/2afbc4b  (last visited Apr. 5, 2023).

[6] The original December 11, 2021 notice invoked the HEROES Act to extend the pause to December 31, 2020. But the Secretary already had extended the pause to that date, relying on "economic hardship" deferment under the HEA to do so. The January 19, 2021 correction clarified that the HEROES Act was invoked to extend the pause a second time to January 31, 2021.

[7] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/pausing-federal-student-loan-payments/ (last visited Apr. 5, 2023).

Department issued a press release the next day confirming this extension. Press Release, Dep't of Educ. (Jan. 21, 2021).[8]

34.     The Department's sole explanation for this third extension was: "Too many Americans are struggling to pay for basic necessities and to provide for their families. They should not be forced to choose between paying their student loans and putting food on the table." *Id.* The Department did not explain why forbearance for *all* borrowers, even those millions who were not struggling economically, was appropriate. Nor did the Department cite *any* legal authority whatsoever. No Federal Register notice accompanied the third extension.

35.     On August 6, 2021, President Biden announced that his indefinite pause on student loan repayments should end and that, to "ensure a smoother transition that minimizes loan defaults and delinquencies," he would extend the Payment-and-Interest Pause for a fourth and purportedly "final" time until January 31, 2022. *Statement by President Joe Biden Extending the Pause on Student Loan Repayment*, White House (Aug. 6, 2021).[9] The Department issued a press release the same day confirming this fourth extension. Press Release, Dep't of Educ. (Aug. 6, 2021).[10]

36.     Neither the President's announcement nor the Department's press release cited any legal authority for this fourth and purportedly "final" extension. No Federal Register publication explained the Department's rationale.

37.     Despite claiming that the fourth extension would be the "final" one, President Biden announced on December 22, 2021, that the Payment-and-Interest Pause would be extended a fifth

---

[8] Available at: https://www.ed.gov/news/press-releases/request-president-biden-acting-secretary-education-will-extend-pause-federal-student-loan-payments (last visited Apr. 5, 2023).
[9] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/06/statement-by-president-joe-biden-extending-the-pause-on-student-loan-repayment/ (last visited Apr. 5, 2023).
[10] Available at: https://www.ed.gov/news/press-releases/biden-administration-extends-student-loan-pause-until-january-31-2022 (last visited Apr. 5, 2023).

time until May 1, 2022. *Statement by President Joe Biden Extending the Pause on Student Loan Repayment an Additional 90 Days*, White House (Dec. 22, 2021).[11] He claimed another extension was needed for all 41 million student loan borrowers because "millions of [them] are still coping with the impacts of the pandemic" despite "one of the strongest" economic recoveries. *Ibid.*

38. On the same day, the Department issued a press release confirming this fifth extension. Press Release, Dep't of Educ. (Dec. 22, 2021).[12] That press release explained that "[t]he pause on student loan payments will help 41 million borrowers save $5 billion per month" as a result of interest not accruing on their outstanding debt. *Id.* Neither the President's announcement nor the Department's press release cited any legal authority for the fifth extension of the Payment-and-Interest Pause nor the incurring of $5 billion per month in costs to the Treasury. No Federal Register publication explained the Department's rationale.

39. On April 6, 2022, President Biden announced a sixth extension of the Payment-and-Interest Pause to August 31, 2022. *Statement by President Biden Extending the Pause on Student Loan Repayment Through August 31st, 2022*, White House (Apr. 6, 2022).[13] He claimed this extension was needed because, "[i]f loan payments were to resume on schedule in May, analysis of recent data from the Federal Reserve suggests that millions of student loan borrowers would face significant economic hardship." *Ibid.*

---

[11] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/22/statement-by-president-joe-biden-extending-the-pause-on-student-loan-repayment-an-additional-90-days/ (last visited Apr. 5, 2023).
[12] Available at: https://www.ed.gov/news/press-releases/biden-harris-administration-extends-student-loan-pause-through-may-1-2022 (last visited Apr. 5, 2023).
[13] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2022/04/06/statement-by-president-biden-extending-the-pause-on-student-loan-repayment-through-august-31st-2022/ (last visited Apr. 5, 2023.

40.    The Department issued a press release on the same day confirming this sixth extension. Press Release, Dep't of Educ. (Apr. 6, 2022)[14] Once again, neither the President's announcement nor the Department's press release cited any legal authority for the sixth extension of the Payment-and-Interest Pause. And no Federal Register publication explained the Department's rationale.

41.    On August 24, 2022, the Department of Education announced a second "final extension" of the Payment-and-Interest Pause—the seventh extension overall—until December 31, 2022. Press Release, Dep't of Educ. (Aug. 24, 2022).[15] This seventh unlawful extension was accompanied by a further unlawful announcement that the Department would also outright cancel up to $10,000 or up to $20,000 of debt for approximately 40 million borrowers, a program referred to hereinafter as the "Loan Cancellation Program."

