**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

**Northern Division**

| | |
|---|---|
| MACKINAC CENTER FOR PUBLIC POLICY, <br><br> *Plaintiff*, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION; <br><br> MIGUEL CARDONA, Secretary, U.S. Department of Education, in his official capacity; <br><br> RICHARD CORDRAY, Chief Operating Officer of Federal Student Aid, U.S. Department of Education, in his official capacity; <br><br> *Defendants.* | CIVIL CASE NO. 1:23-cv-10795-TLL-PTM |

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff Mackinac Center for Public Policy respectfully moves for a preliminary injunction to stop Defendants' unlawful, ongoing administrative moratorium on the obligation of student-loan debtors to make monthly payments on their outstanding debt and the accrual of monthly interest on that debt. In support of this motion, Plaintiff relies on its Complaint filed in this action, the Declaration of Joseph G. Lehman attached as Exhibit 1 to the Complaint, and the brief filed with this motion. Pursuant to Local Rules 7.1 and 65.1, there was a conference in which counsel for Plaintiffs explained the nature of the motion and its legal basis to counsel for Defendants and requested but did not obtain concurrence in the relief sought.

May 11, 2023                              Respectfully submitted,

                                          /s/ Sheng Li
                                          ───────────────────────────
                                          SHENG LI
                                          Litigation Counsel
                                          RUSSELL G. RYAN
                                          Senior Litigation Counsel
                                          NEW CIVIL LIBERTIES ALLIANCE
                                          1225 19th Street NW, Suite 450
                                          Washington, DC 20036
                                          (202) 869-5210
                                          Sheng.Li@ncla.legal

                                          Patrick J. Wright
                                          Vice President for Legal Affairs
                                          MACKINAC CENTER FOR PUBLIC POLICY
                                          130 W. Main Street
                                          Midland, MI 48640
                                          (989) 430-3912

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 11, 2023, a true and correct copy of the foregoing was filed electronically through the Court's CM/ECF system, to be served on counsel for all parties by operation of the Court's electronic filing system.


<u>/s/ Sheng Li</u>
Sheng Li

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

**Northern Division**

| | |
|---|---|
| MACKINAC CENTER FOR PUBLIC POLICY, | |
| *Plaintiff*, | |
| v. | |
| U.S. DEPARTMENT OF EDUCATION; | |
| MIGUEL CARDONA, Secretary, U.S. Department of Education, in his official capacity; | CIVIL CASE NO. 1:23-cv-10795-TLL-PTM |
| RICHARD CORDRAY, Chief Operating Officer of Federal Student Aid, U.S. Department of Education, in his official capacity; | |
| *Defendants*. | |

**PLAINTIFF'S BRIEF IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

## ISSUES PRESENTED

1. Whether the Department of Education has authority to extend unilaterally a congressionally enacted student-loan debt-relief program that costs taxpayers $5 billion per month past the expiration date for that program set by Congress.

2. If yes, whether the Department of Education followed the requirements of the Administrative Procedure Act in extending the challenged debt-relief program.

3. Whether preliminary injunctive relief is appropriate to halt the Department of Education's unlawful debt-relief program.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021)

*Clinton v. City of New York*, 524 U.S. 417 (1998)

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)

*Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022), *cert. granted before judgment*, 143 S. Ct. 477 (2022)

*OPM v. Richmond*, 496 U.S. 414 (1990)

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022)

## TABLE OF CONTENTS

ISSUES PRESENTED ................................................................................................. i

CONTROLLING OR MOST APPROPRIATE AUTHORITY ..................................... ii

TABLE OF CONTENTS ........................................................................................... iii

TABLE OF AUTHORITIES ...................................................................................... iv

INTRODUCTION ..................................................................................................... 1

RELEVANT FACTS .................................................................................................. 1

    I.    THE MORATORIUM DURING THE TRUMP ADMINISTRATION ............................... 1

    II.   THE MORATORIUM DURING THE BIDEN ADMINISTRATION ................................ 4

    III.  IMPACT OF THE MORATORIUM ........................................................................ 7

PLAINTIFF'S STANDING ......................................................................................... 9

ARGUMENT ............................................................................................................ 12

    I.    PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS ......................................... 13

        A.  Extensions of the Moratorium Violate the Vesting Clause as well as Bicameralism and Presentment ............................................................... 13

        B.  Extensions of the Moratorium Violate the Constitution's Appropriations Clause ........ 15

        C.  The HEROES Act Does Not Authorize Administrative Extensions of the Moratorium ......................................................................................... 16

           1.  The Major Questions Doctrine Applies ................................................ 16

           2.  The Power to "Modify" Does Not Permit Resurrecting an Expired Debt-Relief Program ........................................................................... 18

           3.  Extensions of the Moratorium Were Not 'Necessary' .......................... 19

        D.  Repeated Extensions of the Moratorium Are Arbitrary and Capricious ...................... 20

        E.  Extensions of the Moratorium Failed to Follow Procedures Required by Law ............. 21

    II.   INJUNCTIVE RELIEF IS WARRANTED ............................................................... 22

    III.  THE SCOPE OF THE INJUNCTION SHOULD BE NATIONWIDE ............................ 23

CONCLUSION ......................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States,*
   295 U.S. 495 (1935) ............................................................................................ 14

*ABA v. U.S. Dep't of Educ.,*
   370 F. Supp. 3d 1 (D.D.C. 2019) ........................................................................ 11

*Adams v. Watson,*
   10 F.3d 915 (1st Cir. 1993) ............................................................................. 9, 11

*Ala. Ass'n of Realtors v. HHS,*
   141 S. Ct. 2485 (2021) ................................................................... 13, 16, 18, 23

*Am. Power & Light Co. v. SEC,*
   329 U.S. 90 (1946) .............................................................................................. 14

*Basicomputer Corp. v. Scott,*
   973 F.2d 507 (6th Cir. 1992) .............................................................................. 23

*Brown v. U.S. Dep't of Educ.,*
   No. 4:22-CV-0908-P, 2022 WL 16858525 (N.D. Tex. Nov. 10, 2022),
   *cert. granted before judgment,* 143 S. Ct. 541 (2022) ..................................... 6, 7

*Can. Lumber Trade All. v. United States,*
   517 F.3d 1319 (Fed. Cir. 2008) ...................................................................... 9, 25

*City of Chicago v. Barr,*
   961 F.3d 882 (7th Cir. 2020 ............................................................................... 23

*Clinton v. City of New York,*
   524 U.S. 417 (1998) ........................................................................................ 9, 14

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,*
   140 S. Ct. 1009 (2020) ........................................................................................ 12

*Commonwealth v. Biden,*
   57 F.4th 545 (6th Cir. 2023) ............................................................................... 23

*Czyzewski v. Jevic Holding Corp.,*
   137 S. Ct. 973 (2017) ............................................................................................ 9

*Dismas Charities, Inc. v. U.S. Dep't of Just.,*
   401 F.3d 666 (6th Cir. 2005) .............................................................................. 10

*E.B. v. U.S. Dep't of State,*
   583 F. Supp. 3d 58 (D.D.C. 2022) ..................................................................... 22

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) ............................................................................................ 21

*Faust v. Vilsack,*
   519 F. Supp. 3d 470 (E.D. Wis. 2021) .......................................................... 23, 24

*In re Glob. Indus. Techs., Inc.,*
    645 F.3d 201 (3d Cir. 2011) ............................................................................................. 9

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ........................................................................................................ 13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ........................................................................................................ 12

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................................................... 9, 12

*Michigan v. EPA,*
    576 U.S. 743 (2015) ........................................................................................................ 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................................... 20, 21

