**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

**Northern Division**

MACKINAC CENTER FOR PUBLIC
POLICY,

*Plaintiff,*

v.

U.S. DEPARTMENT OF EDUCATION;

MIGUEL CARDONA, Secretary, U.S.
Department of Education, in his official capacity;

RICHARD CORDRAY, Chief Operating Officer
of Federal Student Aid, U.S. Department of
Education, in his official capacity;

*Defendants.*

CIVIL CASE NO. 1:23-CV-10795-TLL-PTM

**FIRST AMENDED COMPLAINT
FOR DECLARATORY,
INJUNCTIVE, AND OTHER
RELIEF**

JURY TRIAL DEMANDED

## INTRODUCTION

Congress responded to the Covid-19 pandemic by providing trillions of dollars of relief to affected Americans. One legislative relief measure was a limited, six-month suspension of monthly payment obligations and interest accrual on federally held student loans. Congress further provided that non-payments during the six-month suspension period would count as monthly payments for the purpose of various loan-forgiveness programs, including the Public Service Loan Forgiveness ("PSLF") and the Income-Driven Repayment ("IDR") programs.

Congress's lawful statutory six-month suspension period began on March 27, 2020 and expired on September 30, 2020. Without any lawful basis or congressional appropriation, Defendant Department of Education ("Department") has repeatedly extended the suspension period for three

1

years beyond its statutory expiration date, at enormous expense to taxpayers and to the detriment of Plaintiff Mackinac Center for Public Policy ("Mackinac") and other qualifying public service employers who benefit from the employee recruitment and retention advantages Congress gave them through PSLF. The Department has also continued to count non-payments during this prolonged extension of the suspension period as monthly "payments" for purposes of the IDR and PSLF loan-forgiveness programs, thereby further disadvantaging Mackinac and other public service employers.

The Department initially claimed that a short extension of the payment-and-interest suspension period was needed to allow Congress time to decide whether to extend the suspension legislatively. But our electorally accountable lawmakers in Congress declined to extend the statutory six-month suspension any further, even as they repeatedly legislated all manner of other forms of Covid-19 relief. Unwilling to accept this decision of elected lawmakers, the Department then decided to extend the unfunded suspension—again and again and again—by administrative fiat.

Alternately using press releases and federal register notices rather than notice-and-comment rulemaking, the Department has extended the payment-and-interest suspension period a total of eight times for a total of 35 months—most recently in November 2022—asserting an ever-shifting potpourri of purported legal justifications. At first, the Department relied on the economic hardship provisions of the Higher Education Act of 1965; it then pivoted to the HEROES Act of 2003; it then stopped citing legal authority altogether and stopped publishing new extensions in the Federal Register; most recently, it claimed (falsely) that it had been relying on the HEROES Act all along.

None of these justifications holds water. The Supreme Court recently made clear that the HEROES Act does not authorize the Department to unilaterally enact a student-loan relief program that costs hundreds of billions of dollars. *Biden v. Nebraska*, 143 S. Ct. 2355, 2369 (2023). While *Nebraska* concerned a different student-loan relief gambit, even the dissenting Justices indicated that the prolonged payment-and-interest suspension at issue in this case is likewise unlawful under

2

*Nebraska*'s reasoning. *Id.* at 2396 ("The majority claims it is not deciding whether [the extension of the statutory suspension period] was [un]lawful. Which is all well and good, except that under the majority's reasoning, how could it not be?") (Kagan, J. dissenting) (citation omitted).

The Department itself concedes the administrative suspension costs approximately $5 billion per month—mostly in lost interest accrual—for a total of $175 billion after 35 months. This estimate does not include the approximately $119 billion resulting from premature cancellation of student loans under IDR and PSLF programs by counting non-payments during the suspension as payments. The full price tag of the challenged policy is therefore nearly $300 billion. In open defiance of both the Supreme Court's June 30 decision in *Nebraska*, 143 S. Ct. 2355, and the Fiscal Responsibility Act passed the same month, the Department of Education continues to treat nearly $300 billion of debt-instrument assets in the Treasury as having been permanently cancelled absent congressional appropriation.

Only Congress can authorize such vast expenditures. Only Congress can categorically suspend repayment obligations for all student-loan borrowers nationwide. Only Congress can cancel the accrual of interest on student debt owed to the United States and its taxpayers. And, only Congress can deem periods of non-payment to count as monthly payments needed to earn loan forgiveness under the statutory IDR and PSLF programs. Congress has not suspended repayment obligations, nor canceled the accrual of interest on student loans beyond September 30, 2020. Nor has it authorized periods of non-payment beyond that date to count as payments for purposes of earning loan forgiveness. The Department's repeated extension of the payment-and-interest suspension beyond its statutory expiration date is unlawful, *ultra vires* agency action and must be stopped and set aside.

## PARTIES

1.     Plaintiff Mackinac is a § 501(c)(3) organization incorporated in Michigan and headquartered in Midland, Michigan. With 45 employees, Plaintiff regularly competes to recruit and

retain college-educated employees for staff positions, helped by the incentives Congress provided through the PSLF program. *See* Declaration of Joseph G. Lehman ("Lehman Decl.") (Attached as Exhibit 1). Plaintiff has four employees who are current participants in the PSLF program and are affected by unlawful conduct challenged in this Amended Complaint. *Id.* Additionally, future employees with outstanding student-loan debt hired by Plaintiff will have been affected because that conduct affects every single student-loan borrower in the country.

2.      Defendant U.S. Department of Education is an agency of the United States.

3.      Defendant Miguel Cardona is sued in his official capacity as Secretary of the U.S. Department of Education ("Secretary").

4.      Defendant Richard Cordray is sued in his official capacity as Chief Operating Officer of Federal Student Aid of the U.S. Department of Education.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 5 U.S.C. §§ 702 and 703 and 28 U.S.C. §§ 1331, 1361, and 2201.

6.      This Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. §§ 1361 and 2201-2202, and under its inherent equitable powers.

7.      Venue is proper within this district pursuant to 28 U.S.C. § 1391. Defendants are United States agencies or officials sued in their official capacities. Plaintiff has its principal place of business in this judicial district and substantial parts of the events or omissions giving rise to the Complaint occurred within this district.

## STATEMENT OF FACTS

### I.   LEGAL BACKGROUND

8.      The Department administers student loan programs under Title IV of the Higher Education Act ("HEA") of 1965, 20 U.S.C. § 1070 et seq. Federal student-loan debt currently exceeds

4

$1.6 trillion and is owed by approximately 45 million borrowers. Alexandra Hegji, Kyle D. Shohfi & Rita R. Zota, Cong. Rsch. Serv., R47196 *Federal Student Loan Debt Cancellation: Policy Considerations* 1 (2022).

9.      Under the Federal Direct Loan program, which now accounts for most federal student debt, the federal government makes loans directly to borrowers "using federal capital (*i.e.*, funds from the U.S. Treasury), and once made, outstanding loans constitute an asset of the federal government." *Id.* at 2.

10.      Direct-loan borrowers generally must make monthly loan payments to the United States under a repayment plan. *See* 20 U.S.C. § 1087e(d). Interest on such loans accrues at rates specified by Congress. *See id.* § 1087e(b).

11.      Borrowers may be eligible for deferment of monthly payments and the accrual of interest under certain conditions. *Id.* § 1087e(f). Deferment is available, for example, to individual borrowers, on an individualized basis, who are experiencing "economic hardship," which the HEA and Department regulations define as occurring when a borrower either works a full-time job while earning extremely low wages, receives means-tested public assistance, or serves in the Peace Corps. 20 U.S.C. §§ 1085(o), 1087e(f)(2)(D); 34 C.F.R. § 682.204(g).

12.      The Department has never determined that *all* borrowers nationwide, regardless of individual economic circumstances, are entitled to a deferment for economic hardship under the HEA. Nor could it plausibly make such a determination.

13.      In 2003, Congress enacted the Higher Education Relief Opportunities for Students ("HEROES") Act, Pub. L. No. 108-76, 117 Stat. 904 (2003), in the wake of the September 11 terrorist attacks "to support the members of the United States military and provide assistance with their transition into and out of active duty and active service." 20 U.S.C. § 1098aa(b)(6).

14.     The HEROES Act states that the Secretary may "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs" under the HEA when "necessary in connection with a war or other military operation or national emergency." *Id.* § 1098bb(a)(1). Any such waiver or modification must be "necessary to ensure that" certain statutory objectives are achieved, including to ensure that "recipients of student financial assistance … are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." *Id.* § 1098bb(a)(2)(A).

