## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

MACKINAC CENTER FOR PUBLIC
POLICY,

               Plaintiff,

      v.

U.S. DEPARTMENT OF
EDUCATION, *et al.*,

               Defendants.

Case No. 1:23-cv-10795-TLL-PTM

### DEFENDANTS' MOTION TO DISMISS

      Pursuant to Federal Rule of Civil Procedure 12(b)(1), Defendants hereby move to dismiss Plaintiff Mackinac Center for Public Policy's amended complaint, ECF No. 22, for lack of subject-matter jurisdiction.  In support of this motion, Defendants rely upon and incorporate by reference their Brief in Support of Defendants' Motion to Dismiss, which is filed contemporaneously with this motion.

Dated: November 6, 2023

                               Respectfully submitted,

                               BRIAN M. BOYNTON
                               Principal Deputy Assistant
                               Attorney General

                               MARCIA BERMAN
                               Assistant Branch Director

                               */s/ Cody T. Knapp*
                               CODY T. KNAPP (NY #5715438)
                               Trial Attorney
                               U.S. Department of Justice

Civil Division
Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 532-5663
Facsimile: (202) 616-8470
E-mail: cody.t.knapp@usdoj.gov

*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

MACKINAC CENTER FOR PUBLIC
POLICY,

                Plaintiff,

      v.

U.S. DEPARTMENT OF
EDUCATION, *et al.*,

            Defendants.

Case No. 1:23-cv-10795-TLL-PTM

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## ISSUES PRESENTED

Whether Plaintiff Mackinac Center for Public Policy has standing to maintain its claims?

## MOST APPROPRIATE AUTHORITIES

- *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013)

- *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)

- *Air Excursions LLC v. Yellen*, 66 F.4th 272 (D.C. Cir. 2023)

- *Arpaio v. Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015)

- *Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010)

- *Cato Institute v. Cardona*, No. 1:23-cv-11906, 2023 WL 5232910 (E.D. Mich. Aug. 14, 2023)

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 2

I.     Statutory and Regulatory Background .................................................................. 2

    A.   The Higher Education Act ................................................................................ 2

    B.   The Higher Education Relief Opportunities for Students Act of 2003 ............... 3

    C.   Income-Driven Repayment .............................................................................. 4

    D.   The Public Service Loan Forgiveness Program .................................................. 5

II.    The Challenged Policies ...................................................................................... 6

    A.   The Pause on Student-Loan Payments and Interest Accrual During the
        COVID-19 Pandemic ....................................................................................... 6

    B.   The Return to Repayment Protections ............................................................. 8

III.  This Case ............................................................................................................ 10

STANDARD OF REVIEW .......................................................................................... 12

ARGUMENT ................................................................................................................ 12

I.     The Court should dismiss this case for lack of standing. ...................................... 12

    A.   Mackinac's alleged competitive injury is not cognizable. .................................... 13

    B.   Mackinac's alleged injury is not sufficiently traceable to Defendants. .............. 20

    C.   The relief Mackinac seeks is unlikely to redress its alleged injury. ..................... 23

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Adams v. Watson,*
　10 F.3d 915 (1st Cir. 1993) ........................................................ 22

*Air Excursions LLC v. Yellen,*
　66 F.4th 272 (D.C. Cir. 2023)................................................ 15, 16

*Already, LLC v. Nike, Inc.,*
　568 U.S. 85 (2013) ..................................................................... 19

*Arpaio v. Obama,*
　797 F.3d 11 (D.C. Cir. 2015) .................................................... 22

*Block Commc'ns, Inc. v. FCC,*
　808 F. App'x 332 (6th Cir. 2020) ............................................. 14

*California v. Texas,*
　141 S. Ct. 2104 (2021) .............................................................. 23

*Cartwright v. Garner,*
　751 F.3d 752 (6th Cir. 2014) .................................................... 12

*Cato Institute v. Cardona,*
　No. 1:23-cv-11906, 2023 WL 5232910 (E.D. Mich. Aug. 14, 2023) .................. 13, 15

*Clapper v. Amnesty Int'l USA,*
　568 U.S. 398 (2013) .............................................................. 20, 21

*DaimlerChrysler Corp. v. Cuno,*
　547 U.S. 332 (2006) ................................................................... 12

*Dep't of Commerce v. New York,*
　139 S. Ct. 2551 (2019) .............................................................. 22

*El Paso Nat. Gas Co. v. FERC,*
　50 F.3d 23 (D.C. Cir. 1995) ...................................................... 15

*Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.,*
　807 F.3d 806 (6th Cir. 2015) .................................................... 12

*Henderson v. Stalder,*
   287 F.3d 374 (5th Cir. 2002) ........................................................................... 19

*KERM, Inc. v. FCC,*
   353 F.3d 57 (D.C. Cir. 2004) .......................................................................... 20

*L. C. v. United States,*
   83 F.4th 534 (6th Cir. 2023) .......................................................................... 12

*La. Energy & Power Auth. v. FERC,*
   141 F.3d 364 (D.C. Cir. 1998) ....................................................................... 14

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ................................................................................. 12, 23

*New World Radio, Inc. v. FCC,*
   294 F.3d 164 (D.C. Cir. 2002) ....................................................................... 19

*Salazar v. Buono,*
   559 U.S. 700 (2010) ....................................................................................... 24