42.    On the same day, the Department of Justice released a memorandum from the Office of Legal Counsel. *Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, 46 Op. O.L.C. __, Slip Op. (Aug. 23, 2022) ("OLC Memo"). The OLC Memo analyzed the requirement that waiver or modification of federal student-loan obligations under the HEROES Act must "be necessary" to "ensure" that affected individuals "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." 20 U.S.C. § 1098bb(a)(2)(A) (emphasis added). OLC concluded that the HEROES Act authorizes waivers or modifications only to the extent needed to "put loan recipients back into the financial position" they would have been in relation to their loans "were it not for the national emergency." OLC Memo at

---

[14] Available at: https://www.ed.gov/news/press-releases/biden-harris-administration-extends-student-loan-pause-through-august-31(last visited Apr. 5, 2023).
[15] https://www.ed.gov/news/press-releases/biden-harris-administration-announces-final-student-loan-pause-extension-through-december-31-and-targeted-debt-cancellation-smooth-transition-repayment (last visited Apr. 5, 2023).

21. In other words, the Department may not grant loan recipients a windfall that puts them in a *better* financial position.

43.     According to a confidential memorandum released by the Department for litigation, the Loan Cancellation Program is necessary because restarting repayments would place some student borrowers at a higher risk of delinquency and default. The Department reached this conclusion based on past recipients of natural-disaster-related forbearance experiencing higher rates of default after repayments restarted. Under Secretary James Kvall, *Pandemic-Connected Loan Cancellation* 2 (Aug. 24, 2022) (Attached as Exhibit 2). But those past forbearance recipients were placed in a worse financial position with respect to their student loan by a natural disaster—a precondition that the Department has not demonstrated for borrowers nationwide covered by the Payment-and-Interest Pause.

44.     At most, the Department's analysis suggests that, because borrowers nationwide have become accustomed to not making payments for several years, restarting payments may result in delinquency and default. In other words, the Department's own unlawful administrative extensions of the Payment-and-Interest Pause exacerbated default risks, which the Department bootstraps as justification for its unlawful Loan Cancellation Program.

45.     The Department cited the Secretary's authority under the HEROES Act to "waive or modify" certain statutory and regulatory requirements as the purported basis for the Loan Cancellation Program and published a notice in the Federal Register on October 12, 2022, invoking that authority. 87 Fed. Reg. 61,512 (Oct. 12, 2022). The same Federal Register notice also invoked the HEROES Act to justify the seventh extension of the Payment-and-Interest Pause to December 31, 2022. *Id.* at 61,514. The Department further claimed in that Federal Register notice to have relied on the HEROES Act to justify the fourth, fifth, and sixth extensions, even though the Department had not cited the HEROES Act when announcing those prior extensions on August 6, 2021, December 22, 2021, and April 6, 2022, respectively. *Id.* at 61,513–14.

46.     The Loan Cancellation Program was challenged in federal court and was enjoined and set aside before the Supreme Court granted certiorari to review that program's legality.[16] In the midst of those legal challenges, on November 22, 2022, the Department announced in a press release an eighth extension of the Payment-and-Interest Pause, until "60 days after the Department is permitted to implement the [Loan Cancellation P]rogram or the litigation is resolved."[17] The press release did not invoke the HEROES Act nor any other legal authority. Nor did the Department publish a notice in the Federal Register, which is a prerequisite for exercising the Act's "waive or modify" authority. 20 U.S.C. § 1098bb(b)(1).

47.     The Supreme Court heard oral argument on the Department's Loan Cancellation Program on February 28, 2023. During that oral argument, the Department conceded that administrative extensions of the Payment-and-Interest Pause had already cost taxpayers "over $150 billion" in cancellation of interest that would have accrued on the affected debt, which amounts to approximately $5 billion per month. *See* Oral Argument Transcript at 39, *Biden v. Nebraska*, No. 22-506 (Feb. 28, 2023) ("Transcript").[18]

48.     Also during argument, the Solicitor General represented to the Court that the Department had relied on the HEROES Act for all extensions of the Payment-and-Interest Pause, starting on March 20, 2020. *See id.* at 17; Petitioner's Brief at 8, *Biden v. Nebraska*, No. 22-506 ("In March 2020, then-Secretary of Education Betsy DeVos invoked the HEROES Act to pause repayment

---

[16] *Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022), *cert. granted before judgment*, 143 S. Ct. 477 (2022); *Brown v. U.S. Dep't of Educ.*, No. 4:22-CV-0908-P, 2022 WL 16858525 (N.D. Tex. Nov. 10, 2022), *cert. granted before judgment*, 143 S. Ct. 541 (2022).
[17] Available at: https://www.ed.gov/news/press-releases/biden-harris-administration-continues-fight-student-debt-relief-millions-borrowers-extends-student-loan-repayment-pause.
[18] Available at: https://www.supremecourt.gov/oral_arguments/argument_transcripts/2022/22-506_22p3.pdf (last visited Apr. 5, 2023).

obligations and suspend interest accrual on all such loans."). That representation was false for several reasons.