*Nebraska v. Biden,*
    52 F.4th 1044 (8th Cir. 2022),
    *cert. granted before judgment,* 143 S. Ct. 477 (2022) ............................................ 6, 24, 25

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012) ........................................................................................... 22

*OPM v. Richmond,*
    496 U.S. 414 (1990) ........................................................................................................ 15

*Sherley v. Sebelius,*
    610 F.3d 69 (D.C. Cir. 2010) ............................................................................................. 9

*Sw. Penn. Growth All. v. Browner,*
    144 F.3d 984 (6th Cir. 1998) ........................................................................................... 10

*Tiger Lily, LLC v. HUD,*
    5 F.4th 666 (6th Cir. 2021) .............................................................................................. 15

*United States v. Students Challenging Regul. Agency Procs.,*
    412 U.S. 669 (1973) ........................................................................................................ 12

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ........................................................................................................ 17

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ................................................................................... 13, 16, 17, 18

*Whitman v. Am. Trucking Ass'ns, Inc.,*
    531 U.S. 457 (2001) ........................................................................................................ 18

*Wilson v. Gordon,*
    822 F.3d 934 (6th Cir. 2016) ........................................................................................... 12

*Wilson v. Williams,*
    961 F.3d 829 (6th Cir. 2020) ..................................................................................... 12, 23

*Wynn v. Vilsack*,
  545 F. Supp. 3d 1271 (M.D. Fla. 2021) ................................................................. 24

*Yakus v. United States*,
  321 U.S. 414 (1944) ............................................................................................ 14

**Statutes**

20 U.S.C. § 1085 ...................................................................................................... 2

20 U.S.C. § 1087e ................................................................................................. 2, 8

20 U.S.C. § 1098a ................................................................................................... 21

5 U.S.C. § 533 ........................................................................................................ 21

5 U.S.C. § 706 .................................................................................................. 13, 20

7 U.S.C. § 1736e .................................................................................................... 15

Coronavirus Aid, Relief, and Economic Security Act,
  Pub. L. No. 116-136, 134 Stat. 281 ....................................................................... 2

Higher Education Relief Opportunities for Students Act of 2003,
  Pub. L. No. 108-76, 117 Stat. 904 ................................................................. Passim

**Other Authorities**

Alexandra Hegji, Kyle D. Shohfi & Rita R. Zota, Cong. Rsch. Serv., R47196 *Federal Student Loan Debt Cancellation: Policy Considerations* (2022) .......................................... 10

Bruce Champ, *Private Money in our Past, Present, and Future*,
  U.S. Fed. Rsrv. Bank of Cleveland (Jan. 1, 2007) ................................................ 15

Committee for a Responsible Federal Budget, *Latest Student Pause Brings Total Cost to $155 Billion* (Aug. 30, 2022) ............................................................................ Passim

*Federal Student Aid Programs*, 85 Fed. Reg. 79,856 (Dec. 11, 2020) ............... Passim

*Federal Student Aid Programs*, 86 Fed. Reg. 5,008 (Jan. 19, 2021) .................. 3, 22

*Federal Student Aid Programs*, 87 Fed. Reg. 61,512 (Oct. 12, 2022) ............... Passim

H.R. 3024, 117th Cong. (2021) ............................................................................... 2

Joe Patrice, Milbank Announces $215K Salary Scale to Kick Off The New Year, Above the Law,
  Jan. 20, 2022 ....................................................................................................... 19

Kevin M. Lewis & Edward C. Liu, Cong. Rsch. Serv., LSB10568 Version 3, *The Biden Administration Extends the Pause on Federal Student Loan Payments: Legal Considerations for Congress* (2021) ............... 17

*Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic*,
  85 Fed. Reg. 49,585 (Aug. 13, 2020) ..................................................................... 2

Office of Legal Counsel, *Use of the Heroes Act of 2003 to Cancel the Principal Amounts of Student Loans*,
  2022 WL 3975075 (Aug. 23, 2022) ...................................................................... 19

Oral Argument Transcript, *Biden v. Nebraska*, No. 22-506 (Feb. 28, 2023) ........... 7, 8

*Pausing Federal Student Loan Payments*, White House (Jan. 20, 2021) ..................................................... 4

Press Release, Dep't of Educ., (Mar. 20, 2020) .............................................................................. 1

Press Release, Dep't of Educ., (Aug. 21, 2020) .................................................................... 2, 4, 13

Press Release, Dep't of Educ., (Dec. 4, 2020) .................................................................... 3, 13, 15

Press Release, Dep't of Educ., (Jan. 21, 2020) ............................................................... 4, 6, 13, 15

Press Release, Dep't of Educ., (Aug. 6, 2021) ....................................................................... 4, 6, 13

Press Release, Dep't of Educ., (Dec. 22, 2021) ................................................................... 5, 6, 7, 13

Press Release, Dep't of Educ., (Apr. 6, 2022) ....................................................................... 5, 6, 13

Press Release, Dep't of Educ., (Aug. 24, 2022) ........................................................................ 5, 13

Press Release, Dep't of Educ., (Nov. 22, 2022) ........................................................... 6, 13, 21, 22

Sarah Turner, *Student loan pause has benefited affluent borrowers the most, others may struggle when payments resume*, Brookings Institute (Apr. 13, 2023) ...................................................................... 8, 21

Staci Zaretsky, *The Biglaw Salary Wars Increased First-Year Associate Salaries Across the Legal Profession*, Above the Law (May 10, 2023) ...................................................................................................... 19

*Statement by President Biden Extending the Pause on Student Loan Repayment Through August 31st, 2022*, White House (Apr. 6, 2022) ........................................................................................................ 5

*Statement by President Joe Biden Extending the Pause on Student Loan Repayment an Additional 90 Days*, White House (Dec. 22, 2021) ....................................................................................................... 5

*Statement by President Joe Biden Extending the Pause on Student Loan Repayment*, White House (Aug. 6, 2021) ............................................................................................................................... 4

Susan Hoffman, Politics and Banking: Ideas, Public Policy, and the Creation of Financial Institutions (2001) ......................................................................................................................... 15

**Regulations**

34 C.F.R. § 682.210 ................................................................................................................. 2

34 C.F.R. § 685.204 ................................................................................................................. 2

**Constitutional Provisions**

U.S. Const. art. I, § 1 ............................................................................................................ 14

U.S. Const. art. I, § 9 ............................................................................................................ 15

## INTRODUCTION

Plaintiff Mackinac Center for Public Policy respectfully moves for a preliminary injunction to stop Defendants' unlawful, ongoing administrative moratorium on the obligation of student-loan debtors to make monthly payments on their outstanding debt and the accrual of monthly interest on that debt (hereinafter referred to as the "Moratorium"). The Moratorium has been wiping out $5 billion of assets owned by the United States every month for the past 32 months without any statutory authorization or appropriation, at a cumulative cost to taxpayers of $160 billion and counting.

Plaintiff is likely to succeed on the merits of its claims that the Moratorium violates the Constitution, misconstrues and misapplies Defendants' statutory authority, and flouts the Administrative Procedure Act ("APA"). Unless enjoined, Defendants will continue to inflict irreparable harm not only on Plaintiff but also on many other nonprofit organizations. Especially because the Moratorium mostly benefits high-income earners, the public interest and balance of hardships tip decidedly in favor of halting this unlawful giveaway immediately while the Court considers the merits of the case.

## RELEVANT FACTS

### I.   THE MORATORIUM DURING THE TRUMP ADMINISTRATION

On March 20, 2020, near the outset of the Covid-19 pandemic in the United States, Defendant Department of Education ("Department") announced in a press release that it would set interest rates on all federal student loans at zero percent for "a period of at least 60 days" and would suspend all borrowers' repayment obligations "for at least two months." Press Release, U.S. Dep't of Educ. (Mar. 20, 2020) (Exhibit 1).