15.     Until December 2020, the Department had never invoked the HEROES Act's "waive or modify" authority to extend the deadline of a student-loan relief program beyond the expiration date set by Congress.

16.     Nor had the Department previously invoked the HEROES Act's "waive or modify" authority to provide debt relief indiscriminately to all borrowers nationwide, without regard to how a national emergency has affected each borrower's financial position in relation to his or her loans.

17.     Congress has authorized several statutory programs that forgive the unpaid debt owed by certain student-loan borrowers who make qualifying monthly payments on those loans for a certain number of years. These include the IDR and PSLF programs.

18.     Under IDR, a borrower's remaining debt is forgiven after the borrower makes the requisite number of qualifying monthly payments. A borrower can choose between four IDR plans during the relevant period,[1] each with specific monthly repayment amounts—which are based on the borrower's income and family size—and forgiveness timelines of either 20 or 25 years. *See* 34 C.F.R. §§ 685.209(a)-(c), 685.221. Up to three years of deferment under 20 U.S.C. § 1085(o) for "economic

---

[1] One plan, the income-based repayment (IBR) plan, is established under the College Cost Reduction and Access Act of 2007. *See* 20 U.S.C. § 1098e. Three others, the income-contingent repayment (ICR) plan, the PAYE plan, and the REPAYE plan, are established under the 1993 Amendments to the HEA. *See* 20 U.S.C. § 1087e(e).

hardship" may count toward IDR's monthly payment requirement. 20 U.S.C. §§ 1087e(e)(7)(B), 1098e(b)(7)(B).

19.     The College Cost Reduction and Access Act of 2007 established the PSLF program "to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of this section." 34 C.F.R. § 685.219(a), as authorized by 20 U.S.C. § 1087e(m).

20.     PSLF forgives a borrower's entire remaining student-loan balance after the borrower makes 120 qualifying monthly payments while "employed in a public service job." 20 U.S.C. § 1087e(m)(1). Qualifying payments include payments made under IDR plans or a standard plan. *See* 20 U.S.C. § 1087e(m)(1)(A). Unlike IDR, periods of deferment for "economic hardship" do *not* count under PSLF. *Compare* 20 U.S.C. § 1087e(m)(1)(A) *with id.* § 1098e(b)(7)(B).

21.     PSLF "promotes the interests of public service employers by providing significant financial subsidies to the borrowers they hire on the condition they remain employed in public service," thereby "increasing recruitment and lowering labor costs" for those employers. *ABA v. Dep't of Educ.*, 370 F. Supp. 3d 1, 19 (D.D.C. 2019).

22.     Qualified employers include nonprofit organizations under § 501(c)(3) of the Internal Revenue Code. 20 U.S.C. § 1087e(m)(1)(B). Plaintiff is a qualified employer.

## II.   DEFENDANTS ENACTED AND UNLAWFULLY EXTENDED A PAUSE ON STUDENT LOAN MONTHLY PAYMENTS AND INTEREST ACCRUAL

23.     Beginning in March 2020, having no statutory or other legal authority to do so, the Defendants unlawfully allowed student-loan debtors to avoid repaying their outstanding loans or even having interest accrue on those loans, thereby costing taxpayers hundreds of billions of dollars in deferred and lost revenue.

24.     On March 20, 2020, near the outset of the Covid-19 pandemic in the U.S., the Department announced in a press release that it would set interest rates on federally held student loans at zero percent for "a period of at least 60 days" and would allow borrowers with such loans to suspend their payments "for at least two months."[2] The press release did not identify any statutory or other legal authority for granting this extraordinary and open-ended debt relief.

25.     The Department's March 20 press release was soon overtaken by events on March 27, 2020, when Congress enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. *See* Pub. L. No. 116-136, 134 Stat. 281 (2020). Section 3513 of the CARES Act instructed the Department to "suspend all payments" for federally held student loans until September 30, 2020, and it provided that no interest would accrue on such loans during that period. *Id.* § 3513(a)–(b). Section 3513 further stated that non-payments during this six-month suspension shall count "as if the borrower of the loan has made a payment for any loan forgiveness program … authorized under … the Higher Education Act," including the IDR and PSLF programs. *Id.* § 3513(c).

26.     Apparently dissatisfied with the limited period of relief decided upon by our elected lawmakers, however, the Department extended the statutory six-month period—and did so repeatedly. In all, the Department's serial extensions effectively extended Congress's six-month suspension of student-loan payment obligations and interest accrual for an additional 35 months—more than five times the length of the suspension Congress commanded must expire September 30, 2020. Unless and until it is stopped, the Department is also counting these 35 months of non-payments on student loans as monthly "payments" for all borrowers participating in the IDR and PSLF programs. *See* Dep't of Education, Federal Student Aid, *Covid-19 Emergency Relief and Federal Student Aid*

---

[2] Press Release, U.S. Dep't of Educ. (Mar. 20, 2020), available at: https://content.govdelivery.com/accounts/USED/bulletins/2823e37 (last visited October 6, 2023).

("Payments that were paused for COVID-19 count toward IDR forgiveness" and "Payments that were paused for COVID-19 count toward PSLF").[3]

27.     As previously alleged, the Department cited no legal authority when it first suspended payment obligations and interest accrual in March 2020.

28.     As the CARES Act's September 30, 2020 statutory expiration date for the relief approached, Congress was debating whether to extend the CARES Act's six-month suspension of loan payments and interest accrual and, if so, whether to amend its scope.[4]

29.     While that debate was ongoing, President Trump ordered his Secretary of Education to extend the suspension period administratively through December 31, 2020. *Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic*, 85 Fed. Reg. 49,585 (Aug. 13, 2020).

30.     As legal authority for this ***first*** extension of the suspension period, President Trump's order cited "economic hardship deferments described in section 455(f)(2)(D) of the Higher Education Act of 1965, as amended, 20 U.S.C. 1087e(f)(2)(D)." 85 Fed. Reg. at 49,585.

31.     On August 21, 2020, the Department announced in a press release that it would comply with President Trump's order and extend the suspension period until December 31, 2020. Press Release, Dep't of Educ. (Aug. 21, 2020).[5] That press release cited President Trump's memorandum, and thus economic-hardship deferment under the HEA, as the purported legal authority for extending relief. *Id.*

---

[3] Available at: https://studentaid.gov/announcements-events/covid-19 (last visited October 6, 2023).
[4] Michael Stratford, *Trump Extends Student Loan Relief Through Year's End*, POLITICO (Aug. 8, 2020), available at: https://www.politico.com/news/2020/08/08/trump-extends-student-loan-relief-through-years-end-392724 (last visited October 6, 2023).
[5] Available at: https://content.govdelivery.com/accounts/USED/bulletins/29b4634 (last visited October 6, 2023).

32.     The August 21, 2020 press release further announced that "[n]on-payments by borrowers working full-time for qualifying employers will count toward the 120 payments required by the Public Service Loan Forgiveness program and as payments that are required to receive forgiveness under an income-driven repayment plan." *Id.* The Department has similarly allowed non-payments to count as payments needed for IDR and PSLF forgiveness during all subsequent administrative extensions of the suspension, even though under federal statute, periods of deferment for "economic hardship" do *not* count as payments for the PSLF program. *See* 20 U.S.C. § 1087e(m)(1)(A).

33.     By law, the Department must undertake notice-and-comment and negotiated rulemaking procedures to issue any rule affecting the provision of financial assistance to student borrowers under the HEA. *See* 5 U.S.C. § 533; 20 U.S.C. § 1098a. The Department did neither when it cited the HEA as purported authority to extend the six-month suspension period in August 2020. It published no Federal Register notice to explain its reasoning—let alone to invite public comment— for either its initial administrative suspension of payment obligations and interest accrual in March 2020 or its August 2020 administrative extension of the six-month CARES Act suspension period.

34.     On December 4, 2020, the Department announced in a press release a ***second*** administrative extension of the suspension of loan payments and interest accrual, this time from December 31, 2020, to January 31, 2021. Press Release, Dep't of Educ. (Dec. 4, 2020).[6] The Department explicitly acknowledged that "Congress, not the Executive Branch, is in charge of student loan policy," but said another short extension by administrative fiat would "allow[] Congress to do its job and determine what measures it believes are necessary and appropriate." *Id.*

35.     On December 11, 2020, the Department published a related notice in the Federal Register announcing that it was exercising power "under the HEROES Act to modify the terms of

---

[6] Available at: https://content.govdelivery.com/accounts/USED/bulletins/2afbc4b  (last visited October 6, 2023).

the benefits provided under section 3513 of the CARES Act such that they will continue to be provided to borrowers until January 31, 2021." 85 Fed. Reg. 79,856, 79,863 (Dec. 11, 2020); as corrected, 86 Fed. Reg. 5,008, 5008 (Jan. 19, 2021).[7] This Federal Register notice was the first time the Department invoked the HEROES Act as purported statutory authority for its across-the-board suspension of student loan payment obligations and interest accrual.