*Sherley v. Sebelius,*
   610 F.3d 69 (D.C. Cir. 2010) .................................................................... 14, 15

*Sorenson Commcns., LLC v. FCC,*
   897 F.3d 214 (D.C. Cir. 2018) ....................................................................... 14

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) ....................................................................................... 12

*State Nat'l Bank of Big Spring v. Lew,*
   795 F.3d 48 (D.C. Cir. 2015) ......................................................................... 19

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) ................................................................................... 13

*U.S. Dep't of Educ. v. Brown,*
   600 U.S. 551 (2023) ................................................................................. 20, 23

*U.S. Telecom Ass'n v. FCC,*
   295 F.3d 1326 (D.C. Cir. 2002) ..................................................................... 15

*Warth v. Seldin,*
   422 U.S. 490 (1975) ....................................................................................... 12

**STATUTES**

20 U.S.C. § 108e(m) ............................................................................... 5

20 U.S.C. § 1070 *et seq* ......................................................................... 2

20 U.S.C. § 1082 ..................................................................................... 3

20 U.S.C. § 1087a ................................................................................... 2

20 U.S.C. § 1087e(e)(7) .......................................................................... 4

20 U.S.C. § 1087e(m) ............................................................................. 5

20 U.S.C. § 1087e(m)(1)(A) .................................................................. 5

20 U.S.C. § 1098aa ................................................................................. 3

20 U.S.C. § 1098bb(a)(1) ....................................................................... 3

50 U.S.C. § 1621 ..................................................................................... 4

Pub. L. No. 108-76, 117 Stat. 904 (2003) ........................................... 3

Pub. L. No. 110-84, 121 Stat. 784 (2007) ........................................... 5

Pub. L. No. 116-136, 134 Stat. 281 (2020) ......................................... 7

Pub. L. No. 118-3, 137 Stat. 6 (2023) ................................................. 6

Pub. L. No. 118-5, 137 Stat. 10 (2023) ............................................... 8

**RULES**

Federal Rule of Civil Procedure 12(b)(1) .......................................... 12

**REGULATIONS**

34 C.F.R. § 682.209 ............................................................................... 4

34 C.F.R. § 685.209(a)(6) ...................................................................... 5

34 C.F.R. § 685.219 ............................................................................... 6

34 C.F.R. § 685.219(c) ........................................................................... 5

34 C.F.R. § 685.219(c)(1)(iv) ................................................................ 5

85 Fed. Reg. 15,337 (Mar. 18, 2020) ................................................... 6

85 Fed. Reg. 79,856 (Dec. 11, 2020) ................................................... 7

**OTHER AUTHORITIES**

Centers for Disease Control and Prevention, COVID Data Tracker,
    https://covid.cdc.gov/covid-data-tracker/#datatracker-home ................................. 6

Memorandum on the Use of Secretary's Compromise Authority for Remediating
    Potential Harm to Borrowers Caused by Return to Repayment Servicing Errors
    (Oct. 29, 2023), *available at*
    https://www2.ed.gov/policy/gen/leg/foia/readingroom_2.html ............................ 9

Return to Repayment Protections Memorandum, *available at*
    https://www2.ed.gov/policy/gen/leg/foia/readingroom_2.html ................. 8, 9, 10

U.S. Dep't of Educ., Federal Student Aid ("FSA"), Annual Report FY 2020 (Nov. 16,
    2020), https://perma.cc/9ZM7-HWZP ...................................................... 7

## INTRODUCTION

Plaintiff Mackinac Center for Public Policy, a non-profit advocacy organization and employer purporting to promote an enhanced qualify of life in Michigan through free-market and small-government policies, challenges two policies of the Department of Education.  One of those policies—a general pause on the repayment of student loan obligations and the accrual of interest on outstanding student loan debt, which ended more than two months ago—was implemented to lessen the financial pressure imposed by those debts for the duration of a catastrophic, years-long pandemic.  The other policy—which allows the Department to delay the worst effects for borrowers of delinquency and default on student loan debt—was adopted to help ensure a smooth transition for borrowers as the first policy ended and borrowers were required to make payments on their loan obligations again.  Neither policy directly concerns Mackinac, much less prohibits or requires any action by it, although Mackinac clearly opposes the policies as what it contends is government overreach.  In a convoluted effort to manufacture standing to challenge the policies, Mackinac argues that the policies have harmed it—at least as a matter of economic theory—by making the organization marginally less attractive as an employer to indebted borrowers, who will not be burdened with as much debt and financial pressure as they otherwise might have been.

Mackinac's theory of standing is meritless.  Mackinac has suffered no "competitive injury" from Defendants' actions to provide a small measure of assistance to borrowers who may or may not participate in the various programs that permit

borrowers working in lower-paying public service jobs to obtain debt forgiveness under certain conditions following years of timely payments.   Any marginal effect the challenged policies may have on Mackinac's recruitment and retention of new employees is purely speculative and not traceable to Defendants at this point, as it depends on myriad and unfettered decisions of millions of third parties not before the Court.  And even if Mackinac could make out a cognizable claim of injury in this case (it cannot), its request for relief would only underscore those harms rather than provide any redress.  Because Mackinac lacks standing in these circumstances, the Court should dismiss the amended complaint and close this case.