49.     As noted above, the March 20, 2020 announcement suspending monthly student loan payments and cancelling the accrual of interest for a period of at least 60 days did *not* cite the HEROES Act—nor any other legal authority. *See* supra ¶ 21. Nor did the Department publish a notice in the Federal Register, which is required to invoke the Act's "waive or modify" authority. *See* 20 U.S.C. § 1098bb(b)(1).[19]

50.     Additionally, the first extension announced in August 2020 explicitly cited economic hardship deferment under the HEA, *not* the HEROES Act, as legal authority. 85 Fed. Reg. at 49,585. The Department did *not* invoke the HEROES Act until December 2020, when it said it would "modify the terms of the benefits provided under section 3513 of the CARES Act such that they will continue to be provided to borrowers until January 31, 2021." 85 Fed. Reg. at 79,863, as corrected by 86 Fed. Reg. 5,008.

51.     The Department also did *not* invoke the HEROES Act when it announced the third, fourth, fifth, sixth, or eighth extensions. Nor did it publish notices in the Federal Register, as required to invoke the HEROES Act's "waive or modify" power, in connection with *any* of those extensions. *See* 20 U.S.C. § 1098bb(b)(1).

52.     The Solicitor General also represented to the Supreme Court that the Department's Loan Cancellation Program is a necessary precondition to ending the Payment-and-Interest Pause. *See* Oral Argument Transcript at 3, *Biden v. Nebraska*, No. 22-506 (Feb. 28, 2023). The logical implication

---

[19] Moreover, the Department has consistently claimed that it extended the Payment-and-Interest Pause by "using [the Secretary's] authority under the HEROES Act to modify the terms of the CARES Act." 87 Fed. Reg. at 61,513-14; *see also* 85 Fed. Reg. at 79,863. It was impossible to invoke the HEROES Act to modify the terms of the CARES on March 20, 2020, before Congress enacted the CARES Act on March 27, 2020.

of this claim is that, if the Supreme Court sets aside the Loan Cancellation Program, the Department will once again extend the Payment-and-Interest Pause—perhaps indefinitely.

53.     The Solicitor General also said at oral argument that no one had challenged the legality of the Department's extensions of the Payment-and-Interest Pause. Transcript at 99.

## III.    INJURY TO PLAINTIFF AND OTHER PUBLIC SERVICE EMPLOYERS

54.     Each of the Department's eight unlawful extensions of the Payment-and-Interest Pause has injured Plaintiff and other public-service employers by reducing PSLF incentives that benefit such employers in the competition to hire and retain college-educated workers. *ABA*, 370 F. Supp. 3d at 19 (finding Article III injury based on employer's loss of PSLF incentives).

### Plaintiff Benefits from PSLF Incentives

55.     Plaintiff is a nonprofit organization under § 501(c)(3) of the Internal Revenue Code, Lehman Decl. ¶ 4, and is therefore a qualified employer for the PSLF program, *see* 34 C.F.R. § 685.219(b).[20]

56.     Plaintiff competes in the labor market to recruit and retain college-educated employees for staff positions. The incentives Congress provided through the PSLF program have helped Plaintiff recruit and retain such employees. Lehman Decl. ¶ 10.

57.     Plaintiff has previously employed and currently employs borrowers who participate, may become eligible to participate, or have previously participated in the PSLF program. Plaintiff further reasonably expects to recruit other such employees in the future with the help of the incentives Congress provided it through the PSLF program. *Id.* ¶¶ 8-10.

---

[20] *See* Dep't of Educ., Search Employer Eligibility for Public Service Loan Forgiveness (PSLF), available at: https://studentaid.gov/pslf/employer-search (last visited Apr. 5, 2023).

58. Under PSLF, a borrower will have the balance of his or her federal direct loan debt forgiven after making 10 years' worth of qualified payments while working full-time at a qualifying employer. 34 C.F.R. § 685.219(c).

59. Qualifying employers include government agencies, § 501(c)(3) nonprofit entities, and other nonprofit entities that provide certain services. *Id.* § 685.219(b).