The Department did not cite any statutory or other legal authority for this unprecedented, unilateral administrative action. However, events quickly overtook this press release on March 27, 2020, when Congress enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act,

Pub. L. No. 116-136, 134 Stat. 281 (2020). Section 3513 of that Act instructed the Department to "suspend all payments" for federal student loans until September 30, 2020, and it provided that "interest shall not accrue" on such loans during that sixth-month period. *Id.* § 3513(a)–(b). Despite the introduction of bills seeking to do so, *see, e.g.*, H.R. 3024, 117th Cong (2021), Congress has never extended this statutory non-payment and zero-interest-rate period beyond the September 30, 2020 expiration date.

Apparently dissatisfied with our elected lawmakers' inaction, the Department implemented and repeatedly extended the Moratorium by administrative fiat. In all, the Moratorium and its serial extensions have effectively extended Congress's six-month suspension of student-loan payment obligations and interest accrual for an additional 32 months and counting—more than five times the length of the suspension Congress legislated to expire September 30, 2020. The Department has shifted among different purported legal bases for these extensions and, for some extensions, has failed to invoke any legal basis at all.

The first extension came in August 2020, when President Trump ordered the Department to extend the statutory suspension period through December 31, 2020. *Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic*, 85 Fed. Reg. 49,585 (Aug. 13, 2020). According to President Trump, this extension was authorized as "economic hardship deferments" under section 455(f)(2)(D) of the Higher Education Act of 1965 ("HEA"). *Ibid.* But that provision authorizes economic-hardship deferment only for extremely low earners, such as minimum-wage workers, *see* 20 U.S.C. §§ 1085(o)(1), 1087e(f)(2)(D); *and* 34 C.F.R. §§ 682.210(s)(6), 685.204(g)(2). Despite that disconnect, the Department complied with Trump's order and broadly suspended payment obligations and interest accrual for *all* student-loan borrowers through December 31, 2020. Press Release, Dep't of Educ. (Aug. 21, 2020) (Exhibit 2).

2

On December 4, 2020, the Department announced a second administrative extension from December 31, 2020, to January 31, 2021. Press Release, Dep't of Educ. (Dec. 4, 2020) (Exhibit 3). The Department forthrightly acknowledged at the time that "Congress, not the Executive Branch, is in charge of student loan policy," but declared that another short extension would "allow[] Congress to do its job and determine what measures it believes are necessary and appropriate." *Ibid.* On December 11, 2020, the Department published notice of this second extension in the Federal Register, invoking as purported statutory authority the Higher Education Relief Opportunities for Students ("HEROES") Act of 2003, Pub. L. No. 108-76, 117 Stat. 904. *See* 85 Fed. Reg. 79,856, 79,863 (Dec. 11, 2020); *as corrected,* 86 Fed. Reg. 5,008 (Jan. 19, 2021).

There were at least two problems with the Department's reliance on the HEROES Act. First, although the Act permits the Secretary of Education ("Secretary") to "waive or modify any statutory or regulatory provision applicable to the student financial assistance … in connection with a war or other military operation or national emergency," 20 U.S.C. § 1098bb(a)(1), any waiver or modification must be "necessary to ensure" beneficiaries "are not placed in a worse financial position in relation to [their loans] because of their status as affected individuals," *id.* § 1098bb(a)(2). The Secretary cited the Covid-19 pandemic as the "national emergency" but made no finding that all student-loan borrowers—or even most of them—were (or would be) in a worse financial position in relation to their loans as a result of the pandemic. Yet the Secretary applied the Moratorium to all borrowers.

Second, the December 2020 Federal Register notice claimed that both the Department's initial administrative payment-and-interest suspension in March 2020 and its first administrative extension of the CARES Act's suspension in August 2020 had also been predicated on the HEROES Act. 85 Fed. Reg. 79,857. But the Department had not even mentioned the HEROES Act in connection with either of those prior administrative actions. As noted above, the Department had cited no statutory basis for the initial suspension in March 2020, and it had cited the Higher Education Act—*not the*

3

HEROES Act—as purported authority for extending the statutory suspension in August 2020. *See* 85 Fed. Reg. 49,585; *see also* Ex. 2.

## II.    THE MORATORIUM DURING THE BIDEN ADMINISTRATION

Upon taking office on January 20, 2021, President Biden announced a third extension of the Moratorium, this time for an unspecified, indefinite period. *Pausing Federal Student Loan Payments*, White House (Jan. 20, 2021).[1] He did not cite the HEROES Act (or any other statute) as purported legal authority, nor did he explain how this extension could plausibly satisfy the statutory preconditions for the Secretary to exercise "waiver or modify" authority under the HEROES Act. In fact, the White House's announcement of this extension consisted of only three sentences, which the Department's press release confirming the extension parroted without elaboration. *See* Press Release, Dep't of Educ. (Jan. 21, 2021) (Exhibit 4).[2] No formal required notice was published in the Federal Register.

On August 6, 2021, President Biden announced that the Moratorium should finally end but that, to "ensure a smoother transition that minimizes loan defaults and delinquencies," he would extend it for a fourth and purportedly "final" time until January 31, 2022. *Statement by President Joe Biden Extending the Pause on Student Loan Repayment*, White House (Aug. 6, 2021).[3] The Department confirmed this extension in a press release that again identified no statutory authority. Press Release, Dep't of Educ. (Aug. 6, 2021) (Exhibit 5). The Department published no required Federal Register notice again.

Despite claiming that the fourth extension would be the "final" one, President Biden announced on December 22, 2021, that the Moratorium would be extended a fifth time until May 1,

---

[1]    Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/pausing-federal-student-loan-payments/ (last visited May 8, 2023).

[2] "At the request of President Biden, the Acting Secretary of Education will extend the pause on federal student loan payments and collections and keep the interest rate at 0%. Too many Americans are struggling to pay for basic necessities and to provide for their families. They should not be forced to choose between paying their student loans and putting food on the table."

[3] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/06/statement-by-president-joe-biden-extending-the-pause-on-student-loan-repayment/ (last visited May 8, 2023).

2022. *Statement by President Joe Biden Extending the Pause on Student Loan Repayment an Additional 90 Days*, White House (Dec. 22, 2021).[4] He claimed, without citing any data, that "millions of [student-loan borrowers] are still coping with the impacts of the pandemic." *Ibid.* The Department confirmed the fifth extension in a press release that neither identified statutory authority nor cited supporting data. Press Release, Dep't of Educ. (Dec. 22, 2021) (Exhibit 6). Neither the President's announcement nor the Department's press release cited the HEROES Act (nor any other statute) as purported legal authority. Yet again, the Department failed to publish the required Federal Register notice.

On April 6, 2022, President Biden announced a sixth extension of the of the Moratorium until August 31, 2022. *Statement by President Biden Extending the Pause on Student Loan Repayment Through August 31st, 2022*, White House (Apr. 6, 2022).[5] He claimed that "[i]f loan payments were to resume on schedule in May, analysis of recent data from the Federal Reserve suggests that millions of student loan borrowers would face significant economic hardship." *Ibid.* The President did not specify what Federal Reserve data he was referring to. The Department's press release confirming this sixth extension did not mention any Federal Reserve data. Press Release, Dep't of Educ. (Apr. 6, 2022) (Exhibit 7). It did not identify any legal authority, nor publish the required Federal Register notice.