36.     The December 11, 2020 Federal Register notice also claimed (belatedly) that the Department had invoked the HEROES Act's power to "waive or modify … any statutory or regulatory provision" to ensure that "[b]orrowers with [federal student] loans … that are held by the Department, did not accrue interest on those loans from March 13, 2020 to March 27, 2020[, and] were also permitted to suspend payment on their loans[.]" 85 Fed. Reg. 79,856, 79,857 (Dec. 11, 2020). The Department thus retroactively asserted power under the HEROES Act to suspend the accrual of interest and repayment obligations on student loans that is independent of the CARES Act, which was not enacted until March 27, 2020. But it did not identify statutory or regulatory provisions it waived or modified to do so.

37.     Upon taking office on January 20, 2021, President Biden and the Acting Secretary of Education announced a ***third*** administrative extension of the suspension period, this time for an unspecified, indefinite period. *Pausing Federal Student Loan Payments*, White House (Jan. 20, 2021).[8] The Department issued a press release the next day confirming this extension. Press Release, Dep't of Educ. (Jan. 21, 2021).[9]

---

[7] The original December 11, 2021 notice invoked the HEROES Act to extend the pause to December 31, 2020. But the Secretary already had extended the pause to that date, relying on "economic hardship" deferment under the HEA to do so. The January 19, 2021 correction clarified that the HEROES Act was invoked to extend the pause a second time to January 31, 2021.
[8] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/pausing-federal-student-loan-payments/ (last visited October 6, 2023).
[9] Available at: https://www.ed.gov/news/press-releases/request-president-biden-acting-secretary-education-will-extend-pause-federal-student-loan-payments (last visited October 6, 2023).

38.    The Department's sole explanation for this third extension was: "Too many Americans are struggling to pay for basic necessities and to provide for their families. They should not be forced to choose between paying their student loans and putting food on the table." *Id.* The Department did not explain why forbearance for *all* borrowers, even those millions who were not struggling economically, was appropriate. Nor did the Department cite *any* legal authority whatsoever. No Federal Register notice accompanied the third extension, and there was no notice-and-comment process.

39.    On August 6, 2021, President Biden announced that his open-ended third extension of the suspension for student loan repayments and interest accrual must end and that, to "ensure a smoother transition that minimizes loan defaults and delinquencies," he would extend the suspension period for a **fourth** and purportedly "final" time until January 31, 2022. *Statement by President Joe Biden Extending the Pause on Student Loan Repayment*, White House (Aug. 6, 2021).[10] The Department issued a press release the same day confirming this fourth extension. Press Release, Dep't of Educ. (Aug. 6, 2021).[11]

40.    Neither the President's announcement nor the Department's press release cited any legal authority for this fourth and purportedly "final" extension. No Federal Register publication explained the Department's rationale, and there was no notice-and-comment process.

41.    Despite claiming that the fourth extension would be the "final" one, President Biden announced on December 22, 2021, that the suspension period would be extended a **fifth** time until May 1, 2022. *Statement by President Joe Biden Extending the Pause on Student Loan Repayment an Additional 90*

---

[10] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/06/statement-by-president-joe-biden-extending-the-pause-on-student-loan-repayment/ (last visited October 6, 2023).
[11] Available at: https://www.ed.gov/news/press-releases/biden-administration-extends-student-loan-pause-until-january-31-2022 (last visited October 6, 2023).

*Days*, White House (Dec. 22, 2021).[12] He claimed another extension was needed for all 41 million student loan borrowers because "millions of [them] are still coping with the impacts of the pandemic" despite "one of the strongest" economic recoveries. *Id.*

42.     On the same day, the Department issued a press release confirming this fifth extension. Press Release, Dep't of Educ. (Dec. 22, 2021).[13] That press release explained that "[t]he pause on student loan payments will help 41 million borrowers save $5 billion per month" as a result of interest not accruing on their outstanding debt. *Id.* Neither the President's announcement nor the Department's press release cited any legal authority for this fifth extension of the suspension period nor for the unilateral incurring of $5 billion per month in costs to the Treasury. No Federal Register publication explained the Department's rationale, and there was no notice-and-comment process.

43.     On April 6, 2022, President Biden announced a ***sixth*** extension of the payment-and-interest suspension, this time to August 31, 2022. *Statement by President Biden Extending the Pause on Student Loan Repayment Through August 31st, 2022*, White House (Apr. 6, 2022).[14] He claimed this extension was needed because, "[i]f loan payments were to resume on schedule in May, analysis of recent data from the Federal Reserve suggests that millions of student loan borrowers would face significant economic hardship." *id.*

44.     The Department issued a press release on the same day confirming this sixth extension. Press Release, Dep't of Educ. (Apr. 6, 2022)[15] Once again, neither the President's

---

[12] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/22/statement-by-president-joe-biden-extending-the-pause-on-student-loan-repayment-an-additional-90-days/ (last visited October 6, 2023).
[13] Available at: https://www.ed.gov/news/press-releases/biden-harris-administration-extends-student-loan-pause-through-may-1-2022 (last visited October 6, 2023).
[14] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2022/04/06/statement-by-president-biden-extending-the-pause-on-student-loan-repayment-through-august-31st-2022/ (last visited October 6, 2023).
[15] Available at: https://www.ed.gov/news/press-releases/biden-harris-administration-extends-student-loan-pause-through-august-31(last visited October 6, 2023).

announcement nor the Department's press release cited any legal authority for the sixth extension of the suspension, no Federal Register publication explained the Department's rationale, and there was no notice-and-comment process.

45.    On August 24, 2022, the Department of Education announced, for the second time, a purportedly "final extension" of the payment-and-interest suspension—the *seventh* extension overall—this time until December 31, 2022. Press Release, Dep't of Educ. (Aug. 24, 2022).[16] This seventh unlawful extension was accompanied by a further announcement that the Department would also outright cancel up to $10,000 or up to $20,000 of student loan debt for over 40 million borrowers, a program (referred to hereinafter as the "Loan Cancellation Program"), which the Supreme Court subsequently held unlawful as discussed below.

46.    Also on August 24, 2022, the Department of Justice released a memorandum from its Office of Legal Counsel. *Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, 46 Op. O.L.C. __, Slip Op. (Aug. 23, 2022) ("OLC Memo").[17] The OLC Memo analyzed the requirement that waiver or modification of federal student-loan obligations under the HEROES Act must "be necessary" to "ensure" that affected individuals "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." *Id.* at 20 (quoting 20 U.S.C. § 1098bb(a)(2)(A)). OLC concluded this text authorizes waivers or modifications only to the extent needed to "put loan recipients back into the financial position" in which they would have been, in relation to their loans, "were it not for the national emergency." *Id.* at 21. In other words, the Department needs to do individualized assessments of hardship, and it may

---

[16] https://www.ed.gov/news/press-releases/biden-harris-administration-announces-final-student-loan-pause-extension-through-december-31-and-targeted-debt-cancellation-smooth-transition-repayment (last visited October 6, 2023).
[17] Available at: https://www.justice.gov/d9/2022-11/2022-08-23-heroes-act.pdf (last visited October 6, 2023).

not grant loan recipients a windfall that puts them in a *better* financial position. The Department of Education largely ignored the OLC Memo, including the limits it indicated on granting windfalls.

47.     The Department cited the Secretary's authority under the HEROES Act to "waive or modify" certain statutory and regulatory requirements as the purported basis for the Loan Cancellation Program and published a notice in the Federal Register on October 12, 2022, invoking that authority. 87 Fed. Reg. 61,512 (Oct. 12, 2022). The same Federal Register notice also invoked the HEROES Act to justify the seventh extension of the student loan payment-and-interest suspension period to December 31, 2022. *Id.* at 61,514. The Department further claimed in that Federal Register notice to have relied on the HEROES Act to justify the fourth, fifth, and sixth extensions, even though the Department had not cited the HEROES Act when announcing those prior extensions in August 2021, December 2021, and April 2022, respectively. *Id.* at 61,513-14.