## BACKGROUND

### I.  Statutory and Regulatory Background

#### A.      The Higher Education Act

The Secretary of Education is charged with carrying out certain student loan programs under Title IV of the Higher Education Act of 1965 (HEA), 20 U.S.C. § 1070 *et seq.* Foremost among these is the William D. Ford Federal Direct Loan Program, which allows students to apply for and receive Direct Loans from the federal government to pay for their educational expenses, including tuition and living expenses. *See* 20 U.S.C. §§ 1087a–1087j, 1087*ll*.  Title IV also includes other programs, such as the Federal Family Education Loan (FFEL) Program, *id.* §§ 1071–1087-4, and the Perkins Loan Program, *id.* §§ 1087aa-1087ii, although no new loans are authorized under either program.  *See id.* § 1078(a)(1) (no new FFEL loans after July 1, 2010); *id.* §

1087aa(b)(2) (no new Perkins loans after September 30, 2017).  The HEA delegates significant authority to the Secretary to administer the Department's portfolio of more than 43 million federal student loans, *see* 20 U.S.C. §§ 1082, 3441, 3471, including the authority to "compromise, waive, or release any right, title, claim, lien, or demand" acquired in the Secretary's performance of his vested "functions, powers, and duties" to administer student loans, *id.* § 1082(a).

### B.    The Higher Education Relief Opportunities for Students Act of 2003

The Higher Education Relief Opportunities for Students Act of 2003, Pub. L. No. 108-76, 117 Stat. 904 (2003) (codified at 20 U.S.C. §§ 1098aa-1098ee) ("HEROES Act"), authorizes the Secretary to take certain actions with respect to the federal student financial aid programs in times of national emergency.  It provides that, "[n]otwithstanding any other provision of law," the Secretary may "waive or modify any statutory or regulatory provision applicable to" the federal student financial aid programs "as the Secretary deems necessary in connection with a … national emergency to" accomplish certain statutory goals.  20 U.S.C. § 1098bb(a)(1).  The Secretary may provide such waivers and modifications as "necessary to ensure" that (1) covered Title IV financial aid recipients "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals," and (2) administrative requirements placed on such covered individuals are "minimized … to ease the burden on such students and avoid inadvertent, technical violations or defaults."  *Id.* § 1098bb(a)(2).  The HEROES Act defines the covered population of

"affected individual[s]" broadly to encompass any individual who, as relevant here, either "resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency," or "suffered direct economic hardship as a direct result of a [national emergency] as determined by the Secretary." *Id.* § 1098ee(2). And a "national emergency" is "a national emergency declared by the President of the United States." *Id.* § 1098ee(4); *see also* 50 U.S.C. § 1621 (authorizing President to declare national emergency).

### C. Income-Driven Repayment

When a federal student-loan borrower enters repayment following a six-month post-graduation grace period, the borrower may choose from more than ten repayment plan options, which dictate the schedule, overall number, and dollar amount of their loan payments. *See* 20 U.S.C. §§ 1087e(e)(7), 1098e(b)(7); 34 C.F.R.§§ 682.209, 685.208, 685.209. The Standard Repayment Plan is the default and sets a fixed monthly payment that will result in repayment of the loan over ten years; for borrowers with large loan balances, that plan could result in very high monthly payments. To aid borrowers in accessing higher education without crippling their financial future, Congress and the Secretary have created several income-driven repayment (IDR) plans, with differing eligibility criteria and terms, that base monthly payments on a percentage of the borrower's disposable income, including the Income-Contingent Repayment, Income-Based Repayment, Pay-As-You-Earn, and Saving on a Valuable Education plans. For

some low-income borrowers, the required monthly payment under one of these plans may be as low as $0 or only slightly more.

Importantly, the required monthly payments on an IDR plan may be insufficient to pay off the outstanding balance, even over decades of dutiful payments—particularly for borrowers with large balances or low incomes.  Congress and the Department thus assured borrowers that any outstanding loan balance will be forgiven after 20 or 25 years' worth of payments, depending on the plan.  34 C.F.R. § 685.209(a)(6); *id.* § 685.209(c)(5); *id.* §§ 682.215(f), 685.221(f).

### D.    The Public Service Loan Forgiveness Program

The College Cost Reduction and Access Act of 2007 amended the HEA to establish the Public Service Loan Forgiveness ("PSLF") program.  *See* Pub. L. No. 110-84, 121 Stat. 784 (2007); 20 U.S.C. § 1087e(m).  To qualify for loan forgiveness under the PSLF program, a borrower must: (1) have made 120 monthly payments on an eligible loan after October 1, 2007 under designated repayment plans; (2) be employed full-time in a public-service job at the time each of the 120 monthly payments were made; and (3) be employed in a public-service job at the time of loan forgiveness.  *See* 20 U.S.C. § 1087e(m)(1)(A), (B); 34 C.F.R. § 685.219(c).  Each of the IDR plans mentioned above are qualifying payment plans for PSLF.  *See* 34 C.F.R. § 685.219(c)(1)(iv).  The PSLF program is available only to borrowers with Direct Loans, *see* 20 U.S.C. § 108e(m); a borrower with older FFEL loans must consolidate her loans into a Direct Loan to participate in PSLF.