60. PSLF subsidizes qualifying employers' staff-compensation costs by providing an incentive for borrower-employees to seek and maintain employment with such employers rather than employment with non-qualifying employers. *See id.* § 685.219(a) ("The Public Service Loan Forgiveness Program is intended to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of this section.").

61. All else being equal, this incentive materially helps qualifying employers attract and retain borrower-employees who might otherwise choose higher-paying employment with non-qualifying employers in the private sector.

62. Qualifying employers, including Plaintiff, benefit from the PSLF subsidy because the effective compensation they are able to offer each eligible borrower-employee is higher than it would be otherwise. For every year during which an eligible borrower works at a qualifying employer, he or she accrues one-tenth of the service time needed for total loan forgiveness. This accrual is valued at roughly one-tenth of the amount of the total loan balance to be forgiven.

63. The greater debt the borrower-employee owes—and thus will be forgiven under PSLF—the higher his or her effective wage subsidy will be under PSLF. By design, the more outstanding debt a borrower-employee owes, the more the PSLF benefits the public-service employer.

**Cancelling the Accrual of Interest Reduces Plaintiff's PSLF Benefits**

64.     If interest continues to accrue, then a borrower's outstanding debt that will be forgiven under PSLF after ten years is greater than if interest does not accrue. The borrower therefore has greater incentive to work for a public-service employer and to have that debt forgiven under PSLF. In other words, the benefit public-service employers receive under PSLF is greater if interest continues to accrue on student debt than if interest does not accrue.

65.     Conversely, if interest stops accruing, outstanding debt that will be forgiven under PSLF is less than it otherwise would be. The financial incentive to work for a public-service employer thus falls commensurately.

66.     Each unlawful extension of the Payment-and-Interest Pause cancels the accrual of interest for the duration of that extension. The aggregate amount of cancelled interest is approximately $5 billion per month, or approximately $120 per borrower per month.[21]

67.     Every month of extension cancels a borrower's outstanding loan balance by an amount equal to the interest that would have accrued. Thirty months of cancelled interest is roughly equivalent to cancelling the average borrower's debt balance by $3,600. Because the amount of PSLF-forgivable debt is lower, the financial incentive under PSLF for the borrower to work at a public-service employer is reduced.

68.     Each month of extension thus lessens the incentive under PSLF for borrowers to work at a public-service employer, thereby making private-sector work comparatively more attractive than working for a qualified public service employer like Plaintiff.

---

[21] *See Student Loan Pause Could Cost $275 Billion*, COMM. FOR A RESPONSIBLE FED. BUDGET (Nov. 22, 2022), available at: https://www.crfb.org/blogs/student-loan-pause-could-cost-275-billion (last visited Apr. 5, 2023) ("The pause costs over $5 billion per month[.]"). This estimate significantly understates the actual cost because interest compounds over time. The cost of cancelled interest likewise compounds—cancelling $5 billion in interest accrual for one month reduces the amount of interest that would have compounded in all subsequent months.

69.     As a result, as the Defendants' unlawful administrative Payment-and-Interest Pause extensions continue to chip away, month after month, at the incentives Congress legislated though PSLF, fewer borrowers can be expected to seek employment with public-service employers, and more public-service employees can be expected to leave their jobs earlier than they otherwise would. Plaintiff and other public-service employers are suffering, and will continue to suffer, financial harm and a competitive disadvantage in the labor market due to loss of borrower-employees and reduced incentive for borrower-employees to take and keep jobs with them.

**Counting Non-Payments as Payments Reduces Plaintiff's PSLF Benefits**

70.     By counting non-payments during the Payment-and-Interest Pause toward the 120 months of payments required for PSLF loan forgiveness, *see* supra ¶ 28, the Department shortens the period that many borrowers would otherwise have to work for a public-service employer to have their loans forgiven under PSLF.

71.     A month counts towards the 120-month requirement for PSLF forgiveness only if the borrower both (1) works at a public-service employer during that month and (2) makes a monthly payment. *See* 20 U.S.C. § 1087e(m)(1)(A). Thus, the PSLF program designed by Congress envisions earning debt forgiveness in exchange for making monthly payments and working at a public-service employer.

72.     By oxymoronically allowing *non*-payments to count as monthly payments under PSLF through administrative fiat, the Department is shortening the statutory 120-month requirement for PSLF forgiveness for borrowers who make no payments during the Payment-and-Interest Pause. The period for which PSLF incentivizes these borrowers to seek work with or remained working at public-service employers like Plaintiff is thus shortened.

73. This alteration radically changes the legislative policy choices made by Congress and reduces the recruitment-and-retention benefits that PSLF confers upon public-service employers like Plaintiff.