On August 24, 2022, the Department announced a second "final extension" of the Moratorium—the seventh overall—until December 31, 2022. Press Release, Dep't of Educ. (Aug. 24, 2022) (Exhibit 8). This seventh unlawful extension was accompanied by a further announcement that the Department would also cancel up to $10,000 or $20,000 of debt for approximately 40 million borrowers through a program referred to hereinafter as the "Loan Cancellation Program." *Ibid.*

---

[4] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/22/statement-by-president-joe-biden-extending-the-pause-on-student-loan-repayment-an-additional-90-days/ (last visited May 8, 2023).
[5] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2022/04/06/statement-by-president-biden-extending-the-pause-on-student-loan-repayment-through-august-31st-2022/ (last visited May 8, 2023).

This time the Department published the required Federal Register notice on October 12, 2022, albeit over a month *after* the seventh extension had already taken effect. 87 Fed. Reg. 61,512 (Oct. 12, 2022). It invoked the HEROES Act to justify the seventh extension of the Moratorium to December 31, 2022. The Department further claimed in that Federal Register notice to have previously relied on the HEROES Act for the already-expired third, fourth, fifth, and sixth extensions, *id.* at 61,513-14, even though the Department had not invoked that Act when announcing those prior extensions in January 2021, August 2021, December 2021, and April 2022, respectively, *see* Ex. 4-7, and had not published any Federal Register notices as required by the HEROES Act, *see* 20 U.S.C. § 1098bb(b)(1).

Several States and other litigants soon challenged the Loan Cancellation Program in various federal courts, and the program was enjoined and set aside before the Supreme Court granted certiorari to review its legality.[6] In the midst of those challenges, on November 22, 2022, the Department announced in a press release an eighth extension of the Moratorium, until "60 days after … the litigation [over the Loan Cancellation Program] is resolved" or 60 days after June 30, 2023. Press Release, Dep't of Educ. (Nov. 22, 2022) (Exhibit 9). The press release did not cite the HEROES Act nor any other legal authority, and the Department did not publish the required Federal Register notice.

In total, the Department has extended the Moratorium eight times for a total of 32 months and counting. The following chart summarizes these extensions and their shifting legal justifications.

|  | Date Announced | Period of Extension | Contemporaneously Cited Statutory Authority (with date) | Retroactively Cited Statutory Authority (with date) |
|---|---|---|---|---|
| **First** | Aug. 21, 2020 | Dec. 31, 2020 | HEA (Aug. 13, 2020) | HEROES Act (Dec. 11, 2020) |
| **Second** | Dec. 4, 2020 | Jan. 31, 2021 | HEROES Act (Dec. 11, 2020) | N/A |
| **Third** | Jan. 20, 2021 | Indefinite | None | HEROES Act (Oct. 12, 2022) |
| **Fourth** | Aug. 6, 2021 | Dec. 31, 2021 | None | HEROES Act (Oct. 12, 2022) |
| **Fifth** | Dec. 22, 2021 | May 6, 2022 | None | HEROES Act (Oct. 12, 2022) |
| **Sixth** | Apr. 6, 2022 | Aug. 31, 2022 | None | HEROES Act (Oct. 12, 2022) |
| **Seventh** | Aug. 24, 2022 | Dec. 31, 2022 | None | HEROES Act (Oct. 12, 2022) |
| **Eighth** | Nov. 22, 2022 | Aug. 29, 2023 | None | None |

---

[6] *Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022), *cert. granted before judgment*, 143 S. Ct. 477 (2022); *Brown v. U.S. Dep't of Educ.*, No. 4:22-CV-0908-P, 2022 WL 16858525 (N.D. Tex. Nov. 10, 2022), *cert. granted before judgment*, 143 S. Ct. 541 (2022). These pending cases do not address the Moratorium's legality.

There is no reason to believe the current extension is the final one, as Defendants have already twice renewed purportedly "final" extensions. The Department recently told the Supreme Court that the Loan Cancellation Program is a necessary precondition to ending the Moratorium, asserting that "if that forbearance ends without [the Loan Cancellation Program] … defaults and delinquencies will surge[.]" *See* Oral Argument Transcript at 3, *Biden v. Nebraska*, No. 22-506 (Feb. 28, 2023).[7] The logical implication of that claim is that, if the Supreme Court invalidates the Loan Cancellation Program, the Department will once again extend the Moratorium.[8]

### III.    IMPACT OF THE MORATORIUM

Continuation of the Moratorium costs taxpayers approximately $5 billion per month. *See* Committee for a Responsible Federal Budget, *Latest Student Pause Brings Total Cost to $155 Billion* (Aug. 30, 2022) ("CRFB Analysis").[9] Most of this amount is due to cancelled interest. By keeping student-loan interest rates at zero for the past 32 months (even while prime interest rates rose), the Department has unlawfully cancelled debt owed by every student-loan borrower to the U.S. Treasury in an amount equal to the interest that would have accrued over those 32 months. *Ibid.* A smaller portion of the overall cost to taxpayers is due to deferring all payment obligations during an inflationary period—a dollar repaid today is worth less than when Defendants first extended the Moratorium. *Ibid.*

Defendants concede that the Moratorium has enabled borrowers to "save $5 billion per month" in debt that would otherwise be payable to the U.S. Treasury, Ex. 6, for a total cost of "over

---

[7] Available at: https://www.supremecourt.gov/oral_arguments/argument_transcripts/2022/22-506_22p3.pdf (last visited May 8, 2023).

[8] While the Covid-19 emergency declaration ended on May 11, 2023, Defendants have consistently maintained that their HEROES Act authority to enact debt-relief programs does not depend on the continuation of the national emergency because they may invoke the Act to address Covid-19's aftereffects. *See, e.g.*, *Brown*, 2022 WL 16858525, at *13 ("Defendants contend that in ten years, they could still use the HEROES Act to forgive student-loan debt because of the COVID-19 pandemic if the Secretary deems it 'necessary.'").

[9] Available at: https://www.crfb.org/blogs/latest-student-loan-payment-pause-brings-total-cost-155-billion (last visited May 8, 2023).

$150 billion" as of February 28, 2022. Oral Argument Transcript at 39, *supra*. Two months later, that price tag has risen to at least $160 billion—more than $1,000 per U.S. taxpayer.[10] Moreover, this debt cancellation is extremely regressive because it benefits the most affluent segment of college-educated Americans. The Brookings Institute has concluded that "[t]he payment pause especially benefits high-income households because they tend to have larger student loan balances—and therefore higher payments." Sarah Turner, *Student loan pause has benefited affluent borrowers the most, others may struggle when payments resume*, Brookings Institute (Apr. 13, 2023) ("Brookings Analysis").[11] CRFB estimated in August 2022 that "a typical recent medical school graduate will effectively receive nearly $68,000 of forgiven debt through December [2022]" and "a recent law school graduate will get $41,500 of forgiveness" as a result of the continuing Moratorium. CRFB Analysis. By contrast, "someone who just completed an associate's degree will receive $4,500, and individuals who did not complete their undergraduate degree will get $2,500." *Ibid*. Of course, Americans who did not attend college—and those who either have already paid off their student loans or used personal savings instead of borrowing to pay for their education—receive nothing, yet must foot the bill as taxpayers.