48.     The Loan Cancellation Program was challenged in federal court and was enjoined and set aside before the Supreme Court granted certiorari to review that program's legality.[18] In the midst of those legal challenges, on November 22, 2022, the Department announced in a press release an *eighth* extension of the payment-and-interest suspension period, this time until "60 days after the Department is permitted to implement the [Loan Cancellation P]rogram or the litigation is resolved."[19] The press release did not invoke the HEROES Act nor any other legal authority. Nor did the Department publish a notice in the Federal Register, which is a prerequisite for exercising the Act's "waive or modify" authority. *See* 20 U.S.C. § 1098bb(b)(1).

---

[18] *Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022), *cert. granted before judgment*, 143 S. Ct. 477 (2022); *Brown v. U.S. Dep't of Educ.*, No. 4:22-CV-0908-P, 2022 WL 16858525 (N.D. Tex. Nov. 10, 2022), *cert. granted before judgment*, 143 S. Ct. 541 (2022).
[19] Available at: https://www.ed.gov/news/press-releases/biden-harris-administration-continues-fight-student-debt-relief-millions-borrowers-extends-student-loan-repayment-pause (last visited October 6, 2023).

49.     On June 30, 2023, the Court ruled in *Biden v. Nebraska*, 143 S. Ct. 2355, that Defendants' Loan Cancellation Program was not authorized under the HEROES Act. The Court interpreted the HEROES Act's "waive or modify" power to allow the Secretary to make only modest changes to the HEA's loan-forgiveness provisions. In purporting to cancel outright over $400 billion in debt, the Court ruled, the "Secretary has not truly waived or modified the provisions in the Education Act authorizing specific and limited forgiveness of student loans … . What the Secretary has actually done is draft a new section of the Education Act from scratch by 'waiving' provisions root and branch and then filling the empty space with radically new text." *Id.* at 2371-72. The Court also held the Loan Cancellation Program violated the Major Questions Doctrine because there was no "clear congressional authorization" for such a politically and economically significant agency action. *Id.* at 2375.

50.     While the Supreme Court in *Nebraska* did not explicitly decide whether the payment-and-interest suspension was likewise unlawful, Justice Kagan's dissent recognized that "under the majority's reasoning, how could it not be?" *Id.* at 2396 (Kagan, J., dissenting). She explained that, just like the unlawful Loan Cancellation Program, the payment-and-interest suspension "offered a significant new benefit, and to an even greater number of borrowers. (Indeed, for many borrowers, it was worth much more than the [Loan Cancellation Program's] $10,000 discharge.) So the [suspension] could no more meet the majority's pivotal definition of 'modify'—as make a minor change[]—than could the forgiveness plan." *Id.*

51.     Also in June 2023, the President signed into law the Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10, 33–34 (2023) (hereinafter the "FRA"). FRA § 271 provided that "the waivers and modifications of statutory and regulatory provisions relating to an extension of the suspension of payments on certain loans and waivers of interest on such loans under section 3513 of the CARES Act" "shall cease to be effective" 60 days after June 30, 2023. *Id.* § 271(a), (c). With this

provision, Congress put a hard stop on the student loan payment-and-interest suspension as of September 29, 2023.

52.    Section 271 further provided that "[e]xcept as expressly authorized by an Act of Congress enacted after the date of enactment of this Act, the Secretary of Education may not use any authority to implement an extension of" "the suspension of payments on certain loans and waivers of interest on such loans under section 3513 of the CARES Act." *Id.* § 271(b), (c).

53.    Section 271, however, did not address whether the Department may suspend monthly payments or accrual of interest on student loans under authorities other than Section 3513 of the CARES Act, such as Section 455(f)(2)(D) of the HEA, which was the authority the Department initially cited to extend the six-month statutory suspension in August 2020.

54.    Nor did Section 271 address whether the Department may lawfully count periods of non-payments during the 35-month suspension period as monthly payments for purposes of loan-forgiveness programs such as IDR and PSLF.

55.    The Department subsequently announced on one of its websites that the accrual of interest would resume on September 1, 2023, and that monthly payments would restart in October 2023. *See* Dep't of Education, Federal Student Aid, *COVID-19 Emergency Relief and Federal Student Aid.*[20] The Department continued to maintain, however, that it would keep treating periods of non-payment during the entire 35-month payment-and-interest suspension as monthly payments that count toward earning forgiveness under the IDR and PSLF programs. *Id.*

56.    The payment-and-interest suspension on student loan debt cost the federal government approximately $5 billion per month in interest that would have otherwise accrued on outstanding student loans. U.S. Gov't Accountability Office, *Student Loans: Education Has Increased*

---

[20] Available at: https://studentaid.gov/announcements-events/covid-19 (last visited October 6, 2023).

*Federal Cost Estimates of Direct Loans by Billions due to Programmatic and Other Changes* 14 (July 2022). After 35 months, that amounts to $175 billion in incurred costs that Congress never appropriated.

57.     The Department imposed additional costs by counting 35 months of non-payments as monthly payments toward IDR and PSLF loan forgiveness, resulting in the premature cancellation of loans for millions of borrowers. Specifically, every IDR and PSLF borrower must make 35 fewer monthly payments (in amounts that vary by the individual loan) before the borrower's entire loan balance is cancelled. Hence, because of the payment-and-interest suspension, each borrower will receive further unlawful debt cancellation equal to the sum of those 35 forgone monthly payments.

58.     There are over 8.5 million participants in IDR and an unknown number of PSLF participants.[21] So, unless the payment-and-interest suspension is set aside, it will result in at least 297.5 million fewer monthly payments being made to the federal government before borrowers' loans are forgiven. The Department did not even estimate the cost to the U.S. Treasury of these forgone monthly payments its unlawful actions are accruing. Using the average monthly payment of approximately $400,[22] the forgone monthly payments due to the payment-and-interest suspension would cost at least $119 billion. The total cost of the 35-month suspension is therefore at least $294 billion.[23] Again, this math does not even include the undisclosed number of PSLF borrowers affected by the suspension.

---

[21] Tara Siegel Bernard, What to Know About Biden's Income-Driven Repayment Proposal, *The New York Times*, Jan 11, 2023, available at: https://www.nytimes.com/2023/01/10/your-money/student-loans-income-driven-repayment.html (last visited October 6, 2023). It is unclear how many borrowers will seek forgiveness under PSLF because a borrower need not register with the Department to participate in PSLF. Rather, he or she may provide paperwork proving satisfaction of PSLF requirements at the end of the 120-month payment-and-service term.

[22] *See* Robert Farrington, What is the Average Student Loan Payment for U.S. Borrowers, The College Investor, June 1, 2023, available at: https://thecollegeinvestor.com/33643/average-student-loan-monthly-payment/ (last visited October 6, 2023).

[23] The American Enterprise Institute has a slightly lower estimated cost of $238 billion for the payment-and-interest suspension. *See* Na Malkus, Breathtaking Scale of Forgiven Student Loan, Amer. Enter. Inst., Aug. 11, 2023, available at: https://www.aei.org/education/the-breathtaking-

59.     On June 30, 2023, just hours after the Supreme Court's decision in *Nebraska*, and in apparent defiance of Congress's mandate for a hard stop on the payment-and-interest suspension, the President announced that the Department was creating an new "on ramp" period after the hard stop, during which borrowers will not be penalized for non-payments for up to an *additional* 12 months after the mandatory end of the suspension period. White House, Fact Sheet: President Biden Announces New Actions to Provide Debt Relief and Support for Student Loan Borrowers (June 30, 2023).[24]

60.     While interest will accrue during this "on ramp," the President made clear that "interest will not capitalize at the end of the on-ramp period," meaning any unpaid interest each month will not be added to the principal of the loan, *i.e.*, it would not compound. *Id.* Neither the President nor the Department has articulated any statutory or regulatory authority for this 12-month "on ramp," which appears to extend certain elements of the payment-and-interest suspension under another name, as well as create a new element out of whole cloth with the promise not to add unpaid interest to principal nor compound it.

## III.     INJURY TO PLAINTIFF AND OTHER PUBLIC SERVICE EMPLOYERS

61.     The Department's initial adoption and eight unlawful extensions of the payment-and-interest suspension has injured Plaintiff and other public service employers by reducing PSLF incentives that benefit such employers in the competition to hire and retain college-educated workers. *ABA*, 370 F. Supp. 3d at 19 (finding Article III injury based on employer's loss of PSLF incentives).

---

scale-of-forgiven-student-loan-debt/ (last visited October 6, 2023). The different appears to be due to the AEI estimate not counting debt that will be cancelled prematurely (but has not yet been cancelled) because the Department allows millions of current borrowers to count 35 months of non-payment as payment needed to earn forgiveness under IDR and PSLF.

[24] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/30/fact-sheet-president-biden-announces-new-actions-to-provide-debt-relief-and-support-for-student-loan-borrowers/ (last visited October 6, 2023).