Many borrowers participating in PSLF work for a governmental entity (federal, state, or municipal), including teachers, social workers, military servicemembers, nurses, first responders, firefighters, and other essential workers. Borrowers employed by 501(c)(3) nonprofit entities also may participate, as can employees of other nonprofit organizations providing certain public services, including, *e.g.*, public-interest legal services, library services, law enforcement, and emergency management, *see* 34 C.F.R. § 685.219.

## II. The Challenged Policies

### A. The Pause on Student-Loan Payments and Interest Accrual During the COVID-19 Pandemic

In March 2020, then-President Trump declared a national emergency to contain and combat the virus known as COVID-19. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15,337 (Mar. 18, 2020). That declaration, which rendered every state, the District of Columbia, and the territories disaster areas due to COVID-19, remained in effect for more than three years, ending only on April 10, 2023. *See* National Emergencies Act, Pub. L. No. 118-3, 137 Stat. 6 (2023). During the national emergency, COVID-19 killed more than 1.1 million Americans, *see* Centers for Disease Control and Prevention, COVID Data Tracker (last visited Nov. 3, 2023), https://covid.cdc.gov/covid-data-tracker/#datatracker-home, and caused significant disruptions to all aspects of American life, especially to the national economy.

In response to the pandemic and the myriad economic difficulties it caused, the federal government took several significant actions to provide relief to federal student loan borrowers with Department-held loans.  As of March 20, 2020, then-Secretary Betsy DeVos invoked the HEROES Act to place all borrowers in administrative forbearance, thereby pausing repayment obligations and suspending interest accrual on Department-held student loans.  *See* Federal Student Aid Programs, 85 Fed. Reg. 79,856, 79,857 (Dec. 11, 2020) ("2020 Notice").  Shortly thereafter, Congress enacted legislation directing the Secretary to suspend all payments on any Title IV loans held by the Department and apply a zero-percent interest rate to all such loans, through September 2020.  *See* Coronavirus Aid, Relief, And Economic Security Act, Pub. L. No. 116-136, § 3513, 134 Stat. 281 (2020).  These protections were extended by both the Trump Administration and the Biden Administration pursuant to invocations of the Secretary's HEROES Act authority.  *See, e.g.*, 2020 Notice, 85 Fed. Reg. at 79,857; U.S. Dep't of Educ., Federal Student Aid ("FSA"), Annual Report FY 2020 (Nov. 16, 2020), https://perma.cc/9ZM7-HWZP.  While federal student-loan borrowers remained in administrative forbearance, borrowers employed in public service received credit toward the 120-month requirement for loan forgiveness pursuant to PSLF, and borrowers participating in IDR plans received credit toward their plans' statutory forgiveness thresholds.

On June 3, 2023, the President signed into law the Fiscal Responsibility Act of 2023.  *See* Pub. L. No. 118-5, § 271, 137 Stat. 10, 33–34 (2023).  That Act contained

provisions addressing the pandemic-related pause of monthly payments and interest accrual. Specifically, the Act provided that, "[s]ixty days after June 30, 2023, the waivers and modifications described in" the Act—*i.e.*, "the waivers and modifications of statutory and regulatory provisions relating to an extension of the suspension of payments on certain loans and waivers of interest on such loans under section 3513 of the CARES Act . . . described by the Department of Education in the Federal Register on October 12, 2022 . . . and most recently extended in the announcement by the Department of Education on November 22, 2022"—"shall cease to be effective." *Id.* § 271(a), (c). Accordingly, the pause on payments and interest accrual was lifted in August 2023, outstanding loans began to accrue interest again in September, and borrowers were required to start making payments on their loan obligations in October.

## B.    The Return to Repayment Protections

In the course of preparing for the restart of payments, Defendants reviewed information indicating that the unique nature and scale of the transition back to repayment would risk very high rates of delinquency and default among borrowers— far beyond the generally elevated risks that the Department had already found borrowers face following the end of forbearance. *See* Return to Repayment Protections Memorandum at 1–5, available at https://www2.ed.gov/policy/gen/leg/ foia/readingroom_2.html (third document archived under the Office of the Secretary). Among other things, the Department's internal data revealed that more than half of borrowers reported that their financial stability depended on the continuation of the

payment pause. *See id.* at 2.   Additionally, certain structural and technical adjustments to the federal student loan programs had yet to be fully implemented, and budget constraints had forced FSA to reduce personalized assistance services for borrowers. *See id.* at 1 ("These borrowers will return to a student loan system that is midstream in making fundamental reforms to student loan servicing and borrower benefits, at a time when FSA is managing multiple management priorities with constrained funding."). In Defendants' assessment, all these financial and operational challenges amplified the risk of errors and harm to borrowers as student loan payments restarted. *See, e.g., id.* at 5. Recent findings indicate that the Department's concerns have been borne out. *See, e.g.,* Memorandum on the Use of Secretary's Compromise Authority for Remediating Potential Harm to Borrowers Caused by Return to Repayment Servicing Errors at 2 (Oct. 29, 2023), available at https://www2.ed.gov/policy/gen/leg/foia/ readingroom_2.html (first document archived under Federal Student Aid) (noting that one servicer failed to send timely statements to 2.5 million borrowers and that the servicer reported more than 830,000 of those borrowers missed their first student loan payment).