## CLAIMS FOR RELIEF

### Count I: Violation of the Appropriations Clause in Article I § 9 of the Constitution

74. Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

75. Article I, § 9, of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations by Law." This Clause is intended "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). Accordingly, "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Id.* at 424 (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

76. Debt instruments held by the United States counts as "Money" that shall not be drawn without Congressional appropriation. Cancelling such debt is an appropriation that must be authorized by Congress.

77. Cancelling interest that would have otherwise accrued on debt owed to the Treasury is economically the same as cancelling debt equal to the amount of interest that would have accrued. Such cancellation is an expenditure that must be authorized by an appropriation from Congress.

78. In Section 3513 of the CARES Act, Congress cancelled six months of interest on student loans—but only six months—through the end of the 2020 fiscal year on September 30, 2020. Congress did not authorize any further cancellation of interest on student loans beyond that date nor appropriate any budget outlays for the subsequent fiscal years.

79.     Each of the Defendants' extensions of the period of non-accrual of interest beyond the six-month period Congress authorized violates the Appropriations Clause.

**Count II: Violation of the Property Clause in Article IV § 3 of the Constitution**

80.     The Property Clause of the Constitution provides: "The Congress shall have Power to dispose of … Property belonging to the United States." U.S. Const. article IV § 3, cl. 2.

81.     Federal student loans constitute property belonging to the United States.

82.     Only Congress has "[p]ower to release or otherwise dispose of the rights and property of the United States" and "[s]ubordinate officers of the United States are without that power, save only as it has been conferred upon them by Act of Congress or is to be implied from other powers so granted." *Royal Indem. Co. v. United States*, 313 U.S. 289, 294-95 (1941).

83.     The Secretary is a subordinate officer who has not been granted power to dispose of the United States's right to collect monthly payments on all federal student loans beyond the CARES Act's six-month period. Nor has Congress conferred on the Secretary power to dispose of the United States's right to have interest accrue on all such loans beyond that period.

84.     Each of the Defendants' extensions of the period of nonpayment and non-accrual of interest beyond the six-month period Congress authorized violates the Property Clause.

**Count III: Violation of the Vesting Clause in Article I § 1 of the Constitution**

85.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

86.     Article I, § 1, of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States." Article I, § 7 further requires legislation to be passed through bicameralism and presentment.

87.     Congress may not "abdicate or … transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). Nor may it delegate to another branch the power to modify prior legislation through a process that bypasses bicameralism and presentment. *See Clinton v. City of New York*, 524 U.S. 417, 440-41 (1998).

88.     Congress in the CARES Act created a student-loan debt-relief program with a specific end date coinciding with the end of the fiscal year: from March 27, 2020, to September 30, 2020.

89.     Amending the CARES Act to extend the statutory expiration date is a legislative function impacting the following fiscal year that is vested solely in Congress and may not lawfully be exercised by an executive agency. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("We reaffirm the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

90.     Extending a statutory end date for a debt-relief program is a legislative amendment that must be passed through bicameralism and presentment. Congress may not delegate to the Executive Branch the power to bypass that constitutionally required legislative process for modifying statutes. *See Clinton*, 524 U.S. at 440-41. Nor may the Executive Branch self-fund by extending the expiration date of a program slated to end in one fiscal year into the following fiscal year.

91.     The HEROES Act authorizes the Secretary to "waive or modify any statutory … provision applicable to the student financial assistance programs under title IV of the [HEA] … as the Secretary deems necessary in connection with a war or other military operation or national emergency." 20 U.S.C. § 1098bb(a)(1).

92.     The HEROES Act violates Article I's Vesting Clause and bicameralism-and-presentment requirement to the extent it purportedly authorizes the Secretary to replace the CARES Act's September 30, 2020, expiration date with a new date selected by the Secretary. *See Ala. Ass'n of*

*Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021) ("If a federally imposed eviction moratorium is to continue, Congress must specifically authorize it.").

93.     Additionally, Congress may grant regulatory power to an executive agency only if it provides an "intelligible principle" by which an agency can exercise it. *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).

94.     A statutory delegation lacks an intelligible principle and is thus unconstitutional if it grants an agency unfettered discretion to make policy decisions. *See Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) (finding violation of the Vesting Clause where "Congress gave the SEC the power to bring securities fraud actions for monetary penalties within the agency instead of in an Article III court whenever the SEC in its unfettered discretion decides to do so"), *petition for cert. docketed*, No. 22-859 (Mar. 9, 2023).

95.     For each extension purportedly justified under the HEROES Act, the Secretary claimed essentially unfettered discretion to extend a congressionally enacted expiration date for whatever period he or she desired, from one month (second extension), to many months (first, fourth, fifth, sixth, and seventh extensions), to an indefinite period (third extension), to a date based on the timing of a Supreme Court decision (eighth extension), all without any regard to the budget impact of these unauthorized administrative actions.