Lowering student-loan debt through the obligation-free Moratorium also undermines congressionally-enacted debt forgiveness programs that incentivize borrowers to take certain jobs. Most relevant here is the Public Service Loan Forgiveness ("PSLF") program, which Congress enacted in 2007 to provide strong incentives for borrowers to seek and maintain employment with qualifying public-service employers, including § 501(c)(3) nonprofit organizations like Plaintiff. 20 U.S.C. § 1087e(m). PSLF does this by promising student-loan borrowers that their outstanding loan balances will be completely discharged after they make 120 monthly payments (10 years) while working full-

---

[10] There are approximately 157 million taxpayers. Tax Foundation, Summary of Latest Federal Income Tax Data, 2023 update (Jan. 26, 2023), available at: https://taxfoundation.org/summary-latest-federal-income-tax-data-2023-update/ (last visited May 8, 2023).
[11] Available at: https://www.brookings.edu/2023/04/13/student-loan-pause-has-benefitted-affluent-borrowers-the-most-others-may-struggle-when-payments-resume/amp/ (last visited May 8, 2023).

time at qualifying public-service employers like Plaintiff. *Ibid.* The more student-loan debt a borrower has, the stronger the PSLF incentive to take and stay in a public-service job. Conversely, lowering a borrower's debt weakens this PSLF incentive. For example, because the Moratorium has cancelled over $40,000 of debt for a typical recent law school graduate, *see* CRFB Analysis, the PSLF incentive for that graduate to work in a public-service job has fallen by more than $40,000 commensurately.

## PLAINTIFF'S STANDING

To establish Article III standing, a plaintiff must plead: (1) an injury in fact; (2) that is fairly traceable to the challenged action of defendants; and (3) will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Financial harms, no matter how minor, constitute injuries-in-fact. *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017). The Supreme Court "routinely recognizes probable economic injury resulting from [governmental actions] that alter competitive conditions as sufficient [for Article III standing.]" *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (quoting 3 K. Davis & R. Pierce, Administrative Law Treatise 13–14 (3d ed. 1994) (alterations in original)).

Under the well-established doctrine of competitive standing, an injury-in-fact occurs when a party's "position in the relevant marketplace would be affected adversely by the challenged governmental action." *Adams v. Watson*, 10 F.3d 915, 922 (1st Cir. 1993); *accord In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 213 (3d Cir. 2011); *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010); *Can. Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008). There is no need to conduct empirical analysis to measure the adverse effect. *Id.* at 1333. Rather, a party need establish only that it is more likely than not that it will be injured by the challenged government action and may "fairly employ economic logic toward that end." *Ibid.* "Indeed, most 'competitor standing' cases depend on … [using] core economic postulates" to predict the impact of government action on third-party behavior. *Adams*, 10 F.3d at 923.

9

The Sixth Circuit recognizes "economic disadvantage" as injury-in-fact, *Sw. Penn. Growth All. v. Browner*, 144 F.3d 984, 988 (6th Cir. 1998), and has even warned that "the absence of competitor standing may render [unlawful] agency actions effectively immune from judicial review." *Dismas Charities, Inc. v. U.S. Dep't of Just.*, 401 F.3d 666, 677 (6th Cir. 2005). In *Browner*, a Pennsylvania manufacturing association challenged an agency's environmental designation that resulted in lower environmental-compliance costs for businesses in Ohio. 144 F.3d at 988. The court concluded that reduced compliance costs gave Ohio companies "an economic advantage over [their] neighbors in southwestern Pennsylvania," which necessarily means a Pennsylvania manufacturer "suffers an economic disadvantage compared to its Ohio neighbor. This economic disadvantage is an 'injury in fact' directly caused by the [agency]'s decision." *Ibid.* Here, the Moratorium is inflicting economic disadvantage on Plaintiff and other public-service employers when competing against private-sector competitors in the labor market for college-educated workers.

Plaintiff is a nonprofit employer that competes against private-sector employers in the labor market for employees who graduate from law school, graduate school, and four-year colleges.[12] Approximately 45 million Americans have student-loan debt,[13] which can be forgiven in its entirety under PSLF after working for ten years at a nonprofit employer like Plaintiff. There is no comparable promise of debt forgiveness for private-sector work. By offering PSLF incentives to student-loan borrowers in the job market, Congress purposefully gave public-service employers like Plaintiff a competitive advantage over private-sector employers in recruiting and retaining educated workers. Put another way, PSLF "promotes the interests of public service employers by providing significant

---

[12] Plaintiff has 36 employees who have at least a 4-year degree. Of these, 10 have graduate degrees and 5 have law degrees. *See Staff*, Mackinac Center for Public Policy, https://www.mackinac.org/about/staff (last visited May 8, 2023).

[13] *See* Alexandra Hegji, Kyle D. Shohfi & Rita R. Zota, Cong. Rsch. Serv., R47196 *Federal Student Loan Debt Cancellation: Policy Considerations* 1 (2022).

financial subsidies to the borrowers they hire on the condition they remain employed in public service," thereby "increasing recruitment and lowering labor costs" for those employers. *ABA v. Dep't of Educ.*, 370 F. Supp. 3d 1, 19 (D.D.C. 2019). Government actions that take away these PSLF subsidies necessarily injure public-service employers like Plaintiff by increasing their labor costs and undermining recruitment. *Ibid.* (holding nonprofit employer has standing to challenge regulation taking away its PSLF subsidy). That is precisely what the Moratorium has done and continues to do.

The magnitude of the PSLF subsidy benefiting nonprofit employers varies based on the amount that would be eventually forgiven for each borrower-employee. The more PSLF-forgivable debt the borrower-employee has, the greater the subsidy. *Any* reduction in the borrower-employee's debt level reduces the subsidy at least a little bit. The Moratorium has reduced student-debt by $160 billion thus far (and counting). On average, this amounts to approximately $3,500 in canceled debt for each student-loan borrower. Advanced degree holders who tend to take on greater debt benefit the most, with recent law school graduates receiving over $40,000 in cancellation. *See* CRFB Analysis. Such cancellation reduces the PSLF subsidy for a law school graduate to work at a public-service employer like Plaintiff by $40,000, which is $4,000 per year over PSLF's ten-year service requirement. Plaintiff must either make up that annual $4,000 shortfall by offering additional compensation or benefits of equivalent value, or else be less competitive in attracting law school graduates in comparison to private-sector employers. Such increases to Plaintiff's labor costs as compared to private-sector competitors causes competitive injury. *Browner*, 144 F.3d 984, 988 (finding competitive injury in agency action that caused plaintiff to face higher environmental-compliance cost than competitors). With each passing month, this injury grows as the Moratorium further erodes PSLF subsidies by erasing another $5 billion of student-loan debt.

That many public-service employers share Plaintiff's competitive injury does not reduce it nor otherwise affect Plaintiff's standing. *Adams*, 10 F.3d at 924 ("[T]he Commissioner cannot carry the

day on the claim that appellants' injury-in-fact is shared with so large a class (all out-of-state producers selling to Massachusetts dealers) that their respective shares of the aggregate injury will be minimal."). "To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *United States v. SCRAP*, 412 U.S. 669, 687 (1973).

In addition to suffering a competitive economic injury, Plaintiff also satisfies the traceability and redressability elements of Article III standing. *See Lujan*, 504 U.S. at 560-61. An injury is "fairly traceable" to a challenged action so long as the action is a but-for cause of the injury. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct."). The but-for causation standard is easily satisfied whenever, as here, "but for the defendant's unlawful conduct, [Plaintiff's] alleged injury would not have occurred." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). A favorable decision would also redress Plaintiff's injury. Plaintiff's competitive injury is traceable—through basic economic principles courts have repeatedly embraced—to the extension of the Moratorium. A declaration that Defendants' extensions are unlawful and an injunction against continuing them would redress that injury. Plaintiff therefore satisfies all three elements of Article III standing.

## ARGUMENT

Courts balance four factors in deciding whether to issue a preliminary injunction: (1) whether the movant is likely to succeed on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the injunction would harm others; and (4) whether the injunction serves the public interest. *Wilson v. Gordon*, 822 F.3d 934, 952 (6th Cir. 2016). The harm-to-others and public-interest factors "merge when the Government is the opposing party." *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) (citation omitted). These factors all favor injunctive relief in this case.