**Plaintiff Benefits from PSLF Incentives**

62.     Plaintiff is a nonprofit organization under § 501(c)(3) of the Internal Revenue Code, Lehman Decl. ¶ 4, and is therefore a qualified employer for the PSLF program, *see* 34 C.F.R. § 685.219(b).[25]

63.     Plaintiff competes in the labor market to recruit and retain college-educated employees for staff positions. The incentives Congress provided through the PSLF program were intended to help, and have helped, qualified employers like Plaintiff recruit and retain such employees. Lehman Decl. ¶ 8-9.

64.     Plaintiff has previously employed and currently employs borrowers who participate, may become eligible to participate, or have previously participated in the PSLF program. Plaintiff further reasonably expects to recruit other such employees in the future with the help of the incentives Congress provided it through the PSLF program. *Id.* ¶¶ 8-9.

65.     Under PSLF, a borrower will have the balance of his or her federal direct loan debt forgiven after making 10 years' worth of qualified payments while working full-time at a qualifying employer. 34 C.F.R. § 685.219(c).

66.     PSLF subsidizes qualifying employers' staff-compensation costs by providing an incentive for borrower-employees to seek and maintain employment with such employers rather than employment with non-qualifying employers. *See id.* § 685.219(a) ("The Public Service Loan Forgiveness Program is intended to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of this section.").

---

[25] *See* Dep't of Educ., Search Employer Eligibility for Public Service Loan Forgiveness (PSLF), available at: https://studentaid.gov/pslf/employer-search (last visited October 6, 2023).

67.     All else being equal, this incentive materially helps qualifying employers attract and retain borrower-employees who might otherwise choose higher-paying employment with non-qualifying employers in the private sector.

68.     Qualifying employers, including Plaintiff, benefit from the PSLF subsidy because the effective compensation they are able to offer each eligible borrower-employee is higher than it would be otherwise. For every year during which an eligible borrower works at a qualifying employer, he or she accrues one-tenth of the service time needed for total loan forgiveness. This accrual is valued at roughly one-tenth of the amount of the total loan balance to be forgiven.

69.     The greater debt the borrower-employee owes—and thus will be forgiven under PSLF—the higher his or her effective wage subsidy is under PSLF. By design, therefore, the more outstanding debt a borrower-employee owes, the more the PSLF benefits the public service employer.

**Cancelling the Accrual of Interest Reduces Plaintiff's PSLF Benefits**

70.     When interest accrues in the ordinary course, the amount of a borrower's outstanding debt that will be forgiven under PSLF after ten years is higher than if interest had not accrued. The borrower therefore has greater incentive to work for a public service employer and to have that debt forgiven under PSLF when interest accrues. In other words, the benefit public service employers receive under PSLF is greater if interest continues to accrue on student debt than if interest does not accrue.

71.     Conversely, if interest stops accruing, outstanding debt that will be forgiven under PSLF is less than it otherwise would be, and the financial incentive to work for a public service employer thus falls commensurately.

72.     Defendants suspended the accrual of interest on all outstanding student loans for a period of 35 months—almost three full years—beyond the end of the CARES Act's six-month statutory suspension period. The aggregate amount of cancelled interest during that period was

approximately $5 billion per month. *See* Committee for a Responsible Federal Budget, *Latest Student Pause Brings Total Cost to $155 Billion* (Aug. 30, 2022) ("CRFB Analysis").[26] After 35 months, that amounts to $175 billion in aggregate cancelled interest.

73.     Moreover, this unlawful payment-and-interest suspension was extremely regressive because it benefitted the most affluent segment of college-educated Americans. "The payment pause especially benefits high-income households because they tend to have larger student loan balances— and therefore higher payments." Sarah Turner, *Student loan pause has benefited affluent borrowers the most, others may struggle when payments resume*, Brookings Institute (Apr. 13, 2023).[27]

74.     CRFB estimated in August 2022 that "a typical recent medical school graduate will effectively receive nearly $68,000 of forgiven debt through December [2022]" and "a recent law school graduate will get $41,500 of forgiveness" as a result of the payment-and-interest suspension.[28] CRFB Analysis. By contrast, "someone who just completed an associate's degree will receive $4,500, and individuals who did not complete their undergraduate degree will get $2,500." *Id.* Of course, Americans who did not attend college—and those who either have already paid off their student loans or used personal savings instead of borrowing to pay for their education—receive nothing, yet as taxpayers must foot the bills of others who borrowed to attend college and graduate school.

75.     For all borrowers—especially attorneys and other professionals with high loan balances—because the amount of PSLF-forgivable debt is now lower than it would have been but for the payment-and-interest suspension, the financial incentive under PSLF to work at a public service employer is reduced commensurately. For example, the suspension of payments and interest accrual

---

[26] Available at: https://www.crfb.org/blogs/latest-student-loan-payment-pause-brings-total-cost-155-billion (last visited October 6, 2023).

[27] Available at: https://www.brookings.edu/articles/student-loan-pause-has-benefitted-affluent-borrowers-the-most-others-may-struggle-when-payments-resume/ (last visited October 6, 2023).

[28] Of course, these amounts would now be higher because the Department effectively extended the suspension for another year after CRFB's August 2022 analysis.

reduced the incentive for an average recent law school graduate to seek loan forgiveness by working for a public service employer like Plaintiff by over $40,000.

76.     The suspension thereby has made private sector work comparatively more attractive than working for a qualified public service employer like Plaintiff.

77.     As a result, the suspension chipped away, month after month, at the incentives Congress legislated through PSLF to benefit Plaintiff and other qualifying public service employers, so fewer borrowers can be expected to seek employment with such employers, and more public service employees can be expected to leave their jobs earlier than they otherwise would have. Plaintiff and other public service employers have suffered and will continue to suffer financial harm and competitive disadvantage in the labor market due to lower demand for the jobs they offer, accelerated attrition of their existing staff, and the need to raise salaries to compete for replacement employees.

78.     Plaintiff has four current employees who are PSLF participants. As a result of the 35-month payment-and-interest suspension, the amount of debt forgiveness they each would receive under PSLF is now less than it otherwise would be. They thus have less financial incentive to complete their PSLF terms by working for public service employers like Plaintiff for a full 10 years.

79.     Moreover, because the suspension affected *all* borrowers nationwide, it reduced the amount of debt that PSLF would forgive for *all* PSLF-eligible borrowers whom Plaintiff might someday seek to recruit as employees. These potential employees will likewise have less financial incentive to work for public service employers like Plaintiff.

80.     The Department's "on ramp" policy inflicts the same competitive injury, albeit to a lesser extent. Instead of halting the accrual of interest, the "on ramp" slows and lowers that accrual by not capitalizing the accrued interest, meaning interest does not compound. Less interest will therefore accrue on borrowers' loans after the 12-month "on ramp" period than if interest had been capitalized during that period. Every borrower's outstanding loan balance will therefore be smaller,

and all of them will therefore have less incentive to seek or remain employed in public service and seek forgiveness of that smaller amount under PSLF.

**Counting Non-Payments as Payments for PSLF Purposes Reduces Plaintiff's PSLF Benefits**

81.    By counting non-payments during the 35 months of unlawfully suspended payment obligations and interest accrual toward the 120 months of payments required for PSLF loan forgiveness, the Department shortens the period that many borrowers would otherwise need to work for qualified public service employers to have their loans forgiven under PSLF.

82.    As legislated by Congress, a month counts towards the 120-month service requirement for PSLF forgiveness only if the borrower both (1) works at a public service employer during that month and (2) makes a monthly payment. *See* 20 U.S.C. § 1087e(m)(1)(A). Thus, the PSLF program designed by Congress envisions earning debt forgiveness in exchange for making monthly payments *and* working for a public service employer.

83.    By oxymoronically allowing *non*-payments to count as monthly payments under PSLF via administrative fiat, the Department's newspeak effectively amends the statutory 120-month requirement for PSLF forgiveness, shortening it for borrowers who made no payments during the payment-and-interest suspension period. The period for which PSLF incentivizes these borrowers to seek work with or remain working at public service employers like Plaintiff is thus shortened by almost three years (or 29% of the intended length of the program).

84.    This alteration substantially changes Congress's legislative policy choices and reduces the recruitment-and-retention benefits that PSLF confers upon public service employers like Plaintiff.

85.    Plaintiff has four employees who are currently participating in PSLF. They were affected by the payment-and-interest suspension and thus had 35 months of non-payments counted as monthly payments for the purpose of earning PSLF forgiveness. As a result, each of these

24

employees is now incentivized by the Department's alteration to PSLF to work for Plaintiff (or another qualifying public service employer) instead of non-qualifying employers for three fewer years.