To avoid the worst consequences of delinquency and default, Defendants determined to implement certain transitional return-to-repayment protection measures following the statutorily mandated end to the pandemic-related pause on payments and interest accrual. *See* Return to Repayment Protections Memorandum at 6. In particular, Defendants have established a 12-month transitional period during which they will use

administrative forbearance procedures to prevent any federally managed student loan account from becoming more than 90 days delinquent. *See id.* During this period, by placing accounts into administrative forbearance status when a borrower misses their newly scheduled payments, the Department is temporarily delaying certain penalties for borrowers who fail to make complete, on-time payments in the first months after the transition to repayment. *See id.* Importantly, "this retroactive administrative forbearance [does not] affect a borrower's legal obligation to make payments, and interest continues to accrue on borrowers' balances." *Id.* And borrowers who miss payments will not be credited with progress toward loan forgiveness under the PSLF and IDR programs.

## III.  **This Case**

Plaintiff Mackinac Center for Public Policy first filed this case on April 6, 2023, challenging the then-in-effect pandemic-related pause on student loan payments and interests, and it moved for a preliminary injunction to bar the implementation of that pause on May 11. *See* ECF Nos. 1, 9. A briefing schedule was later set, but following the enactment of the Fiscal Responsibility Act on June 3, 2023, Mackinac withdrew its preliminary-injunction motion, and the Court granted several extensions of the parties' pleading deadlines so that Mackinac could evaluate whether it wished to proceed with this litigation following the statutorily mandated end of the pandemic-related pause.

On October 6, 2023, Mackinac filed an amended complaint. *See* Am. Compl., ECF No. 22. The amended complaint maintains Mackinac's challenge to the pandemic-

related pause on student loan payments and interest accrual despite its definitive end. Now, instead of seeking to enjoin the already-terminated pause, Mackinac seeks to prevent Defendants from crediting certain borrowers with progress towards loan forgiveness under IDR plans and the PSLF program for the period in which payments were paused.  The amended complaint also adds claims concerning Defendants' post-pause provision of return-to-payment protections.  On the merits, Mackinac alleges that both policies violate the Constitution's Appropriations and Property Clauses, and that they exceed Defendants' statutory authority under the Administrative Procedure Act, and complains at length about their cost to the taxpayers (see, e.g., Am. Compl. ¶¶ 56, 58, 72).

Mackinac alleges that it is a 501(c)(3) organization with 45 employees.  Am. Compl. ¶ 1.  Mackinac claims to face past, present, and future "economic harm" from both challenged policies, *see id.* ¶ 94, because they leave Mackinac's current employees with "less financial incentive to complete their PSLF terms by working for public service employers like [Mackinac] for a full 10 years," *id.* ¶ 78, and "potential employees" with "less financial incentive to work for public service employers" at all, *id.* ¶ 79.  According to Mackinac, in light of these lower incentives, "fewer borrowers can be expected to seek employment with [public service employers like Mackinac], and more public service employees can be expected to leave their jobs earlier than they otherwise would have."  *Id.* ¶ 77.  As a result, Mackinac claims that it "and other public service employers have suffered and will continue to suffer financial harm and competitive

11

disadvantage in the labor market due to lower demand for the jobs they offer, accelerated attrition of their existing staff, and the need to raise salaries to compete for replacement employees." *Id.*

Defendants now move to dismiss the amended complaint on the ground that Mackinac lacks standing to press its claims.

## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests the Court's jurisdiction to hear the case. A motion under Rule 12(b)(1) may be either facial—contending that the complaint, taking well-plead factual allegations as true, does not plausibly allege a basis for jurisdiction—or factual—disputing the facts the plaintiff has alleged to support jurisdiction. *L. C. v. United States*, 83 F.4th 534, 542 (6th Cir. 2023). When evaluating a factual attack on jurisdiction, "a court has broad discretion with respect to what evidence to consider" and it "has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case." *Cartwright v. Garner*, 751 F.3d 752, 759–60 (6th Cir. 2014). The plaintiff, as the party invoking the Court's jurisdiction, bears the burden of establishing it. *Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015).

## ARGUMENT

## I. The Court should dismiss this case for lack of standing.

As the plaintiff, Mackinac must satisfy the "irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To bear its burden,

Mackinac is required to show it has suffered a "personal injury fairly traceable to [Defendants'] allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 333 (2006). Because this case remains at the pleading stage, Mackinac must "'clearly . . . allege facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)). "General or conclusory allegations will not do." *Cato Institute v. Cardona*, No. 1:23-cv-11906, 2023 WL 5232910, at *5 (E.D. Mich. Aug. 14, 2023), *appeal filed* No. 23-1736 (6th Cir. Aug. 16, 2023).

Mackinac has not carried its burden to establish standing. For many of the same reasons that this Court previously identified in rejecting a similar suit involving Mackinac, *see Cato Institute*, 2023 WL 5232910, at *7–8, Mackinac's convoluted theory of competitive injury is inconsistent with bedrock principles of Article III standing. And in any event, such an injury impermissibly turns on broad speculation about the future actions of independent third parties. Moreover, there is a marked mismatch here between the harm Mackinac purports to suffer and the redress it seeks from this Court. Because Mackinac has not clearly alleged, much less substantiated, any cognizable injury fairly traceable to the policies it challenges and redressable by the relief it seeks, the Court should dismiss the amended complaint and enter judgment for Defendants.