96.     This claimed unfettered discretion fails the intelligible-principle test and violates the Vesting Clause.

### Count IV: Violation of the APA—Exceeding Statutory Authority under the Major Questions Doctrine

97.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

98.     The Department is an agency subject to the requirements of the APA.

99.     Each of the eight extensions of the Payment-and-Interest Pause is a final agency action that is subject to juridical review under the APA.

100.     A court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (B), (C). Each of the eight extensions of the Payment-and-Interest Pause fits all these descriptions.

101.     "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Thus, "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

102.     The Major Questions Doctrine requires an agency to "point to clear congressional authorization for the power it claims" when asserting authority over matters of "economic and political significance." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (internal quotation marks omitted). A "colorable textual basis" is not enough. *Id.*

103.     The need for clear congressional authorization is reinforced by 31 U.S.C. § 1301(d), which state that a "law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made[.]" Officers and employees of the United States may not "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund[.]" Id. § 1341(a)(1)(A).

104.     Defendants invoked "economic hardship" deferment under the HEA to justify the first extension of the Payment-and-Interest Pause beyond the CARES Act's end date. *See* 85 Fed. Reg. at 49,585 (citing 20 U.S.C. § 1087e(f)(2)(D)).

105.     That deferment provision, however, limits deferment to borrowers whom the Secretary determines have experienced or will experience economic hardship under 20 U.S.C.

§ 1085(o), including full-time workers whose income does not exceed the greater of the federal minimum wage or 150 percent of the poverty line. The Department's regulations further define "economic hardship" to include borrowers who receive means-tested public assistance or work for the Peace Corps. 34 C.F.R. § 682.204(g).

106. Defendants, however, extended the Payment-and-Interest Pause for *all* student-loan borrowers nationwide without making any effort to determine which borrowers plausibly qualified under the HEA's narrow definition of "economic hardship." In fact, at the time, only a small minority of the 45 million student-loan borrowers were experiencing economic hardship within the meaning of the HEA.

107. The HEA did not clearly authorize the Department to pause monthly payments and halt the accrual of interest for all borrowers regardless of economic circumstances. The first extension therefore exceeded statutory authority under the Major Questions Doctrine.

108. Defendants subsequently invoked the HEROES Act to justify the second extension (from December 2020 to January 2021) and the seventh extension (from September 2022 to December 2022). 86 Fed. Reg. 5,008; 87 Fed. Reg. at 61,514.

109. The Secretary may waive or modify statutory provisions under the HEROES Act only if such waiver or modification is "necessary to ensure" that borrowers "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals" by a national emergency. 20 U.S.C. § 1098bb(a)(2)(A).

110. Any waiver or modification under this provision of the HEROES Act must be limited to "put[ting] loan recipients back into the financial position" they would have held in relation to their loans "were it not for the national emergency." OLC Memo at 21 (The Department may "only … offset that portion of the harm that has a 'relation to' the borrower's [federal] assistance").

24

111.    Defendants, however, made no showing that individuals whose interest accrual was cancelled and whose monthly payments were paused were being put back into the financial position they would have held—as opposed to a better position—in relation to their loans as they would been in but for the national emergency.

112.    The HEROES Act therefore does not authorize the Department to cancel interest and halt monthly payments for all borrowers without regard to whether and how they were economically affected by the national emergency. Even if the HEROES Act contained ambiguities that arguably authorized serial extensions of the Payment-and-Interest Pause beyond the CARES Act's congressionally enacted end date, it does not authorize such extensions where they are not "necessary to ensure" that borrowers "are not placed in a worse position financially in relation to that financial assistance."

113.    Likewise, even if the HEROES Act contained ambiguities that arguably authorized serial extensions of the Payment-and-Interest Pause beyond the CARES Act's congressionally enacted end date, the Major Questions Doctrine would require a clear authorization from Congress before reading a statute to approve an action of such vast economic and political significance, which is utterly lacking here. *See West Virginia v. EPA*, 142 S. Ct. at 2610. These extensions therefore exceeded statutory authority under the Major Questions Doctrine.

114.    Under that doctrine, Defendants may not invoke the Act's vague language to discover "an unheralded power" representing an outlandishly expensive ($5 billion per month) and "transformative expansion in [an agency's] regulatory authority." *Id.*

115.    The HEA has never before been used to pause monthly payments and cancel the accrual of interest of all borrowers regardless of their economic circumstances. Nor has the HEROES Act been used to extend a congressionally enacted end date of a debt-relief program.