## I.     PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS

"[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). When the Executive claims "sweeping and consequential authority," a "colorable textual basis" in statute is insufficient; rather, the Executive must point to "clear congressional authorization." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). The APA directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction [or] authority," or "without observance of procedures required by law." 5 U.S.C. § 706(2). Because the unlawful extensions of the Moratorium fit all these descriptions, Plaintiff is likely to succeed on the merits.

### A.     Extensions of the Moratorium Violate the Vesting Clause as well as Bicameralism and Presentment

Section 3513 of the CARES Act enacted a six-month suspension of student-loan payment obligations and interest accrual that ended on September 30, 2020. Defendants have repeatedly and unlawfully extended that statutory expiration date—first to December 2020, then to January 2021, then to an indefinite date, then to December 2021, then to May 2022, then to August 2022, then to December 2022, and most recently to 60 days after a Supreme Court decision. *See* Ex. 2-9.

Federal courts have already been down this road under a different provision of the CARES Act that imposed a 120-day nationwide eviction moratorium for federally subsidized properties. *See Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021). When that statutory moratorium expired in July 2020, the Centers for Disease Control and Prevention ("CDC") repeatedly and unlawfully extended that moratorium by administrative fiat—first to December 2020, then to March 2021, then to June 2021, then to July 2021, and then to October 2021. *Id.* at 2486-87. The Supreme Court eventually declared these extensions unlawful: "If a federally imposed eviction moratorium is to continue, Congress must specifically authorize it." *Id.* at 2490. The extensions of the Moratorium on student-

13

loan payment obligations and interest accrual are even more clearly unlawful because Defendants explicitly admit to having rewritten the CARES Act's September 2020 expiration date. 87 Fed. Reg. 61,513 ("[T]he Secretary [used] his authority under the HEROES Act to extend the benefits provided under section 3513 of the CARES Act[.]").

Such legislative amendment by administrative fiat clearly violates Article I, § 1, of the Constitution, which provides: "All legislative Powers herein granted shall be vested in a Congress of the United States." Congress may not "abdicate or … transfer to others the essential legislative functions with which it is thus vested," *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). So, neither the HEROES Act nor any other statute allows Defendants to rewrite a statutory expiration date. In *Clinton*, the Supreme Court rejected the President's authority under the Line-Item Veto Act to cancel certain types of statutory "provisions that have been signed into law" because the effect of cancellation was to "amend[] … Acts of Congress." 524 U.S. at 436-38. Such amendment must "accord with a single, finely wrought and exhaustively considered, procedure," namely bicameralism and presentment. *Id.* at 439-40. Defendants' rewriting of Section 3513 likewise bypasses that procedure and is therefore unconstitutional.

*Clinton* found it unnecessary to consider whether an "intelligible principle" guided the Line-Item Veto's delegation because bypassing bicameralism and presentment is *per se* unconstitutional. 524 U.S. at 448. But even if the intelligible-principle test were applied, Defendants' reliance on the HEROES Act would fail. That test requires delegations of regulatory power to be bounded by objective and judicially administrable standards. *Yakus v. United States*, 321 U.S. 414, 426 (1944) (delegation would be unconstitutional if "it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed"); *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946) (delegation must allow "the courts to test" whether agency is following Congress's instruction). But the HEROES Act provides no administrable standard to guide the Secretary's discretion over

14

whether and when to "waive or modify" a statute during a national emergency. And when he decides in his apparently unreviewable discretion to act, he need not follow any objective, judicially administrable standard. The Department initially claimed power under the HEROES Act in December 2020 to extend the statutory expiration date for the suspension of payment obligations and interest accrual by just one month to "allow[] Congress to do its job." Ex. 3. One month later it claimed power to extend the suspension indefinitely. Ex. 4. Such "unfettered power" fails the intelligible-principle test. *Tiger Lily, LLC v. HUD*, 5 F.4th 666, 672 (6th Cir. 2021).

**B.    Extensions of the Moratorium Violate the Constitution's Appropriations Clause**

Article I, § 9 of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations by Law." This Clause ensures "that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *OPM v. Richmond*, 496 U.S. 414, 428 (1990). Congress's exclusive power of the purse is not limited to control over cash but also includes other monetary assets such as debt instruments held by the United States. *See, e.g.,* 7 U.S.C. § 1736e(c) (limiting President's power to forgive principal and interest on foreign debt to amount Congress specifically appropriated). Indeed, any distinction between cash and debt instruments for the purposes of the Appropriations Clause is illusory because money in the early Republic consisted of debt instruments, such as bank notes.[14]

Congress's decision to suspend payments and interest accrual on government-held student-loan debt for six months was an exercise of its exclusive power of the purse, and it was done via

---

[14] *See* Susan Hoffman, Politics and Banking: Ideas, Public Policy, and the Creation of Financial Institutions 75-76 (2001); Bruce Champ, *Private Money in our Past, Present, and Future*, U.S. Fed. Rsrv. Bank of Cleveland (Jan. 1, 2007), available at: https://www.clevelandfed.org/publications/economic-commentary/2007/ec-20070101-private-money-in-our-past-present-and-future. ("In the 1800s, for example, much of the country's paper currency consisted of notes issued by private banks.").

bicameralism and presentment. Congress only authorized the expenditure of funds to pay for a six-month debt-relief program—approximately $30 billion—and not a penny more. Every additional month of the Moratorium has resulted in unlawful cancellation of approximately $5 billion of debt owed to the U.S. Treasury. And it must end.

### C.    The HEROES Act Does Not Authorize Administrative Extensions of the Moratorium

The Court should "hold unlawful and set aside" the Moratorium because it exceeds Defendants' statutory authority. 5 U.S.C. § 706(2)(C). The Major Questions Doctrine applies because Defendants' claimed power under the HEROES Act to indefinitely suspend payments and cancel interest for all borrowers is a matter of immense economic and political significance, a novel invocation of a 20-year-old statute, and a transformative assertion of power beyond their institutional expertise. Such arrogation of power "counsels skepticism" toward the Defendants' action, and there is no "clear congressional authorization" for the extensions. *West Virginia*, 142 S. Ct. at 2614.

#### 1.    *The Major Questions Doctrine Applies*

The Major Questions Doctrine prohibits agencies from addressing issues of "vast economic and political significance" without explicit congressional authorization. *West Virginia*, 142 S. Ct. at 2605. In such cases, "both separation of powers principles and a practical understanding of legislative intent" provide "reason to hesitate before concluding that Congress meant to confer" sweeping agency authority—even where such "regulatory assertions have a colorable textual basis." *Id.* at 2608-09 (cleaned up). In other words, courts must "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 2609 (cleaned up).