86.     The same is true of many prospective employees Plaintiff expects to recruit in the future because the payment-and-interest suspension applied to all student-loan debtors nationwide. Thus, any prospective recruit owing student loan debt who was employed by another PSLF-qualified employer during all or part of the unlawful 35-month payment-and-interest suspension period likewise would have a reduced incentive to work in public service for the full 10 years required by PSLF.

87.     By simple economic logic, Plaintiff's employee recruitment and retention costs will increase accordingly.

**Counting Non-Payments as Payments for IDR Purposes Reduces Plaintiff's PSLF Benefits**

88.     By counting non-payments during the 35-month payment-and-interest suspension period as payments for purposes of the 20-year or 25-year payment requirements under IDR, the suspension likewise reduces the incentives for seeking PSLF loan forgiveness by making IDR forgiveness a comparatively more attractive alternative.

89.     Borrowers who make monthly payments under an IDR plan can also earn forgiveness toward PSLF. They can have the amount of their required monthly payments capped by one of the IDR plans and then have their remaining outstanding debt cancelled after only 10 years (rather than 20 or 25) if they make those required monthly payments while employed for 10 years by one or more PSLF-qualified employers such as Plaintiff.

90.     PSLF offers faster student-loan forgiveness than IDR. It ordinarily takes only 120 monthly payments while working in public service to earn forgiveness under PSLF versus 240 or 300 monthly payments (20 or 25 years) in IDR payments for those not working in public service. Thus, PSLF participation offers forgiveness 120 or 180 months (12 or 15 years) faster than IDR without

PSLF participation, which incentivizes borrowers to accelerate their loan forgiveness under PSLF by working for public service employers like Plaintiff instead of waiting for IDR forgiveness.

91.     However, by counting 35 months of non-payments as qualifying monthly payments under IDR, Defendants have effectively reduced the 240 or 300 monthly payments required to earn forgiveness under IDR to only 205 or 265 monthly payments, respectively.

92.     IDR participants who did not work for a public service employer during the payment-and-interest suspension period would still need to make 120 monthly payments if they now wish to seek PSLF forgiveness by working for a PSLF-qualified employer like Plaintiff. But they now need only to make 205 or 265 monthly payments instead of 240 or 300, depending on the plan, to obtain forgiveness under IDR without ever working in public service.

93.     As a result, the relative advantage of seeking PSLF loan forgiveness over IDR forgiveness has fallen by 35 months for such borrowers. They therefore have relatively less incentive, both financially and in terms of speed, to seek forgiveness under PSLF by working for public service employers like Plaintiff instead of waiting for IDR forgiveness.

94.     By eroding the statutory incentives and advantages Congress legislated to help Plaintiff and other public service employers recruit and retain college-educated talent, Defendants have unlawfully inflicted economic harm on Plaintiff through their unlawful administrative actions, and unless they are enjoined and their actions are set aside, they will continue to inflict such harm.

## CLAIMS FOR RELIEF

### Count I: Violation of the Appropriations Clause in Article I § 9 of the Constitution

95.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

96.     Article I, § 9, of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." This Clause is intended "to assure

that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). Accordingly, "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Id.* at 424 (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

97.     Debt instruments held by the United States are assets and count as "Money" that may not lawfully be drawn without Congressional appropriation. Cancelling such debt is an appropriation that may not be made without being first authorized by Congress.

98.     Cancelling interest that would have otherwise accrued on debt owed to the Treasury is economically the same as cancelling debt equal to the amount of interest that would have accrued. Such cancellation is an expenditure that must be authorized by an appropriation from Congress.

99.     In Section 3513 of the CARES Act, Congress cancelled six months of interest on student loans—but only six months—through the end of the 2020 fiscal year on September 30, 2020. Congress did not authorize any further cancellation of interest on student loans beyond that date, nor did it appropriate any related budgetary outlays for the subsequent fiscal years.

100.     Each of the Defendants' extensions of the period of non-accrual of interest beyond the six-month period Congress authorized violate the Appropriations Clause.

101.     Counting non-payments during the payment-and-interest suspension as monthly payments needed to earn forgiveness under the IDR and PSLF programs without congressional authorization resulted in cancellation of student-loan debt before conditions required by Congress were fulfilled. Such premature debt cancellation thus violated the Appropriations Clause.

102.     Premature cancellation of student-loan debt due to the payment-and-interest suspension also results in greater amounts of debt cancellation than what Congress has authorized. Recipients of premature cancellation are now required to make 35 fewer monthly payments toward

their debt balances. Thus, for each recipient, the entire debt balance that is cancelled by IDR or PSLF is larger in an amount equal to up to 35 monthly payments. The cancellation of those 35 monthly payments for each recipient of premature IDR or PSLF forgiveness necessarily exceeds the amount that Congress appropriated for those programs.

### Count II: Violation of the Property Clause in Article IV § 3 of the Constitution

103.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

104.    The Property Clause of the Constitution provides: "The Congress shall have Power to dispose of … Property belonging to the United States." U.S. Const. article IV § 3, cl. 2.

105.    Federal student loan debts constitute property belonging to the United States.

106.    Only Congress has "[p]ower to release or otherwise dispose of the rights and property of the United States" and "[s]ubordinate officers of the United States are without that power, save only as it has been conferred upon them by Act of Congress or is to be implied from other powers so granted." *Royal Indem. Co. v. United States*, 313 U.S. 289, 294-95 (1941).

107.    The Secretary is a subordinate officer who has not been granted power to release or dispose of the United States's right to collect monthly payments on federal student loans beyond the CARES Act's six-month period. Nor has Congress conferred on the Secretary power to release or dispose of the United States's right to have interest accrue on all such loans beyond that period.

108.    Each of Defendants' administrative extensions of the six-month CARES Act suspension of student loan payment obligations and interest accruals violated the Property Clause.

109.    The Secretary has not been granted power to release or dispose of the United States's right to require student loan debtors to make at least 120 monthly payments to earn loan forgiveness under PSLF or at least 240 or 300 monthly payments to earn loan forgiveness under IDR.  Nor has

the Secretary been granted power to count periods of non-payment after September 2020 as monthly payments needed to earn debt forgiveness under either IDR or PSLF.

110.    Cancelling student-loan debt by administrative fiat by counting periods of non-payment after September 2020 as qualifying monthly payments needed to earn debt forgiveness under IDR or PSLF violates the Property Clause.

## Count III: Violation of the Vesting Clause in Article I § 1 of the Constitution

111.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

112.    Article I, § 1 of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States." Article I, § 7 further requires legislation to be passed through bicameralism and presentment.

113.    Congress may not "abdicate or … transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). Nor may it delegate to another branch the power to modify prior legislation through a process that bypasses bicameralism and presentment. *See Clinton v. City of New York*, 524 U.S. 417, 440-41 (1998).

114.    Congress in the CARES Act created a student-loan debt-relief program with a specific end date coinciding with the end of the fiscal year: from March 27, 2020, to September 30, 2020.

115.    Amending the CARES Act to extend the statutory expiration date for its debt-relief provisions is a core legislative function that is vested solely in Congress and may not lawfully be exercised by an executive agency. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("We reaffirm the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

116.    Extending a statutory end date for a debt-relief program is a legislative amendment that must be passed through bicameralism and presentment. Congress may not delegate to the

Executive Branch the power to bypass that constitutionally required legislative process for modifying statutes. *See Clinton*, 524 U.S. at 440-41.

117.    The HEROES Act authorizes the Secretary to "waive or modify any statutory … provision applicable to the student financial assistance programs under title IV of the [HEA] … as the Secretary deems necessary in connection with a war or other military operation or national emergency." 20 U.S.C. § 1098bb(a)(1).

118.    The HEROES Act violates Article I's Vesting Clause and bicameralism-and-presentment requirement if and to the extent it purportedly authorized the Secretary to amend the CARES Act's September 30, 2020, expiration date with a new end date selected by the Secretary. *See Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021) ("If a federally imposed eviction moratorium is to continue, Congress must specifically authorize it.").

119.    Additionally, Congress may delegate regulatory power to an executive agency only if it provides an "intelligible principle" by which an agency can exercise it. *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).

120.    A statutory delegation lacks an intelligible principle and is thus unconstitutional if it grants an agency unfettered discretion to make policy decisions. *See Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022), (finding violation of the Vesting Clause where "Congress gave the SEC the power to bring securities fraud actions for monetary penalties within the agency instead of in an Article III court whenever the SEC in its unfettered discretion decides to do so"), *cert. granted*, 143 S. Ct. 2688 (June 30, 2023).