### A. Mackinac's alleged competitive injury is not cognizable.

To support a plaintiff's standing, an injury must be "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

According to Mackinac, the past pandemic-related pause on student loan payments and interest accrual, as well as the transitional twelve-month return-to-repayment protections, inflict various economic harms:   "financial harm and competitive disadvantage in the labor market due to lower demand for the jobs [Mackinac and similar employers] offer, accelerated attrition of their existing staff, and the need to raise salaries to compete for replacement employees."   Am. Compl. ¶ 77.   Invoking the competitor standing doctrine, Mackinac styles these alleged economic harms as a general "competitive injury."   *Id.* ¶ 80; *see generally id.* ¶¶ 61–94.   But because Mackinac's allegations of competitive injury remain inchoate, generalized, and speculative, the Court should reject them as insufficient to support standing in this case.

As a threshold matter, the competitor standing doctrine is ill-fitted to this case. The doctrine recognizes that, in some circumstances, plaintiffs may "suffer an economic injury 'when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them.'"   *Block Commc'ns, Inc. v. FCC*, 808 F. App'x 332, 336 (6th Cir. 2020) (quoting *Sorenson Commcns., LLC v. FCC*, 897 F.3d 214, 226 (D.C. Cir. 2018)).   But Defendants have taken no action for or against Mackinac's competitors, which Mackinac defines as "non-[PSLF]-qualifying employers in the private sector," Am. Compl. ¶ 67, that participate in the labor market "to hire and retain college-educated workers," *id.* ¶ 61.   Instead, Defendants have simply acted to ease the financial strains on certain federal student loan borrowers.   And this case— a clearly ideologically driven lawsuit in which a small, regional advocacy organization

seeks to impose "greater debt," Am. Compl. ¶ 69, on every federal student loan borrower in the country, in nominal service of its parochial employee recruitment and retention efforts—is a far cry from the ordinary commercial contexts in which the competitor standing doctrine is typically applied. *Cf. Sherley v. Sebelius*, 610 F.3d 69, 72, 74 (D.C. Cir. 2010) (a party competing for a government grant had standing to challenge agency action that "benefit[ted] his rival" and "intensified the competition for a share in a fixed amount of money"); *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (allowing a "customer and competitor" of an energy company to challenge agency approval of the company's application "to sell . . . energy at market-based rates"); *U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002) (finding that a party had standing to challenge an agency order permitting its competitor to "offer lower prices for the same telecommunication services").

Even assuming that the competitor standing framework can have some application in a case like this one, the doctrine offers no support for Mackinac's claim of injury. "[T]he basic requirement common to all [competitor standing] cases" is that the allegedly unlawful competitive benefit must be shown to result in "an actual or imminent increase in competition." *Sherley*, 610 F.3d at 73; *El Paso Nat. Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995) ("The nub of the 'competit[or] standing' doctrine is that when a challenged agency action authorizes allegedly illegal transactions that will almost surely cause [a plaintiff] to lose business, there is no need to wait for injury from specific transactions to claim standing."). As this Court recently put it, "[w]hile the

'competit[ive] standing doctrine supplies the link between increased competition and tangible injury' it 'does not, by itself, supply the link between the challenged conduct and increased competition.  The latter must be apparent from the nature of the challenged action itself . . . or from the well-pleaded allegations of the plaintiff's complaint.'" *Cato Institute*, 2023 WL 5232910, at *7 (quoting *Air Excursions LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023)).  Mackinac has not supplied such allegations here, so its claim of competitive injury necessarily fails.

Fatally for its claim to standing, Mackinac fails to identify any link between, on one hand, the labor market distortions it attributes to the pause on student loan payments and interest accrual and the transitional return-to-repayment protections, and on the other, any concrete, particularized, and actual or imminent competitive harm. Mackinac spills considerable ink describing its assessment that, as a theoretical matter, the challenged policies provide a benefit to its competitors relative to the status quo by at least somewhat reducing federal student-loan borrowers' financial incentives to choose employment with a public-sector employer over a private-sector employer.  But Mackinac never connects the dots between this alleged change in borrowers' incentives and any actual or imminent impact on its financial bottom line. *Cf. Air Excursions LLC*, 66 F.4th at 280 (requiring a plaintiff to "connect their competitors' receipt of payments with a more specific competitive injury" and noting that "a competitor's receipt of a windfall, whether monetary or otherwise, falls short of establishing that 'any specific harm' will result 'as a matter of economic logic'").  And nothing about that link is

obvious—if anything, the pause and post-pause protections seem most likely to have assisted borrowers interested in joining or staying in lower-paying public service positions by relieving financial pressures that might otherwise have forced them to consider other higher-paying careers.  Indeed, Mackinac never acknowledges that receiving credit towards PSLF during the pause puts a borrower who worked in public service during that period closer to the loan forgiveness threshold, making it all the more valuable for that borrower to remain in public service for the rest of the required 10-year period.