116.    Neither the HEA nor the HEROES Act provides clear authority to extend the Payment-and-Interest Pause beyond the CARES Act's September 30, 2020 end date. Extensions of the pause based on those statutes are therefore unlawful under the Major Questions Doctrine and must be set aside.

117.    Defendants did not invoke any statutory authority whatsoever to implement the third, fourth, fifth, sixth, and eighth extensions of the Payment-and-Interest Pause.

118.    Those extensions are therefore without statutory authority and must be set aside.

**Count V: Violation of the APA—Arbitrary and Capricious Agency Action**

119.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

120.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

121.    Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

122.    The Department did not present relevant data nor provide a rational explanation for any of the eight extensions of the Payment-and-Interest Pause. As such, all eight extensions are arbitrary and capricious and must be set aside.

123.    Agency action also is arbitrary and capricious if the agency "failed to address whether there was 'legitimate reliance'" on the prior policy. *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1896 (2020).

124.    When canceling over $150 billion of interest that otherwise would have accrued on student debt, the Department failed to address the legitimate reliance interests of public-service employers like Plaintiff in PSLF incentives, which are directly based on the amount of forgivable debt that borrower-employees have.

125.    This failure to consider legitimate reliance interests renders all eight extensions of the Payment-and-Interest Pause arbitrary and capricious.

126.    Agency action also is arbitrary and capricious "if the agency 'failed to consider an important aspect of the problem.' This includes, of course, considering the costs and benefits[.]" *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023) (quoting *State Farm*, 463 U.S. at 43).

127.    The Department entirely failed to consider whether and how the costs of extending the Payment-and-Interest Pause for 30 months beyond its statutory expiration date—estimated to cost taxpayers $5 billion per month and $150 billion in total so far—are worth the benefits.

128.    The Department failed to recognize the $5 billion per month price tag of the Payment-and-Interest Pause until the fifth extension, announced on December 22, 2021. Press Release, Dep't of Educ. (Dec. 22, 2021).

129.    Even then, the Department framed the cost to taxpayers as a benefit: "The pause on student loan payments will help 41 million borrowers save $5 billion per month." *Id.* In other words, the Department believes transferring taxpayer funds into the pockets of relatively well-off college-educated borrowers is a benefit, not a cost. The Department could not have rationally considered costs and benefits when it utterly failed to recognize the difference between the two concepts.

130.    The Department failed to consider non-financial cost in terms of fundamental fairness. It did not consider, for example, why college graduates should receive interest-free loans with

suspended repayment obligations at consider taxpayer expense when their non-college-educated peers face greater economic challenges.

131.    All eight extensions are arbitrary and capricious and must be set aside because the Department failed to weigh the cost and benefits of those extensions.

**Count VI: Violation of the APA—Failure to Observe Procedure Required by Law**

132.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

133.    Under the APA, courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

134.    The APA requires administrative agencies to undertake notice-and-comment rulemaking when engaging in substantive decision-making. *Id.* § 533.

135.    Under notice-and-comment procedures: (1) "the agency must issue a '[g]eneral notice of proposed rule making,' ordinarily in the Federal Register"; (2) "the agency must 'give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments'"; and (3) "it must include in the final rule's test 'a concise general statement of [its] basis and purpose.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (alterations in original) (quoting 5 U.S.C. § 533). The APA also requires "publication … of a substantive rule [to] be made not less than 30 days before its effective date." 5 U.S.C. § 553(d).

136.    Additionally, the HEA requires Defendants to follow "negotiated rulemaking" procedures to "obtain the advice of and recommendations from individuals and representatives of the groups involved in student financial assistance programs" when developing regulations that affect federal student assistance. 20 U.S.C. § 1098a(a)(1).

137.    Defendants invoked economic-hardship deferment under HEA to justify the first extension (from September 30, 2020 to December 31, 2020) of the Payment-and Interest Pause.

138.    The first extension was a binding rule affecting federal student assistance. It therefore was required to follow the APA's notice-and-comment procedures and the HEA's negotiated rulemaking procedures.

139.    Defendants followed neither the notice-and-comment nor the negotiated-rulemaking requirements when they promulgated the first extension.

140.    The first extension was unlawful and should be set aside because it was agency action that failed to observe procedure required by law. 5 U.S.C. § 706(2)(D).

141.    The HEROES Act provides an exception to notice-and-comment and negotiated-rulemaking procedures when the Department exercises the Act's "waive or modify" authority under 20 U.S.C. § 1098bb(b)(1). But the Department must nonetheless "by notice in the Federal Register, publish the waivers or modifications of statutory and regulatory provisions." *Id.*

142.    The Department published a notice under the HEROES Act only for the second extension of the Payment-and-Interest Pause (from December 31, 2020 to January 31, 2021) and the seventh extension (from August 2022 to December 2022). 86 Fed. Reg. at 5,008; 87 Fed. Reg. at 61,514. The Department now claims that the third, fourth, fifth, sixth, and eighth extensions were also promulgated pursuant to the HEROES Act, but each of those extensions was announced in a press release without any notice published in the Federal Register.