Suspending student-loan payments and outright cancelling interest for all borrowers is a power of "vast economic and political significance." *Id.* at 2605. The $60 billion annual cost marks the ongoing Moratorium as a matter of vast economic significance. *See Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (finding $50 billion to be economically significant). The political significance of the Moratorium

16

is likewise undeniable because student-loan relief "has been the subject of an earnest and profound debate across the country." *West Virginia*, 142 S. Ct. at 2614. An Act of Congress in March 2020 authorized the original six-month suspension of payment obligations and interest accrual, which suggests Congress itself views this kind of decision as one for it to make. Congress has since "conspicuously and repeatedly declined to enact" new student-loan relief. *Id.* at 2610. The Moratorium also falls outside of Defendants' "policy expertise." *Id.* at 2612. The agency is not equipped to "balanc[e] the many vital considerations of national policy implicated" when forgiving $60 billion per year in debt owed to the U.S. Treasury, including the impact on inflation, on the national debt, and the fairness of concentrating benefits in the highest earning households. *Ibid.*

In the past, the Department "generally invoked the HEROES Act relatively narrowly to grant relief to limited subsets of borrowers, such as deployed military service members[.]" Kevin M. Lewis & Edward C. Liu, LSB10568 Version 3, Cong. Rsch. Serv., *The Biden Administration Extends the Pause on Federal Student Loan Payments: Legal Considerations for Congress* 2-3 (2021). By contrast, Defendants now claim authority to grant all borrowers categorical debt relief at the tremendous cost of $60 billion per year. Recasting the HEROES Act from a statute permitting limited modifications for targeted groups (primarily those serving in the military during wartime) to one that can suspend payments and cancel interest for all 45 million borrowers is a change so significant as to "effect[] a fundamental revision of the statute, changing it from one sort of scheme … into an entirely different kind." *West Virginia*, 142 S. Ct. at 2596 (cleaned up). "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, [courts] typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (cleaned up). "[S]omething more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to 'clear congressional authorization' for the power it

claims." *West Virginia*, 142 S. Ct. at 2609. Against this interpretative background, Defendants can muster no clear—or even colorable—authorization to support their unprecedented power grab.

        2.   *The Power to "Modify" Does Not Permit Resurrecting an Expired Debt-Relief Program*

The HEROES Act authorizes the Secretary to "waive" or "modify" a statutory or regulatory provision applicable to federal student assistance. 20 U.S.C. § 1098bb(a)(1). Defendants do not claim to have used the "waiver" power and instead invoked the HEROES Act "to modify the terms of the benefits provided under section 3513 of the CARES Act." 85 Fed. Reg. 79,863; *see also* 87 Fed. Reg. 61,513. But "modify" means "to change moderately or in a minor fashion." *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 225 (1994) (citing dictionaries); *accord* Modify, Black's Law Dictionary (11th ed. 2019) ("to make small changes"). Resurrecting an expired debt-relief program, however, "is effectively the introduction of a whole new regime" of debt relief. *MCI*, 512 U.S. at 234. It exceeds what the word "modify" permits.

The Major Questions Doctrine reinforces this conclusion by requiring clear congressional authorization to extend a statutory program beyond its expiration. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2490. The expiration date in Section 3513 was not a minor detail but rather a "major policy decision[]" that Congress made for itself based on its considered judgment of not only when a $5 billion-per-month program should be available, but also when it should cease to be available. *West Virginia*, 142 S. Ct. at 2609. Congress thus explicitly decided the suspension of payments and interest accrual (and its enormous cost to taxpayers) must terminate on September 30, 2020, and extend no further. The power to override Congress's decision to resume payments and interest accrual —to the tune of $160 billion—is an elephant that Congress would not have hidden in the HEROES Act's "modify" mousehole. *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). A contrary conclusion would deprive Congress of power to firmly end *any* student-loan program unless the HEROES Act were repealed, because Defendants could always "modify" a statutory sunset date.

### 3. Extensions of the Moratorium Were Not 'Necessary'

Defendants' extensions of the Moratorium were not "necessary to ensure"—nor even calculated to ensure—that "recipients of student financial assistance … are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals," as the HEROES Act requires. 20 U.S.C. § 1098bb(a)(2)(A). This language places two limits on waivers or modifications under the Act, which Defendants fail to follow.

*First*, the Secretary must "determine that the COVID-19 pandemic was a but-for cause of the financial harm to be addressed by the waiver or modification." Office of Legal Counsel, *Use of the Heroes Act of 2003 to Cancel the Principal Amounts of Student Loans*, 2022 WL 3975075, at *14 (Aug. 23, 2022). But Defendants *never* attempted to isolate the financial harm caused by Covid-19, which might conceivably be addressed by the HEROES Act's "waiver or modify" power, from harm caused by other factors, which could not be.

*Second*, any waiver or modification must be limited to "put[ting] loan recipients back into the financial position they would be in were it not for the national emergency—that is, … the Secretary can use the HEROES Act only to offset that portion of the [pandemic-caused] harm that has a 'relation to' the borrower's [student loan] assistance." *Ibid.* But the Moratorium goes far beyond what is necessary to ensure borrowers are not placed by the pandemic in a worse position financially in relation to their loans. To be sure, some borrowers were financially impacted by Covid-19, but others were not. Nationwide debt relief that fails to distinguish between the two groups provides an unlawful windfall to the latter. For instance, junior associates at major law firms saw their six-figure salaries increase throughout the pandemic.[15] Yet, extensions of the Moratorium gifted law school graduates

---

[15] *See, e.g.,* Staci Zaretsky, *The Biglaw Salary Wars Increased First-Year Associate Salaries Across the Legal Profession*, Above the Law (May 10, 2023) ("[O]ne thing COVID didn't bring crashing down were first-year associate salaries" because "as of January 1, 2023, the median base salary for first-year associates was $200,000, which is up $35,000 from 2021), available at: https://abovethelaw.com/2023/05/the-biglaw-salary-wars-increased-first-year-associate-salaries-across-the-legal-profession/ (last visited May 11, 2023).

who took those jobs an average of $40,000 in debt cancellation. *See* CRFB Analysis. Other high-income professionals received similar unjustified windfalls at taxpayer expense. *Ibid.*

The scale of unlawful windfalls grew with each successive extension because borrowers had already benefited from every prior extension. For instance, by November 2022, borrowers had already received $160 billion in debt cancellation from six months of zero interest rates under the CARES Act and another 26 months from the administrative Moratorium. Any possible pandemic-related financial impact was long ago fully redressed for this group, which has been put in a far better financial position *with respect to* their student loans. Thus, the eighth extension announced in November 2022 cannot possibly fit within the HEROES Act's limited authority to keep borrowers from being placed in a "worse position."

### D.      Repeated Extensions of the Moratorium Are Arbitrary and Capricious

A court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" 5 U.S.C. § 706(2)(A). This standard requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

Defendants claimed merely that some unspecified number of unidentified borrowers are still suffering negative financial impact from Covid-19. From that premise, without explanation or logic, they concluded that debt relief must be extended to *all* borrowers nationwide. They do not explain how suspending payments and cancelling interest—which disproportionally benefits affluent borrowers—advance a policy to help economically struggling borrowers. Defendants' utter failure to connect Covid-19's financial impacts with the Moratorium renders their suspensions of payment

obligations and interest accrual arbitrary and capricious. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (agency is arbitrary and capricious unless "its path may reasonably be discerned.").

Agency action also is arbitrary and capricious if the agency "failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, such as costs and benefits, *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (rational agency decision-making "requires at least some attention to cost[s]" and "benefits"). Defendants entirely failed to consider whether the $5 billion per month cost of the Moratorium is worthwhile. Nor did they consider the wisdom or fairness of concentrating benefits in high-earning households. *See* Brookings Analysis; CRFB Analysis. As such, they could not possibly have rationally weighed costs and benefits when repeatedly extending the Moratorium.

Finally, in their most recent extension of the Moratorium, Defendants "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. The November 2022 extension is explicitly meant to "alleviate uncertainty for borrowers" caused by ongoing "litigation" over other debt-cancellation efforts. Ex. 9. Defendants' explanation that it would be "unfair" to "ask borrowers to pay a debt that they wouldn't have to pay, were it not for [the ongoing litigation]," *ibid.,* has no connection to the financial impact Covid-19 may have had on these borrowers' financial position—the only statutory factor that could justify waiver or modification under the HEROES Act.