121.    For each extension of the student loan payment-and-interest suspension purportedly authorized by the HEROES Act, the Secretary claimed essentially unfettered discretion to extend a congressionally enacted expiration date for whatever additional period he or she desired, from one month (second extension), to many months (first, fourth, fifth, sixth, and seventh extensions), to an

indefinite period (third extension), to a date based on the timing of a Supreme Court decision (eighth extension), all without any regard to the budgetary impact of such unauthorized administrative actions.

122.    This claimed unfettered discretion fails the intelligible-principle test and violates the Vesting Clause and the bicameralism and presentment requirements.

### Count IV: Violation of Administrative Procedure Act—Exceeding Statutory Authority

123.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

124.    The Department is an agency subject to the requirements of the Administrative Procedure Act (APA).

125.    The payment-and-interest suspension and each of its eight administrative extensions were final agency actions that are subject to judicial review under the APA.  A court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (B), (C). The administrative payment-and-interest suspension and each of its extensions fit all these descriptions.

126.    "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Thus, "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

127.    The Major Questions Doctrine requires an agency to "point to clear congressional authorization for the power it claims" when asserting authority over matters of "economic and political significance." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (internal quotation marks omitted). A "colorable textual basis" is not enough. *Id.*  The doctrine applies to debt-forgiveness programs that cost billions of dollars. *Nebraska*, 143 S. Ct. at 2372.

128.     The need for clear congressional authorization is reinforced by 31 U.S.C. § 1301(d), which states that  a "law may be construed to make an appropriation out of the Treasury … only if the law specifically states that an appropriation is made[.]" Officers and employees of the United States may not "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund[.]" *Id.* § 1341(a)(1)(A).

129.     Defendants invoked "economic hardship" deferment under the HEA to justify the first extension of the six-month CARES Act's payment-and-interest suspension on student loan debt in August 2020. *See* 85 Fed. Reg. at 49,585 (citing 20 U.S.C. § 1087e(f)(2)(D)).

130.     That deferment provision, however, limits deferment to borrowers whom the Secretary determines have experienced or will experience economic hardship under 20 U.S.C. § 1085(o), including full-time workers whose income does not exceed the greater of the federal minimum wage or 150 percent of the poverty line. The Department's regulations further define "economic hardship" to include borrowers who receive means-tested public assistance or work for the Peace Corps. 34 C.F.R. § 682.204(g).

131.     Defendants, however, extended the payment-and-interest suspension for *all* student-loan borrowers nationwide without making any effort to determine which borrowers plausibly qualified under the HEA's narrow definition of "economic hardship." In fact, at the time, only a small minority of the 45 million student-loan borrowers was experiencing economic hardship within the meaning of the HEA.

132.     The HEA did not clearly authorize the Department to pause monthly payments and halt the accrual of interest for all borrowers regardless of economic circumstances. The first extension therefore exceeded statutory authority under the Major Questions Doctrine.

133.    Defendants subsequently invoked the HEROES Act's power to "modify" to justify the second extension (from December 2020 to January 2021) and the seventh extension (from September 2022 to December 2022). 86 Fed. Reg. 5,008; 87 Fed. Reg. at 61,514.

134.    But the authority to "modify" statutes and regulations under the HEROES Act merely "allows the Secretary to make modest adjustments and additions to existing provisions, not transform them." *Nebraska*, 143 S. Ct. at 2369. Extending student-loan relief under Section 3513 of the CARES Act beyond its statutory expiration goes further than a modest adjustment and thus falls outside of the HEROES Act's authority. *Id.* at 2396 (Kagan, J., dissenting) ("So the suspension could no more meet the majority's pivotal definition of 'modify'—as make a 'minor change[ ]'—than could the forgiveness plan.").

135.    The HEROES Act therefore did not authorize the Department to administratively extend Section 3513 of the CARES Act beyond its explicit expiration date of September 30, 2020. The suspension of monthly payments and interest accrual for 35 months past that deadline was unlawful. The counting of those 35 months of non-payments as monthly payments for purposes of IDR and PSLF loan forgiveness was likewise not authorized under the HEROES Act, was not a minor change, and was therefore unlawful.

136.    Even if the HEROES Act contained ambiguities that arguably authorized serial extensions of the payment-and-interest suspension beyond the CARES Act's congressionally enacted end date, it does not authorize such extensions where they are not "necessary to ensure" that borrowers "are not placed in a worse position financially in relation to that financial assistance." 20 U.S.C. § 1098bb(a)(2)(A); *see also* OLC Memo at 21 (The Department may "only … offset that portion of the harm that has a 'relation to' the borrower's [federal] assistance").

137.    The Major Questions Doctrine requires clear authorization from Congress before reading a statute to empower an agency to implement a policy that cancels billions of dollars in

student-loan debt. *See Nebraska*, 143, S. Ct. at 2375 ("'[T]he basic and consequential tradeoffs' inherent in a mass debt cancellation program 'are ones that Congress would likely have intended for itself.'") (quoting *West Virginia*, 142 S. Ct. at 2610). Indeed, Congress did pass such a plan, but one that explicitly expired in six months. The administrative payment-and-interest suspension and its subsequent extensions therefore exceeded Defendants' statutory authority under the Major Questions Doctrine.

138.    The HEA has never before been used to pause monthly payments and cancel the accrual of interest of all borrowers regardless of their economic circumstances. Nor has the HEROES Act been used to extend the congressionally enacted end date of a debt-relief program.

139.    Neither the HEA nor the HEROES Act provides clear authority to extend the payment-and-interest suspension beyond the CARES Act's September 30, 2020 end date. Extensions of the suspension based on those statutes were therefore unlawful under the Major Questions Doctrine and must be set aside.

140.    Defendants did not invoke any statutory authority whatsoever to implement the third, fourth, fifth, sixth, and eighth extensions of the payment-and-interest suspension at the time they were implemented. Nor did the Department invoke any statutory authority when it initially suspended student loan payment obligations and interest accrual on March 20, 2022.

141.    The administrative suspension and its extensions were therefore without statutory authority and must be set aside.

### Count V: Violation of the APA—Arbitrary and Capricious Agency Action

142.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

143.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

144.    Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

145.    The Department did not present relevant data nor provide a rational explanation for its initial decision to enact a payment-and-interest suspension on March 20, 2020. Nor did it present any data and explanation for any of the eight extensions of the suspension. As such, the administrative suspension and all eight extensions were arbitrary and capricious and must be set aside.

146.    Agency action also is arbitrary and capricious if it fails to rationally weigh costs and benefits. *State Farm*, 463 U.S. at 43.

147.    The 35-month administrative suspension of student loan payment obligations and interest accrual is estimated to have cost taxpayers $5 billion per month in forgone interest and $175 billion in cancelled interest payments in the aggregate.

148.    The Department failed even to acknowledge the $5 billion per month price tag of payment-and-interest suspension until the fifth extension, announced in December 2021. Press Release, Dep't of Educ. (Dec. 22, 2021). Even then, the Department framed the cost to taxpayers as a benefit: "The pause on student loan payments will help 41 million borrowers save $5 billion per month." *Id.* In other words, the Department considered the transfer of taxpayer funds into the pockets of relatively well-off college-educated borrowers a benefit, not a cost. The Department could not have rationally considered costs and benefits when it utterly failed to recognize the difference between the two concepts.

149.    Additionally, by counting 35 months of non-payments as monthly payments for purposes of IDR and PSLF loan forgiveness, the Defendants are effectuating early cancellation of student-loan debt for all IDR and PSLF participants at tremendous budgetary cost. At the very least,

each IDR and PSLF participant will make 35 fewer monthly payments before having their outstanding debt cancelled, which costs taxpayers 35 monthly payments per IDR and PSLF participant. There are over 8.5 million IDR participants, and the average monthly student-loan payment is approximately $400. This means the forgone 35 monthly payments for just IDR participants would cost approximately $119 billion. The Department did not consider this cost—it did not even attempt to estimate it, nor the corresponding cost of foregone payments for the unknown number of PSLF participants—and thus could not have rationally weighed the enormous costs of its actions against their purported benefits.

150.    The payment-and-interest suspension and its extensions, and the decision to count non-payments during the suspension as payments by IDR and PSLF participants, were arbitrary and capricious and must be set aside because Defendants failed to weigh their costs and benefits.

151.    Agency action also is arbitrary and capricious if the agency "failed to address whether there was 'legitimate reliance'" on the prior policy. *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1896 (2020).