     With respect to the post-pause protections Mackinac challenges, Mackinac's claim to injury is particularly specious.  Mackinac claims that "by not capitalizing the accrued interest[]" when a borrower misses payments, Defendants have decreased the incentive to seek loan forgiveness under PSLF because "[e]very borrower's outstanding loan balance will . . . be smaller."  Am. Compl. ¶ 80.  But not all borrowers miss their payments.  And by definition, the post-pause protections concerning delinquency and default apply only to those individuals.  Mackinac presents no allegations that any of its employees—much less any particular prospective employee—fall into the category of borrowers to whom the post-pause protections will be applied, so it is wholly unclear how the post-pause protections for delinquent borrowers might have any relevance to Mackinac's financial interests.  Moreover, nothing in Mackinac's theory of borrowers' financial incentives points to any concrete, particularized, and actual or imminent harm that the failure to capitalize interest will inflict on Mackinac.

Even if it were true that "the financial incentive under PSLF to work at a public service employer is reduced" by the challenged policies, Am. Compl. ¶ 75—and as mentioned above, that is a highly questionable proposition—it does not "necessarily" follow that Mackinac is competitively disadvantaged by the challenged policies, much less that that competitive disadvantage translates to a concrete financial harm. *Id.* Notwithstanding the fact that some current or prospective employee of Mackinac may benefit from the challenged policies, private sector employers with which Mackinac competes may still pay higher salaries than Mackinac; individuals who receive relief (and whose employment decisions are actually impacted by their indebtedness) will still have increased incentives to pursue public service employment as a result of decreased "debts due to student loans," H.R. Rep. No. 110-210, at 48 (June 25, 2007); and such individuals will still be able to leave Mackinac for other public service employers without losing their ability to seek PSLF forgiveness.

Critically, Mackinac is not challenging any government policy applicable to either it or its competitors, and Mackinac has offered nothing more than conjecture to support the assertion that the actions challenged here will actually cause it to expend more resources to recruit and retain college-educated workers. *See* Decl. of Joseph G. Lehman, ECF No. 22-1 (detailing no changes in Mackinac's finances). Tellingly, Mackinac alleges that it has four employees who are current participants in the PSLF program and speculates about their decreased incentives to work in public service due to the challenged policies, but it does not allege that any of these employees have left

18

Mackinac or are planning on leaving Mackinac imminently.  *See* Am. Compl. ¶¶ 78, 85. The purely theoretical possibility that receiving additional student loan debt relief might influence some number of third-party borrowers not to pursue or continue employment with Mackinac is not an Article III injury, and the Court should reject Mackinac's attempt to chart an unprecedented expansion of the competitor standing doctrine.

Indeed, the Supreme Court has squarely rejected the sort of "boundless theory of standing" that Mackinac advances here, in which "a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013).  Rather, it has insisted that competitive injury must be "based on an injury more particularized and more concrete than the mere assertion that something unlawful benefited the plaintiff's competitor." *Id.*  Accordingly, courts routinely reject invocations of the competitor standing doctrine where the allegedly unlawful benefit does not presumptively dictate competitive injury as a matter of economic logic.  *See, e.g., State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (D.C. Cir. 2015) (Kavanaugh,  J.) (alleged reputational benefit to a competitor from enhanced regulatory burdens was "simply too attenuated and speculative"); *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (renewal of a potential competitor's license in a different market was "too remote to confer standing" based on a "'chain of events' injury" that renewal would allow the licensee to seek to relocate the license and begin competing).  Because there is no presumptive relationship between the challenged measures and the outcome of Mackinac's employee recruitment

19

and retention efforts, this Court should conclude that any competitive impacts on Mackinac or its private-sector counterparts are too attenuated and speculative to confer standing in this case. *Cf. Henderson v. Stalder*, 287 F.3d 374, 384 (5th Cir. 2002) (Jones, J., concurring) ("As a general proposition, a plaintiff who complains merely that a benefit has been [unlawfully] granted to others is asserting only a 'generalized grievance' that does not allow the plaintiff standing to obtain judicial relief for the alleged wrong in federal court."); *see also KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004) (a party seeking to invoke competitor standing must show "that it is a direct and current competitor whose bottom line may be adversely affected by the challenged government action") (citation omitted).

### B. Mackinac's alleged injury is not sufficiently traceable to Defendants.

For similar reasons, Mackinac's asserted injury is not "fairly traceable" to the policies it challenges. Traceability requires that "there must be a causal connection between the injury and the conduct complained of." *U.S. Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023). Where a plaintiff "can only speculate" that a particular injury will result from the challenged conduct rather than some other cause, the traceability requirement is not met. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013). Such is the case here.

Whether Mackinac will experience, as it predicts, "accelerated attrition of [its] existing staff" and "need to raise salaries to compete for replacement employees," Am.

Compl. ¶ 77, depends on many factors other than the challenged policies and any relationship they might have to PSLF benefits.  Principal among those factors are the millions of independent, complex and multi-faceted decisions by third-party student loan borrowers—each weighted to some unmeasurable degree by the impact of relative student loan indebtedness in particularized circumstances—about what kind of employment to pursue at a given point in their careers.  For many borrowers, the prospect of obtaining loan forgiveness under the PSLF program may be only a minor or irrelevant consideration in deciding to enter or stay in a public service career.  Some borrowers might feel a moral calling to teach public school or to serve as a police officer, and  they may pursue those careers without regard to the future prospect of loan forgiveness.  Similarly, Mackinac's current or prospective employees may feel a special calling to serve its mission "to enhance quality of life in Michigan by developing free-market policies, challenging government overreach, and fostering a climate of public opinion that encourages policymakers to act in the public interest."  Lehman Decl. ¶ 5.  But even if a given borrower *is* drawn to a career in the public service sector out of a desire to obtain debt relief through PSLF, such a borrower may still choose to leave public service for reasons unrelated to their student loan debts, including because of disagreements with an employer's mission, a desire to take on different job responsibilities or live in a different geographic region, or to accommodate a particular family situation.  Indeed, Mackinac's theory of standing wholly ignores how the challenged policies could provide some borrowers with an equal or greater incentive to

work in public service by limiting the growth of their student loan debt, reducing the burden of loan payments, and giving them more flexibility to work in a lower-paying public interest position, to Mackinac's and similar employers' benefit.