143.    The third, fourth, fifth, sixth, and eighth extensions of the Payment-and-Interest Pause thus violated the requirement under the HEROES Act to publish any waiver or modification "by notice in the Federal Register." 20 U.S.C. § 1098bb(b)(1). Those extensions were unlawful and must be set aside as agency actions performed without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

## Count VII: Alterations to the PSLF Program During the Extensions Likewise Violate the Appropriations Clause, the Vesting Clause, and the APA

144.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

145.    The Department's August 21, 2020 press release announced that, during extensions of the Payment-and-Interest Pause, "[n]on-payments by borrowers working full-time for qualifying employers will count toward the 120 payments required by the Public Service Loan Forgiveness program[.]" Press Release, Dep't of Educ. (Aug. 21, 2020).

146.    Congress authorized the expenditure of funds to pay for debt forgiveness under the PSLF program only for borrowers who "ha[ve] made 120 monthly payments" on their direct loan debt. 20 U.S.C. § 1087e(m)(1)(A).

147.    By counting periods of non-payment during extensions of the Payment-and-Interest Pause toward PSLF's 120 required monthly payments, the Department would cancel the debt of borrowers who have not made 120 monthly payments as the statute requires.

148.    Such cancellation of debt exceeds the scope of congressional appropriations for the PSLF program and thus violates the Constitution's Appropriations Clause.

149.    It further violates the Constitution's Property Clause by disposing of debt assets belonging to the United States without authorization from Congress.

150.    Counting non-payments during extensions of the Payment-and-Interest Pause toward PSLF's 120 required monthly payments amounts to legislative amendment of the PSLF statute's monthly payment requirement outside of the Constitution's bicameralism-and-presentment requirements. It thus also violates the Constitution's Vesting Clause.

151.    The Department did not follow the APA's notice-and-comment and the HEA's negotiated rulemaking requirements when announcing that it would count non-payments as payments

under the PSLF program. Nor did the Department invoke the HEROES Act's exemption from those requirements. Counting non-payments as payments under the PSLF program is therefore unlawful and must be set aside as agency action performed without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

## **RELIEF REQUESTED**

**WHEREFORE,** Plaintiff respectfully requests this Court to declare Defendants' unauthorized extensions of the Payment-and-Interest Pause unconstitutional and otherwise unlawful, and to enjoin their implementation and set them aside. Specifically, Plaintiff requests this Court to find Defendants have committed the violations alleged and described above, and to issue the following:

A. A declaration that each of the eight extensions of the Payment-and-Interest Pause, including the current extension, violated and continues to violate the Appropriations, Property, and/or Vesting Clauses;

B. A declaration that none of the eight extensions of the Payment-and-Interest Pause, including the current extension, was authorized by any statute under the Major Questions Doctrine.

C. A declaration that each of the eight extensions of the Payment-and-Interest Pause, including the current extension, violated and continues to violate the APA;

D. A judgment setting aside each of the eight extensions of the Payment-and-Interest Pause, including the current extension;

E. An injunction prohibiting Defendants from issuing further extensions of the Payment-and-Interest Pause absent clear statutory authorization from Congress;

F. An injunction requiring Defendants to end the current Payment-and-Interest Pause immediately;

G. An injunction requiring Defendants to restart monthly payment obligations as required by the HEA;

H. An injunction requiring Defendants to restart the accrual of interest as required by the HEA;

I. A declaration that counting non-payments during the Payment-and-Interest Pause toward the 120 monthly payments required for PSLF debt forgiveness violates the Appropriations Clause, the Property Clause, the Vesting Clause, the Major Questions Doctrine, and the APA.

J. An injunction requiring Defendants to stop counting non-payments as payments under the PSLF statute.

K. An award of attorneys' fees and costs;

L. Any other relief as the Court deems just and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury of any triable issues.

April 6, 2023

Respectfully submitted,

/s/ Patrick J. Wright

Patrick J. Wright (Bar No. 54052)
Vice President for Legal Affairs
MACKINAC CENTER FOR PUBLIC POLICY
130 W. Main Street
Midland, MI 48640
(989) 430-3912

SHENG LI, *Admission forthcoming*
Litigation Counsel
RUSSELL G. RYAN, *Admission forthcoming*
Senior Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210
Sheng.Li@ncla.legal