### E.    Extensions of the Moratorium Failed to Follow Procedures Required by Law

The Court must "hold unlawful and set aside agency action" taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The APA and HEA respectively require substantive agency actions affecting federal student loans to follow notice-and-comment and negotiated rulemaking procedures. *See* 5 U.S.C. § 533; 20 U.S.C. § 1098a. While Defendants may bypass these

procedures when exercising the HEROES Act's "waiver or modify" authority, they still must "by notice in the Federal Register, publish the waivers or modifications[.]" 20 U.S.C. § 1098bb(b)(1).

As previously noted, however, Defendants contemporaneously cited the HEROES Act as statutory authority for only one of the eight Moratorium extensions (the one announced in December 2020, which extended the Moratorium from December 31, 2020 through January 31, 2021). *See* 85 Fed. Reg. at 79,863 (Dec. 11, 2020); *as corrected*, 86 Fed. Reg. 5008 (Jan. 19, 2021). Defendants cannot provide "notice" of exercising "modify" authority for extensions that have already taken effect and expired. *E.B. v. U.S. Dep't of State*, 583 F. Supp. 3d 58, 68 (D.D.C. 2022) (vacating rule because agency "failed to provide notice … *before* the [challenged] Rule went into effect.") (emphasis in original). The October 2022 Federal Register publication thus fails to provide "notice" for prior extensions that stretch all the way back to January 2021, even if it arguably might suffice for the August 2022 extension. *See* 87 Fed. Reg. 61,513-14. Nor could the December 2020 Federal Register publication retroactively have provided valid notice of the initial extension in August 2020, 85 Fed. Reg. 79,857, which was explicitly based on the Higher Education Act—not the HEROES Act, 85 Fed. Reg. 49,585.

In any event, no Federal Register notice was published for Defendants' most recent extension, which was announced on November 22, 2022, and took effect on January 1, 2023. *See* Ex. 9. Thus, even if *post hoc* notice were somehow permitted—it is not—the most recent extension still failed to follow the HEROES Act's notice procedures.

## II.    INJUNCTIVE RELIEF IS WARRANTED

Without immediate injunctive relief, Plaintiff will suffer irreparable financial and competitive injury. Injury "is irreparable if it is not fully compensable by monetary damages." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citation omitted).

The Moratorium reduces the incentives under PSLF for educated individuals who have federal student-loan debt to work at PSLF-qualified employers like Plaintiff. This harm increases Plaintiff's

labor costs and makes it more difficult for Plaintiff to compete in the labor market. These injuries are irreparable because they are impossible to calculate and there is no way for Plaintiff to recover them through money damages against Defendants, who are immune from such liability. *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) ("The federal government's sovereign immunity typically makes monetary losses [caused by unlawful agency action] irreparable."); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) ("[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate."). Moreover, "[o]nce a loan is forgiven, it cannot easily be undone." *Faust v. Vilsack*, 519 F. Supp. 3d 470, 477-78 (E.D. Wis. 2021). Competitive injuries caused by unlawful debt cancellation will become permanent and can only be prevented by a preliminary injunction now.

When the party opposing an injunction is the federal government, the balance-of-harms factor "merge[s]" with the public-interest factor. *Wilson*, 961 F.3d at 844. Enjoining Defendants' unlawful ongoing Moratorium would not only save taxpayers $5 billion per month, but it also would serve the public interest because "the public's true interest lies in the correct application of the law." *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022). "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2490. Here, the ends are not even desirable because the Moratorium costs taxpayers a fortune while overwhelmingly benefiting high-income households. There is no plausible public interest served by unlawfully enriching lawyers, doctors, and other highly paid professionals at taxpayers' expense.

## III.   THE SCOPE OF THE INJUNCTION SHOULD BE NATIONWIDE

While nationwide injunctions are rare, they "can be necessary to provide complete relief to plaintiffs, to protect similarly-situated nonparties, and to avoid the chaos and confusion that comes from a patchwork of injunctions." *City of Chicago v. Barr*, 961 F.3d 882, 916-17 (7th Cir. 2020). The Eighth Circuit recently enjoined Defendants' Loan Cancellation Program on a nationwide basis until

a final decision on merits because a narrower injunction "would be impractical and would fail to provide complete relief." *Nebraska*, 52 F.4th at 1048. The same is true here. The Moratorium inflicts nationwide competitive injury on Plaintiff and other nonprofit employers by unlawfully cancelling $5 billion of debt each month that is owed by college-educated potential employees who live all over the country. An injunction that halts such cancellation is necessary to protect Plaintiff from that injury.

Even courts that firmly disfavor nationwide injunctions have recognized their necessity in other cases involving unlawful debt relief provided by the federal government. *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1295 (M.D. Fla. 2021) (issuing nationwide injunction against unconstitutional debt-relief program); *Faust*, 519 F. Supp. 3d at 478 (concluding that "nation-wide injunction is appropriate in this [debt-relief] case"). *Wynn* and *Faust* concerned the Secretary of Agriculture's decision in 2021 to provide debt relief to farmers based on racial categories. In *Wynn*, The Middle District of Florida held raced-based debt relief violated the Equal Protection Clause and issued a nationwide injunction. 545 F. Supp. 3d at 1295. The court "proceed[ed] with great caution in determining that an injunction that will have nationwide effect is warranted," noting that such broad injunctions have been criticized by Justices Gorsuch and Thomas. *Id.* at 1294 (first citing *DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring); and then citing *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (Thomas, J. concurring)). Yet, "despite exploring any possible more narrow option," the Court could not identify any relief short of a nationwide injunction that could "provide Plaintiff the opportunity to obtain any relief at all." *Id.* at 1295. The *Faust* court reached the same conclusion when it halted the same race-based debt-relief program nationwide. 519 F. Supp. 3d at 477-78.

This debt-relief case presents very similar issues in terms of the appropriate scope of injunctive relief. In equal-protection cases such as *Wynn* and *Faust*, the injury is not inflicted by agency action toward a plaintiff, but rather by action toward nonparties, such as unlawfully bestowing an advantage based on race. As such, the injunction must prevent unlawful action as to those nonparties. When the

equal-protection violation has nationwide scope, as was the case in *Wynn* and *Faust*, the injunction must be nationwide. The same is true of competitive injuries, which are also often inflicted by agency action that unlawfully advantages nonparties, such as by showering unappropriated government largess on the affluent and incentivizing workers to favor private-sector employers over nonprofits. The only way to protect Plaintiff here from competitive injury is to enjoin unlawful agency action directed toward nonparties. *See Can. Lumber*, 517 F.3d at 1344 (enjoining illegal subsidy to nonparty trade group). If the unlawful action is directed toward nonparties nationwide, only a nationwide injunction will suffice. *Nebraska*, 52 F.4th at 1048 (enjoining Loan Cancellation Program nationwide).

## **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiff's motion for a preliminary injunction.

May 11, 2023                                  Respectfully submitted,

                                             /s/ Sheng Li

Patrick J. Wright,                           SHENG LI,
Vice President for Legal Affairs             Litigation Counsel
MACKINAC CENTER FOR PUBLIC POLICY            RUSSELL G. RYAN
130 W. Main Street                           Senior Litigation Counsel
Midland, MI 48640                            NEW CIVIL LIBERTIES ALLIANCE
(989) 430-3912                               1225 19th Street NW, Suite 450
                                             Washington, DC 20036
                                             (202) 869-5210
                                             Sheng.Li@ncla.legal

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 11, 2023, a true and correct copy of the foregoing and exhibits attached thereto were filed electronically through the Court's CM/ECF system, to be served on counsel for all parties by operation of the Court's electronic filing system.

/s/ Sheng Li
Sheng Li