152.    When cancelling over $175 billion of interest that otherwise would have accrued on student debt and another $119 billion in forgone monthly payments due to premature forgiveness, Defendants failed to address the legitimate reliance interests of public service employers like Plaintiff in PSLF incentives, which are directly based on the amount of forgivable debt owed by employees and prospective employees.

153.    Nor did Defendants consider the effect of shortening PSLF's payment-and-service requirement by 35 months. Nor did the Department consider the effect on such employers of making IDR forgiveness relatively more attractive than PSLF for millions of borrowers.

154.     This failure to consider legitimate reliance interests renders the student loan payment-and-interest suspension and its eight extensions, as well as the decision to count non-payments during the suspension as payments for purposes of IDR and PSLF loan forgiveness, arbitrary and capricious.

**Count VI: Violation of the APA—Failure to Observe Procedure Required by Law**

155.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

156.     Under the APA, courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

157.     The APA requires administrative agencies to undertake notice-and-comment rulemaking when engaging in substantive decision-making. *Id.* § 533.

158.     Under notice-and-comment procedures, the agency must: (1) issue a general notice of proposed rulemaking, ordinarily in the Federal Register; (2) give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments; and (3) publish a final rule that provides a concise general statement of its basis and purpose. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing 5 U.S.C. § 533). The APA also requires "publication … of a substantive rule [to] be made not less than 30 days before its effective date." 5 U.S.C. § 553(d).

159.     Additionally, the HEA requires Defendants to follow "negotiated rulemaking" procedures to "obtain the advice of and recommendations from individuals and representatives of the groups involved in student financial assistance programs" when developing regulations that affect federal student assistance. 20 U.S.C. § 1098a(a)(1).

160.     Defendants invoked economic-hardship deferment under HEA to justify the first extension (from September 30, 2020 to December 31, 2020) of the student loan payment-and-interest suspension in August 2020.

161.    The first extension was a binding rule affecting federal student assistance. Defendants were therefore required to follow the APA's notice-and-comment procedures and the HEA's negotiated rulemaking procedures.

162.    Defendants followed neither the notice-and-comment nor the negotiated-rulemaking requirements when they promulgated the first extension.

163.    The first extension was unlawful and should be set aside because it was agency action that failed to observe procedure required by law. 5 U.S.C. § 706(2)(D).

164.    The HEROES Act provides an exception to notice-and-comment and negotiated-rulemaking procedures when the Department exercises the Act's "waive or modify" authority under 20 U.S.C. § 1098bb(b)(1). But the Department must nonetheless "by notice in the Federal Register, publish the waivers or modifications of statutory and regulatory provisions." *Id.*

165.    The Department published a Federal Register notice under the HEROES Act only for the second extension of the payment-and-interest suspension (from December 31, 2020, to January 31, 2021) and the seventh extension (from August 2022 to December 2022). 86 Fed. Reg. at 5,008; 87 Fed. Reg. at 61,514. The Department now claims that the third, fourth, fifth, sixth, and eighth extensions were also promulgated pursuant to the HEROES Act, but each of those extensions was announced in a press release without any notice published in the Federal Register.

166.    The third, fourth, fifth, sixth, and eighth extensions of the suspension thus violated the requirement under the HEROES Act to publish any waiver or modification "by notice in the Federal Register." 20 U.S.C. § 1098bb(b)(1). Those extensions were unlawful and must be set aside as agency actions performed without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

### Count VIII: The 12-Month "On Ramp" Exceeds Statutory Authority

167.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

168.    The Department announced the 12-month "on ramp" period that would start in October 2023, during which borrowers will not be penalized for failing to make monthly payments on their student loans and during which unpaid interest on such loans will not be capitalized.

169.    This "on ramp" is equivalent to the Department granting all borrowers who miss their monthly payments forbearance under 34 C.F.R. § 685.205(a), which permits "the temporary cessation of payments" for up to 12 months.

170.    The Department lacks statutory authorization to put all borrowers who miss their payments in such forbearance. Rather, such forbearance must be supported by documentation on a case-by-case basis indicating that the borrower intends to repay the loan and qualifies for one of the eligibility conditions listed at 34 C.F.R. § 685.205(a). The "on ramp" exceeds statutory authority and must be set aside and enjoined. 5 U.S.C. § 706(2)(C).

171.    Moreover, the Department lacks authority to halt the capitalization of interest during a period of forbearance. See 34 C.F.R. § 685.205(a) ("[I]f payments of interest are forborne, they are capitalized.").

172.    The Department lacks statutory authorization to forgo capitalization of interest owed by borrowers during the 12-month "on ramp" forbearance period. The HEA requires interest to be capitalized except in circumstances where the Secretary is given explicit authority to limit capitalization of interest. *See, e.g.*, 20 U.S.C. § 1087e(e) ("The Secretary may promulgate regulations limiting the amount of interest that may be capitalized on [the qualified income contingent] loan, and the timing of any such capitalization."). No such authority exists for the 12-month forbearance period contemplated by the "on ramp" policy.  The "on ramp" thus exceeds statutory authority and must be set aside and enjoined. 5 U.S.C. § 706(2)(C).

**Count IX: The 12-Month "On Ramp" Violates the Appropriations and Property Clauses**

173.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

174.    By not capitalizing interest during this 12-month "on ramp" period, the Department will be forgiving debt equal to the amount of additional interest that would have accrued had interest been capitalized.

175.    Such cancellation of debt exceeds the scope of congressional appropriations and thus violates the Constitution's Appropriations Clause (art. I, § 9) and Property Clause (article IV § 3, cl. 2) and unlawfully disposes of debt assets belonging to the United States without authorization from Congress.

**RELIEF REQUESTED**

**WHEREFORE,** Plaintiff respectfully requests that the Court declare Defendants' above-described actions unconstitutional and otherwise unlawful, and to enjoin their implementation and set them aside. Specifically, Plaintiff requests this Court to find Defendants have committed the violations alleged and described above, and to issue the following:

A.  A declaration that the student loan payment-and-interest suspension adopted administratively on March 20, 2020, and each of its eight extensions violated and continues to violate the Appropriations, Property, and/or Vesting Clauses of the Constitution;

B.  A declaration that neither the HEROES Act nor the HEA authorized the payment-and-interest suspension nor any of its extensions.

C.  A declaration that the payment-and-interest suspension and its extensions violated the APA;

D.  A declaration that the payment-and-interest suspension and its extensions violated the Major Questions Doctrine;

E.  A judgment setting aside the payment-and-interest suspension and its extensions;

F.   A judgment requiring the Department, to the extent practical, to nominally unwind by $1 per affected borrower its unlawful debt cancellations caused by the suspension and its extensions and thereby partially restore PSLF incentives that were improperly depleted;

G.   A declaration that counting non-payments during the administrative suspension period as payments toward the 120 monthly payments required for debt forgiveness under PSLF violates the Appropriations Clause, the Property Clause, the Vesting Clause, the Major Questions Doctrine, and the APA;

H.   An injunction requiring Defendants to stop counting non-payments during the administrative suspension period as payments in calculating the number of payments made toward the 120 months required under the PSLF for loan forgiveness;

I.   A declaration that counting non-payments during the administrative suspension period as payments toward the 240 or 300 monthly payments required for debt forgiveness under IDR violates the Appropriations Clause, the Property Clause, the Vesting Clause, the Major Questions Doctrine, and the APA;

J.   An injunction requiring Defendants to stop counting non-payments during the administrative suspension period as payments in calculating the number of payments made toward the 240 or 300 months required under the IDR for loan forgiveness;

K.   A declaration that Defendants' 12-month "on ramp" for resuming student loan payment obligations and interest accrual violates the Appropriations Clause, the Property Clause, the Vesting Clause, the Major Questions Doctrine, and the APA.

L.   An injunction requiring the Department to halt the 12-month "on ramp" policy.

M.   An award of attorneys' fees and costs;

N.   Any other relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiff demands a trial by jury of any triable issues.


October 6, 2023                              Respectfully submitted,

                                             */s/ Sheng Li*
                                             _____
                                             SHENG LI
                                             Litigation Counsel
                                             RUSSELL G. RYAN
                                             Senior Litigation Counsel
                                             NEW CIVIL LIBERTIES ALLIANCE
                                             1225 19th Street NW, Suite 450
                                             Washington, DC 20036
                                             (202) 869-5210
                                             Sheng.Li@ncla.legal

                                             Patrick J. Wright (Bar No. 54052)
                                             Vice President for Legal Affairs
                                             MACKINAC CENTER FOR PUBLIC POLICY
                                             130 W. Main Street
                                             Midland, MI 48640
                                             (989) 430-3912