As all of these examples illustrate, Mackinac's theory of standing "rest[s] upon speculation about the decisions of independent actors," *Clapper*, 568 U.S. at 414—not the predictable operation of "simple economic logic," Am. Compl. ¶ 87.  It is one thing to acknowledge that "economic logic" can sometimes support standing to challenge a law that, for example, provides subsidies to a challenger's competitors—and not the challenger—in a particular market. *See, e.g.*, *Adams v. Watson*, 10 F.3d 915, 916–17, 922 (1st Cir. 1993) (noting that such standing is "obvious" where "government action . . . removes or eases only the competitive burdens on the plaintiff's *rivals*").  But it would be quite another thing to find that government action that provides a benefit to third parties without directly regulating the "relevant marketplace," *id*.—here, the employment market—imposes a competitive injury because that benefit might have some theoretical influence on hypothetical third-party decisions about whether to pursue or continue employment with a given employer.  Thus, where plaintiffs have attempted similar "predictions of future third-party action" that extend well beyond "the basic laws of economics," courts "have not hesitated to find competitor standing lacking." *Arpaio v. Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015) (rejecting standing theory premised on the contention that "more immigrants mean more crime" because crime— like a decision about what employment to pursue—is "notoriously difficult to predict").

So too here.  Because Mackinac's assertions about the labor market effects of the challenged policies do not demonstrate any "predictable effect of Government action on the decisions of third parties," *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019), and instead depend on the "unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," *Lujan*, 504 U.S. at 562 (citation omitted), the Court should reject Mackinac's claim to standing.

**C.    The relief Mackinac seeks is unlikely to redress its alleged injury.**

Finally, there is a redressability problem with Mackinac's theory of standing. Redressability "consider[s] the relationship between the judicial relief requested and the injury suffered."  *California v. Texas*, 141 S. Ct. 2104, 2115 (2021).  For purposes of establishing standing, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *U.S. Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quotation omitted).  And here, there is a telling disconnect between the relief Mackinac seeks and the injury Mackinac seeks to remedy.

For its ultimate relief, Mackinac asks the Court to declare that the challenged policies are unlawful and to order Defendants "to nominally unwind by $1 per affected borrower [any] debt cancellations caused by the [payment and interest] suspension and its extensions," "to stop counting . . . the administrative suspension period . . . in calculating the number of payments made toward" loan forgiveness under the PSLF and the IDR programs, and "to halt the 12-month" policy providing return-to-payment

protections for borrowers. Am. Compl. at 40–41 (prayer for relief). So if it prevails in this suit and obtains the relief it seeks, Mackinac will have succeeded in depriving federal student loan borrowers across the country of important (and in Defendants' view, necessary) benefits through no fault of those borrowers. Moreover, in many instances, Mackinac's success will inflict devastating financial hardship on borrowers, particularly those borrowers working in lower-paying public sector positions like those maintained by Mackinac.

It seems improbable that this outcome will be a boon to Mackinac's efforts to recruit and retain college-educated employees. In truth, Mackinac's requested remedy appears prone to *amplify* any recruiting and retention challenges the organization may face—after all, borrowers faced with increased financial burdens following a ruling in Mackinac's favor in this case could always seek out higher paying opportunities with private sector employers, or even with public sector employers that have not litigated for the express purpose of increasing their employees' debt burdens. And with respect to Mackinac's request to "nominally unwind by $1" any debt forgiveness that has occurred in reliance on the challenged policies, Am. Compl. at 40, it is wholly unclear how such nominal unwinding would offer any relief for injuries of the sort that Mackinac seeks to redress. Mackinac's inability to "find prospective relief that fits the remedy to the wrong or injury that has been established," *Salazar v. Buono*, 559 U.S. 700, 718 (2010), underscores its lack of standing in this case.

**CONCLUSION**

For the reasons stated above, the Court should dismiss Mackinac's amended complaint for lack of standing and close this case.

Dated: November 6, 2023                    Respectfully submitted,

                                                BRIAN M. BOYNTON
                                                Principal Deputy Assistant
                                                Attorney General

                                                MARCIA BERMAN
                                                Assistant Branch Director

                                                */s/ Cody T. Knapp*
                                                CODY T. KNAPP (NY #5715438)
                                                Trial Attorney
                                                U.S. Department of Justice
                                                Civil Division
                                                Federal Programs Branch
                                                1100 L St. NW
                                                Washington, D.C. 20005
                                                Telephone: (202) 532-5663
                                                Facsimile: (202) 616-8470
                                                E-mail: cody.t.knapp@usdoj.gov

                                                *Counsel for Defendants*