**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

**Northern Division**

MACKINAC CENTER FOR PUBLIC POLICY,

*Plaintiff*,

v.

U.S. DEPARTMENT OF EDUCATION;

MIGUEL CARDONA, Secretary, U.S. Department          CIVIL CASE NO. 1:23-cv-10795-TLL-PTM
of Education, in his official capacity; and

RICHARD CORDRAY, Chief Operating Officer of
Federal Student Aid, U.S. Department of Education,
in his official capacity;

*Defendants.*

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

**ISSUES PRESENTED**

Whether Plaintiff Mackinac Center for Public Policy has standing to challenge Defendants' 35-month administrative suspension on repayment obligations and the accrual of interest on federally held student loans and related post-suspension policies.

**CONTROLLING OR MOST APPROPRIATE AUTHORITY**

- *Clinton v. City of New York*, 524 U.S. 417 (1998)

- *Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010)

- *Can. Lumber Trade All. v. United States*, 517 F.3d 1319 (Fed. Cir. 2008)

- *Sw. Pa. Growth All. v. Browner*, 144 F.3d 984 (6th Cir. 1998)

- *Adams v. Watson*, 10 F.3d 915 (1st Cir. 1993)

- *ABA v. Dep't of Educ.*, 370 F. Supp. 3d 1 (D.D.C. 2019)

## TABLE OF CONTENTS

ISSUES PRESENTED ..................................................................................................................... i

CONTROLLING OR MOST APPROPRIATE AUTHORITY .................................................. ii

TABLE OF CONTENTS .............................................................................................................. iii

TABLE OF AUTHORITIES ........................................................................................................ iv

INTRODUCTION ........................................................................................................................... 1

BACKGROUND .............................................................................................................................. 2

    I.   STATUTORY AND REGULATORY FRAMEWORK ................................................................ 2

       A. The Higher Education Act .............................................................................................. 2

       B. The HEROES Act .......................................................................................................... 3

    II.  FACTUAL BACKGROUND ..................................................................................................... 4

       A. Defendants' Student-Loan Suspension Policies ............................................................ 4

       B. Impact of the Student-Loan Suspension on the PSLF Program ..................................... 6

       C. Additional Post-Suspension Loan Relief ....................................................................... 9

    III. PROCEDURAL HISTORY ..................................................................................................... 9

STANDARD OF REVIEW ........................................................................................................... 10

ARGUMENT .................................................................................................................................. 10

    I.   PLAINTIFF SUFFERS A COGNIZABLE COMPETITIVE INJURY ......................................... 11

       A. Competitive Standing Is Satisfied by Economic Disadvantage .................................. 12

       B. PSLF Provides Economic Advantage to Public Service Employers ........................... 14

       C. The Suspension Reduces the Economic Advantage PSLF Offers ............................... 17

          1.  Cancelling PSLF-Forgivable Debt Reduces the Competitive Advantage PSLF
             Confers ................................................................................................................. 17

          2.  Counting Non-Payments as Payments Shortens PSLF's Statutory Tenure
             Requirements ....................................................................................................... 20

    II.  PLAINTIFF'S COMPETITIVE INJURY IS TRACEABLE TO DEFENDANTS' SUSPENSION ............... 23

    III. PLAINTIFF'S COMPETITIVE INJURY IS REDRESSABLE .................................................... 24

CONCLUSION ............................................................................................................................... 25

CERTIFICATE OF SERVICE .................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABA v. Dep't of Educ.,*
370 F. Supp. 3d 1 (D.D.C. 2019)........................................................................14

*Adams v. Watson,*
10 F.3d 915 (1st Cir. 1993) ....................................................... 11, 14, 21, 23

*Air Excursions LLC v. Yellen,*
66 F.4th 272 (D.C. Cir. 2023) ...........................................................13, 22

*Already, LLC v. Nike, Inc.,*
568 U.S. 85 (2013) ..........................................................................................22

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ..............................................................................5, 6, 12

*Can. Lumber Trade All. v. United States,*
517 F.3d 1319 (Fed. Cir. 2008) ......................................................11, 13, 14

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ........................................................................................23

*Clinton v. City of New York,*
524 U.S. 417 (1998) ........................................................................................11

*Dep't of Com. v. New York,*
139 S. Ct. 2551 (2019) ....................................................................................23

*FEC v. Cruz,*
142 S. Ct. 1638 (2022) ....................................................................................10

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ............................................................................10, 23, 25

*Sherley v. Sebelius,*
610 F.3d 69 (D.C. Cir. 2010) .......................................................11, 12, 16, 18

*Sw. Pa. Growth All. v. Browner,*
144 F.3d 984, 988 (6th Cir. 1998)...............................................................passim

*United States v. Ritchie,*
15 F.3d 592 (6th Cir. 1994) ............................................................................10

*United States v. Students Challenging Regul. Agency Procs.,*
412 U.S. 669 (1973) ........................................................................................22

*United Transp. Union v. ICC,*
891 F.2d 908 (D.C. Cir. 1989).......................................................................13

*Uzuegbunam v. Preczewski,*
141 S. Ct. 792 (2021) ......................................................................................25

**Statutes**

20 U.S.C. § 1070............................................................................................2

20 U.S.C. § 1085 ................................................................................................3

20 U.S.C. § 1087e .................................................................................. 1, 2, 3, 6

20 U.S.C. § 1098bb ............................................................................................4

20 U.S.C. § 1098e ..............................................................................................2

26 U.S.C. § 30D .............................................................................................15

Coronavirus Aid, Relief, and Economic Security ("CARES") Act,
    Pub. L. No. 116-136, 134 Stat. 281 (2020) ...............................................4

Fiscal Responsibility Act of 2023,
    Pub. L. No. 118-5, 137 Stat. 10 (2023) .....................................................6

Higher Education Relief Opportunities for Students ("HEROES") Act,
    Pub. L. No. 108-76, 117 Stat. 904 (2003) ...............................................3

Principles of Economics,
    Chap. 12-2: The Supply of Labor (Univ. of Minn. Librs. ed. 2016) (2012) ...............16, 19

**Regulations**

34 C.F.R. § 685.209 ...........................................................................................2

34 C.F.R. § 685.219 ....................................................................................passim

34 C.F.R. § 685.221 ...........................................................................................2

85 Fed. Reg. 49,585 (Aug 13, 2020) ...................................................................5

85 Fed. Reg. 79,856 (Dec. 11, 2020) ..................................................................5

87 Fed. Reg. 61,512 (Oct. 12, 2022) ...................................................................5

**Other Authorities**

149 Cong. Rec. 7922 (2003) ..............................................................................3

Cheyenne Haslet,
    *Biden administration begins cancelling student loan debt for 804,000 borrowers,*
    ABC News (Aug. 14, 2023) ....................................................................21

Committee for a Responsible Federal Budget,
    *Latest Student Pause Brings Total Cost to $155 Billion* (Aug. 30, 2022) .........6, 7, 17

Cong. Rsch. Serv.,
    *Federal Student Loan Debt Cancellation: Policy Considerations* 1 (2022) .........2

Dep't of Education, Federal Student Aid,
    *Covid-19 Emergency Relief and Federal Student Aid* ...............................5

Press Release, U.S. Dep't of Educ.,
    *Delivering on President Trump's Promise, Secretary DeVos Suspends Federal Student Loan Payments,*
    *Waives Interest During National Emergency* (Mar. 20, 2020) .........................4

Sarah Turner,
    *Student loan pause has benefited affluent borrowers the most, others may struggle when payments resume,*
    Brookings Institute (Apr. 13, 2023) ........................................................7

The White House,
    *FACT SHEET: President Biden Announces New Actions to Provide*
    *Debt Relief and Support for Student Loan Borrowers* (June 30, 2023)............................................9

The White House,
    *President Biden Announces an Additional $9 Billion*
    *in Student Debt Relief for 125,000 Americans* (Oct. 4, 2023) ......................................................8

U.S. Gov't Accountability Office,
    *STUDENT LOANS: Education Has Increased Federal Cost Estimates of Direct Loans by Billions*
    *due to Programmatic and Other Changes* 1 (July 28, 2022)...........................................................7

**INTRODUCTION**

Plaintiff Mackinac Center for Public Policy opposes Defendants' motion to dismiss for lack of standing. *See* ECF 25.

As a Section 501(c)(3) non-profit employer, Plaintiff enjoys substantial competitive advantages in recruiting and retaining college-educated workers. Those advantages derive primarily from the Public Service Loan Forgiveness program ("PSLF"), which was established with overwhelming bipartisan support in both houses of Congress as part of the College Cost Reduction and Access Act of 2007, Pub. L. 110-84, 121 Stat. 784, (codified at 20 U.S.C. § 1087e(m)). The PSLF program incentivizes student-loan debtors to seek and maintain employment with public service employers by cancelling their entire remaining student-loan debt balance after they work for any combination of qualifying employers for 10 years *and* make all 120 required monthly loan payments during that period.

It was not long ago that Defendant Department of Education ("Department") codified the statute's economic logic in a rule that states PSLF provides financial incentives specifically to "encourage individuals to enter and continue in full-time public service employment[.]" 34 C.F.R. § 685.219(a). Defendants now attempt to repudiate the Department's own economic logic. They argue against Plaintiff's standing as a public service employer to maintain the very benefit that Congress created. But given that the Department's own regulation concedes Congress created the benefit—its dispute is not really with Plaintiff, but apparently with itself.

Defendants' unlawful 35-month administrative suspension on the obligation of federal student-loan debt borrowers to make monthly payments, and the accrual of interest on their debt, eviscerates the financial incentives PSLF provides for borrowers to work for a public service employer like Plaintiff. It does this in at least two ways. *First*, by forgiving 35 months of interest, the suspension has cancelled at least $175 billion in debt that otherwise could be forgiven under PSLF. Each affected borrower, including four of Plaintiff's employees, now has less PSLF-forgivable debt and thus has less

financial incentive to obtain PSLF forgiveness by working (or continuing to work) for a public service employer. *Second*, Defendants are counting 35 months of non-payments during the suspension as "monthly payments" needed to earn loan forgiveness under PSLF and other programs, shortening by 35 the number of months borrowers are incentivized to work for public service employers.

Defendants' administrative suspension and related policies thus erode the financial incentives PSLF provides and thereby undermine the labor-market advantages PSLF confers on Plaintiff and other public service employers. Reducing a statutory economic advantage inflicts a cognizable injury that is traceable to Defendants' conduct. The court can redress this injury by declaring the suspension and related policies to be unlawful; reinstating the unlawfully cancelled interest to revive Plaintiff's PSLF advantage; and halting the unlawful counting of non-payments as monthly payments to restore PSLF's statutory payment-and-service requirements. The Court should deny Defendants' motion.

## BACKGROUND

### I. STATUTORY AND REGULATORY FRAMEWORK

#### A. The Higher Education Act

Title IV of the Higher Education Act ("HEA"), 20 U.S.C. § 1070 et seq., establishes federal student loan programs administered by the Department. Approximately 45 million Americans participate in these programs with a total outstanding loan balance of over $1.6 trillion. Cong. Rsch. Serv., Federal Student Loan Debt Cancellation: Policy Considerations 1 (2022). Congress has statutorily authorized several loan-forgiveness programs, including the Income Driven Repayment ("IDR") and PSLF programs. *See* 20 U.S.C. §§ 1087e(e), (m), 1098e(b)(7).

Under IDR, a borrower's debt will be forgiven after making the requisite number of qualifying monthly payments. Specific monthly repayment amounts are based on the borrower's income and family size, and the forgiveness timeline is either 20 or 25 years, depending on the plan. *See* 34 C.F.R. §§ 685.209(a)–(c), 685.221.

Congress enacted PSLF in 2007 "to encourage individuals to enter and continue in full-time public service employment[.]" 34 C.F.R. § 685.219(a). It accomplishes this goal by forgiving a borrower's entire remaining student-loan balance *after* the borrower makes 120 qualifying monthly payments while employed in a public service job. 20 U.S.C. § 1087e(m)(1). Qualifying public service employers include Section 501(c)(3) non-profit organizations, such as Plaintiff. 34 C.F.R. 685.219(b).

The HEA authorizes the Secretary to grant loan-payment deferments to borrowers who experience "economic hardship," which is defined as working full time at extremely low wages. 20 U.S.C. §§ 1085(o), 1087e(f)(2)(D). Interest does not accrue during "economic hardship" deferment under Section 1085(o). Periods of such deferment count toward the monthly-payment requirement for IDR—but, importantly, not for PSLF. *Compare* 20 U.S.C. § 1087e(e)(7)(B) *with* § 1087e(m)(1)(A).

### B.  The HEROES Act

In 2001, weeks after the U.S.-led invasion of Afghanistan, Congress unanimously enacted the Higher Education Relief Opportunities for Students ("HEROES") Act, Pub. L. No. 107-122, 115 Stat. 2386 (2002). Congress reauthorized the Act in 2003, shortly after servicemembers deployed to Iraq. Pub. L. No. 108-76, 117 Stat. 904 (2003). The Act "provide[s] the Secretary of Education with specific waiver authority to respond to a war or other military operation or national emergency." *Id.*

In passing the HEROES Act, Congress focused on helping uniformed servicemembers who were temporarily unable to comply with their loan-repayment obligations while deployed overseas. *See* 149 Cong. Rec. 7922 (2003) (Rep. Kline) ("provid[ing] assurance to our men and women in uniform that they will not face education-related financial or administrative difficulties while they defend our Nation."); *see id.* (Rep. Isakson) ("ensur[ing] that our troops whose lives have been disrupted suddenly, and now serve us in the Middle East and in Iraq, to make sure that their families are not harassed by collectors"). To accomplish these objectives, the Act authorizes the Secretary to "waive or modify any statutory or regulatory provision applicable to [] student financial assistance … in connection with a

3

war or other military operation or national emergency[.]" 20 U.S.C. § 1098bb(a)(1). Any such waiver or modification must be "necessary to ensure" beneficiaries "are not placed in a worse position financially in relation to [their loans] because of their status as affected individuals." *Id.* § 1098bb(a)(2).

## II.   FACTUAL BACKGROUND

### A.   Defendants' Student-Loan Suspension Policies

On March 20, 2020, at the outset of the Covid-19 pandemic, the Department issued a press release announcing that it would set the interest rates on federally held student loans at 0 percent—that is, suspend the accrual of interest—for "a period of at least 60 days[]" and would allow borrowers with such loans to suspend their monthly loan payments "for at least two months[.]" Press Release, U.S. Dep't of Educ., *Delivering on President Trump's Promise, Secretary DeVos Suspends Federal Student Loan Payments, Waives Interest During National Emergency* (Mar. 20, 2020).[1]

The Department did not cite any statutory or other legal authority for this sweeping, unprecedented, and unilateral administrative action. However, events quickly overtook this press release on March 27, 2020, when Congress enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281 (2020). Section 3513 of that Act instructed the Department to "suspend all payments" on federal student loans until September 30, 2020, and it provided that "interest shall not accrue" on such loans during that six-month period. *Id.* § 3513(a)–(b). Section 3513 further stated that non-payments during this six-month suspension shall count "as if the borrower of the loan had made a payment for any loan forgiveness program … authorized under … the Higher Education Act," including IDR and PSLF. *Id.* § 3513(c).

Congress did not grant the Department authority to extend this six-month payment-and-interest suspension beyond its September 30 statutory expiration date. Nevertheless, between August

---

[1] Available at: https://content.govdelivery.com/accounts/USED/bulletins/2823e37 (last visited Dec. 1, 2023).

4

2020 and August 2023, the Department issued eight serial administrative extensions—at least two of which it represented as "final"—that cumulatively extended the expiration date for a total of 35 months past the September 2020 statutory deadline. *See* ECF 22 ¶¶ 29-48. The Department's purported legal justification (if any) for these extensions shifted over time. The Department initially relied on the economic-hardship provisions of Section 1085(o) of the HEA. *See* 85 Fed. Reg. 49,585 (Aug. 13, 2020); ECF 22 ¶¶ 29-32. It then switched to the HEROES Act's waiver-or-modification authority to extend the CARES Act's payment-and-interest suspension for the second and seventh extensions. *See* 85 Fed. Reg. 79,856 (Dec. 11, 2020); 87 Fed. Reg. 61,512, 61,513-14 (Oct. 12, 2022). The third, fourth, fifth, sixth, and eighth extensions were not accompanied by any contemporaneous citation to legal authority. ECF 22 ¶¶ 37–44, 48. The Department is counting all 35 months of non-payment during the administrative suspension as monthly payments for IDR and PSLF programs—an interval almost six times the duration of the CARES Act's statutory suspension period. *See* Dep't of Education, Federal Student Aid, *Covid-19 Emergency Relief and Federal Student Aid.*[2]

Amid this payment-and-interest suspension, Defendants separately invoked the HEROES Act in August 2022 to cancel a half-trillion dollars of student debt, likewise without congressional authorization. Numerous lawsuits followed, and the Supreme Court ultimately ruled that this sweeping loan forgiveness scheme was not authorized under the HEROES Act. *Biden v. Nebraska*, 143 S. Ct. 2355 (2023). While the Court did not explicitly say the payment-and-interest suspension was likewise unlawful, Justice Kagan's dissent recognized that "under the majority's reasoning, how could it not be?" *Id.* at 2396 (Kagan, J., dissenting). She explained that, just like the unlawful loan cancellation scheme itself, the payment-and-interest suspension:

> offered a significant new benefit, and to an even greater number of borrowers. (Indeed, for many borrowers, it was worth much more than the [loan cancellation program's] $10,000

---

[2] Available at: https://studentaid.gov/announcements-events/covid-19 (last visited Dec. 1, 2023).

discharge.) So the suspension could no more meet the majority's pivotal definition of 'modify'—as make a minor change[]—than could the forgiveness plan.

*Id.* (second alteration in original).

On June 3, 2023, the President signed into law the Fiscal Responsibility Act of 2023 ("FRA"), which explicitly prohibits the Department from relying on the CARES Act to extend the payment-and-interest suspension. *See* Pub. L. No. 118-5, § 271(a), (c), 137 Stat. 10, 33–34 (2023). After 35 months of consecutive administrative extensions, the Department lifted the payment-and-interest suspension on August 30, 2023.

### B. Impact of the Student-Loan Suspension on the PSLF Program

The administrative payment-and-interest suspension cost the Treasury hundreds of billions of dollars and undermines the PSLF program. Two types of impacts are relevant to this case.

*First*, by keeping student-loan interest rates at zero for 35 months, the Department has unlawfully cancelled debt owed by every student-loan borrower in an amount equal to the interest that would have accrued over those 35 months. *See* Committee for a Responsible Federal Budget, *Latest Student Pause Brings Total Cost to $155 Billion* (Aug. 30, 2022) ("CRFB Analysis").[3] Lowering student-loan debt in this way undermined and continues to undermine congressionally-enacted debt forgiveness programs that incentivize borrowers to take certain jobs. Most relevant here is PSLF, which Congress enacted in 2007 to provide strong incentives for borrowers to seek and maintain employment with qualifying public service employers, including § 501(c)(3) non-profit organizations like Plaintiff. 20 U.S.C. § 1087e(m). PSLF does this by promising student-loan borrowers that their outstanding loan balances will be completely discharged after they make 120 monthly payments (10 years) while working full-time at qualifying public service employers like Plaintiff. *Id.* The more

---

[3] Available at: https://www.crfb.org/blogs/latest-student-loan-payment-pause-brings-total-cost-155-billion (last visited Dec. 1, 2023).

student-loan debt a borrower has, the stronger the PSLF incentive to take and stay in a public service job. Conversely, lowering a borrower's remaining debt weakens this PSLF incentive.

The payment-and-interest suspension unlawfully cancelled approximately $5 billion per month in forgone interest. U.S. Gov't Accountability Office, *STUDENT LOANS: Education Has Increased Federal Cost Estimates of Direct Loans by Billions due to Programmatic and Other Changes* 1, 14 (July 2022).[4] After 35 months, that amounts to $175 billion in debt cancellation that Congress never authorized or funded. This debt cancellation is extremely regressive: "The payment pause especially benefits high-income households because they tend to have larger student loan balances—and therefore higher payments." Sarah Turner, *Student loan pause has benefited affluent borrowers the most, others may struggle when payments resume*, Brookings Institute (Apr. 13, 2023).[5] CRFB estimated in August 2022 that "a typical recent medical school graduate will effectively receive nearly $68,000 of forgiven debt through December [2022]" and "a recent law school graduate will get $41,500 of forgiveness[]" as a result of the suspension. CRFB Analysis. By contrast, "someone who just completed an associate's degree will receive $4,500, and individuals who did not complete their undergraduate degree will get [just] $2,500." *Id.* The erosion of PSLF incentives is proportional to the amount of debt cancelled. For example, because the suspension cancelled over $40,000 of debt for a typical recent law school graduate, *see* CRFB Analysis, the PSLF incentive for that graduate to work in a public service job was reduced by more than $40,000 commensurately.

*Second*, counting 35 months of non-payments during the suspension as monthly payments for PSLF participants further erodes the incentive provided by PSLF to work for public service employers. The Department effectively amended through administrative fiat the statutory 120-month

---

[4] Available at: https://gao.gov/assets/gao-22-105365.pdf (last visited Dec. 1, 2023).

[5] Available at: https://www.brookings.edu/2023/04/13/student-loan-pause-has-benefitted-affluent-borrowers-the-most-others-may-struggle-when-payments-resume/amp/ (last visited Dec. 1, 2023).

requirement for PSLF forgiveness, shortening by 35 months the period that PSLF participants who made no payments during the suspension—including some of Plaintiff's employees—are incentivized to keep working in their public service jobs. The period for which PSLF incentivizes these borrowers to seek work with or remain working at public service employers is thus shortened by nearly three years (or 29% of the intended duration of the program). On October 4, 2023, President Biden also announced outright cancellation of debt for 53,000 borrowers under the PSLF program. The White House, *President Biden Announces an Additional $9 Billion in Student Debt Relief for 125,000 Americans* (Oct. 4, 2023).[6] These borrowers were deemed to have satisfied PSLF's 120-month payment-and-service requirement because they received 35 months of non-payment credit. But for the payment-and-interest suspension, they would still be working toward obtaining PSLF forgiveness and thus would have a strong financial incentive to continue working for public service employers like Plaintiff.

By counting non-payments during the 35-month suspension toward IDR's and PSLF's monthly payment requirements, Defendants reduced the number of monthly payments participants must make before receiving forgiveness under those programs. Each IDR and PSLF participant will make 35 fewer monthly payments before having their outstanding debt cancelled, which means 35 monthly payments will be cancelled for each of the millions of IDR and PSLF participants. Defendants did not consider—let alone attempt to estimate—this cost, which Plaintiff conservatively estimates to be $119 billion. *See* ECF 22 ¶ 58 (based on reports that there are 8.5 million IDR borrowers with an average monthly payment of $400). As with cancelled interest, Congress neither authorized nor funded this premature, administrative cancellation of student-loan debt.

---

[6] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/04/president-biden-announces-an-additional-9-billion-in-student-debt-relief-for-125000-americans/ (last visited Dec. 1, 2023).

### C.  Additional Post-Suspension Loan Relief

On June 30, 2023, just hours after the *Biden v. Nebraska* decision, and in apparent defiance of the FRA's mandate to end the payment-and-interest suspension by August 30, 2023, the President announced that the Department was creating an new "on-ramp" period, during which borrowers will not be penalized for non-payments for up to an *additional* 12 months after the expiration of the payment-and-interest suspension. The White House, *FACT SHEET: President Biden Announces New Actions to Provide Debt Relief and Support for Student Loan Borrowers* (June 30, 2023).[7]

While interest will accrue, the President made clear that "interest will not capitalize at the end of the on-ramp period[,]" meaning any unpaid interest each month will not be added to the principal of the loan, *i.e.*, it will not compound. *Id.* Slowing the rate of interest accrual amounts to another cancellation of interest that Congress never authorized, and it undermines PSLF incentives in the same way as the complete halt of interest accrual during the suspension period—albeit at a smaller scale. Defendants have not articulated any statutory or regulatory authority for this "on ramp."

### III.  PROCEDURAL HISTORY

Plaintiff filed suit on April 6, 2023, and moved for a preliminary injunction on May 11 to halt the then-ongoing payment-and-interest suspension. *See* ECF Nos. 1, 9. Plaintiff withdrew its preliminary-injunction motion following the enactment of the Fiscal Responsibility Act, which promised to end the suspension on August 30. Plaintiff filed an Amended Complaint on October 6, 2023, which again seeks judgment declaring the 35-month administrative suspension period to be unlawful, halting Defendants from counting non-payments during the suspension period as monthly payments for federal student-loan forgiveness programs, and unwinding the debt cancelled through

---

[7] Available at: https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/30/fact-sheet-president-biden-announces-new-actions-to-provide-debt-relief-and-support-for-student-loan-borrowers/ (last visited Dec. 1, 2023).

the suspension by a nominal amount of $1 per affected borrower. ECF No. 22 at 40–41. The Amended Complaint also challenges Defendants' on-ramp policy. *Id.* ¶¶ 173–75. Plaintiff alleges that the suspension and related policies violate the Constitution's Appropriations, Property, and Vesting Clauses, that they exceed Defendants' statutory authority, and that they are arbitrary and capricious under the Administrative Procedure Act.  *See id.* ¶¶ 95–175.

## STANDARD OF REVIEW

In considering a motion to dismiss for lack of subject-matter jurisdiction, "the court must take the material allegations [of the complaint] … as true and construed in the light most favorable to [plaintiffs]." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). It also must "accept as valid the merits of [the plaintiff's] legal claims[.]" *FEC v. Cruz*, 142 S. Ct. 1638, 1647 (2022). One requirement of subject-matter jurisdiction is Article III standing, which is satisfied where a plaintiff pleads: (1) an "injury in fact" that is "concrete and particularized[;]" (2) that the injury is "fairly traceable to the challenged action of the defendant[;]" and (3) that it is "likely" such injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992) (citations omitted).

## ARGUMENT

Plaintiff has standing because the administrative payment-and-interest suspension takes away a benefit that Defendants' own regulations acknowledge Congress created for public service employers like Plaintiff. *See* 34 C.F.R. § 685.219(a). In doing so, it places Plaintiff in a position of "economic disadvantage" relative to for-profit employers and other non-PSLF-qualifying competitors in the labor market, which is a competitive injury sufficient to establish standing under Sixth Circuit precedent. *Sw. Pa. Growth All. v. Browner*, 144 F.3d 984, 988 (6th Cir. 1998) ("*Growth Alliance*").

Defendants know this injury does not "turn[] on broad speculation about the future action of independent third parties," *i.e.*, borrowers affected by the suspension. *See* Def. Br. at PageID.234. The entire premise of PSLF is that it will make public service jobs more attractive for student-loan

10

debtors—a premise the Department understands so well it codified into its regulations that PSLF "is intended to encourage individuals to enter and continue in full-time public service employment[.]" *See* 34 C.F.R. § 685.219(a). Plaintiff may rely on that economic logic to predict how borrowers will respond when Defendants undermine that PSLF incentive. *See Can. Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008). Defendants' administrative payment-and-interest suspension undermines PSLF's financial incentive for such affected borrowers—including four of Plaintiff's current employees—to seek and remain in public service jobs with qualifying employers like Plaintiff. Basic economic logic predicts that borrowers will be less willing to take and keep jobs with public service employers when the financial incentives are reduced, which in turn requires such employers to invest more time and resources to recruit them and to offer additional compensation or benefits to attract and retain them. *See Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010) ("[H]aving to invest more time and resources to craft a successful grant application" when faced with increased competition "is an actual, here-and-now injury.").

## I.     PLAINTIFF SUFFERS A COGNIZABLE COMPETITIVE INJURY

The Supreme Court "routinely recognizes probable economic injury resulting from governmental actions that alter competitive conditions as sufficient to satisfy the Article III 'injury-in-fact' requirement." *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (cleaned up). Under the doctrine of competitive standing, an injury-in-fact occurs when a party's "position in the relevant marketplace would be affected adversely by the challenged governmental action." *Adams v. Watson*, 10 F.3d 915, 922 (1st Cir. 1993); *accord Sherley*, 610 F.3d at 73; *Can. Lumber*, 517 F.3d at 1332.

Defendants present two meritless arguments to avoid this doctrine. *First*, they argue that "the competitor standing doctrine is ill-fitted" because "Defendants have taken no action for or against Mackinac's [non-PSLF-qualifying] competitors[.]" Def. Br. at PageID.235. Defendants ignore the commonsense logic that taking away a statutorily conferred competitive advantage enjoyed by one

11

group—here, public service employers—necessarily confers an advantage on that group's competitors, thus increasing the competition faced by members of the first group.

*Second*, Defendants contend that the competitor standing doctrine does not apply because this is an "ideologically driven lawsuit." Def. Br. at PageID.235. Even if this were true, which Plaintiff does not concede, the very first case Defendants cite in support is *Sherley*, 610 F.3d 69, cited at Def. Br. at PageID.236, wherein the D.C. Circuit recognized competitive standing in an ideologically motivated case brought by, *inter alia*, a Christian adoption agency and a Christian medical association against expanding stem cell research grants. Likewise, state attorneys-generals' political motivations did not prevent the Supreme Court from finding Article III standing to challenge the unlawful debt cancellation program in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023). A party's ideological beliefs have never been relevant to Article III standing. The competitor standing doctrine applies regardless.

Under binding Sixth Circuit precedent, a party has competitive standing to challenge government action that places it in a position of "economic disadvantage" relative to its competitors. *Growth Alliance*, 144 F.3d at 988. Here, PSLF confers on qualifying public service employers an economic advantage over their non-PSLF-qualifying competitors, notably (but not exclusively) for-profit employers in the private sector, in recruiting and retaining highly educated employees. The payment-and-interest suspension undermines that advantage by reducing PSLF's financial incentive to work at public service jobs for all borrowers and by shortening PSLF's required tenure period by 35 months. It thus inflicts economic disadvantage on Plaintiff and other public service employers when competing against for-profit and other non-PSLF-qualifying competitors in the labor market. That is a cognizable Article III injury. *See id.*

### A. Competitive Standing Is Satisfied by Economic Disadvantage

Defendants contend that Plaintiff "never connects the dots between [the reduction] in borrowers' [PSLF] incentives and any actual or imminent impact on its financial bottom line." Def.

Br. at PageID.237. But the Department has already connected those dots by promulgating a regulation that explicitly connects PSLF to a non-profit organization's competitiveness in attracting college-educated talent. *See* 34 C.F.R. § 685.219 (recognizing that PSLF "is intended to encourage individuals to enter and continue in full-time public service employment[.]").

In any event, the whole point of the competitive standing doctrine is to obviate the need for "analysis linking [the challenged conduct] to specific, demonstrated economic harms," such as "lost sales, [or] decreased market share[.]" *Can. Lumber*, 517 F.3d at 1332. The "competitor standing doctrine supplies the link between increased competition and tangible injury[.]" *Air Excursions LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023); *see also United Transp. Union v. ICC*, 891 F.2d 908, 912 n. 7 (D.C. Cir. 1989) (noting that in "garden-variety competitor standing cases[,]" courts routinely credit causal connections "firmly rooted in the basic laws of economics" or "basic economic logic"). Thus, a party need only "supply the link between the challenged conduct and increased competition[,]" *Air Excursions*, 66 F.4th at 281, which in this circuit means being placed at an "economic disadvantage" with respect to one or more competitors, *Growth Alliance*, 144 F.3d at 988.

In *Growth Alliance*, an association representing Pennsylvania manufacturers challenged an agency's environmental designation that resulted in lower compliance costs for competing firms in Ohio. The Sixth Circuit held that the association had competitive standing because reduced compliance costs gave Ohio firms "an economic advantage over [their] neighbors in southwestern Pennsylvania," which necessarily means each Pennsylvania firm "suffers an economic disadvantage compared to its Ohio neighbor." *Id.* There was no need to link the environmental designation to tangible economic injury, such as lost sales or revenue for a specific Pennsylvania firm. It was enough to link the agency designation to lower compliance costs for Ohio firms, which as a matter of economic logic placed each Pennsylvania firm at a relative economic disadvantage. *Id.*

13

Here, there likewise is no need to link the reduced incentives under PSLF to specific financial loss. Just as manufacturers need not show "lost sales, decreased market share[,]" and the like to demonstrate competitive injury, *Can. Lumber*, 517 F.3d at 1332, employers need not show lost workers, as Defendants suggest, *see* Def. Br. at PageID.239–40. Rather, what is needed is linking the suspension to economic disadvantage, which is satisfied because the suspension reduces competitive benefits PSLF confers on each public service employer. Plaintiff may "fairly employ economic logic" to establish that link. *Can. Lumber*, 517 F.3d at 1333 (footnote omitted). "Indeed, most 'competitor standing' cases depend on … core economic postulates," such as "standard principles of 'supply and demand.'" *Adams*, 10 F.3d at 923 (citations omitted).

### B.   PSLF Provides Economic Advantage to Public Service Employers

Defendants' own regulations acknowledge that PSLF provides financial incentives that "encourage individuals to enter and continue in full-time public service employment" instead of for-profit jobs in the private sector (or not working). 34 C.F.R. § 685.219(a). It does not matter whether the incentive goes to the borrower-employee or the public service employer. The economic benefits accrue to both parties because an employee (supplier of labor) who receives a subsidy will pass on a portion of the benefits to the employer (consumer of labor) in the form of lower wages demanded (price of labor)—and vice versa. Hence, loan forgiveness under PSLF not only benefits individual borrower-employees, but it also "promotes the interests of public service employers by providing significant financial subsidies to the borrowers they hire on the condition they remain employed in public service." *ABA v. Dep't of Educ.*, 370 F. Supp. 3d 1, 19 (D.D.C. 2019).

By contrast, for-profit employers in the private sector and other non-qualifying employers do not benefit from a similar statutory subsidy. PSLF thus confers a deliberate competitive advantage on

public service employers over for-profit employers when seeking to recruit and retain the approximately 45 million highly educated individuals with outstanding student-loan debt.

Consider a hypothetical statutory $10,000 tax credit for purchasers of electric vehicles.[8] While funds flow directly into the bank accounts of consumers who purchase electric vehicles, the tax credits are also a subsidy benefiting electric-vehicles manufacturers by making their products relatively less expensive, and thus more attractive to consumers, compared to gasoline vehicles. Now suppose an agency extends that tax credit through administrative fiat to all consumers, regardless of whether they purchase electric or gasoline vehicles. The tax credit would no longer confer any competitive advantage on electric-vehicles manufacturers because the agency has, in effect, subsidized their competitors in equal measure, thus increasing competition faced by electric-vehicles manufacturers.

In extending the tax credit to gasoline vehicles, the agency reduces—indeed eliminates—a key financial incentive to purchase electric vehicles. According to economic logic, at any given price, demand for electric vehicles falls because gasoline-powered vehicles become relatively less expensive—and thus more attractive to consumers who receive the tax credit no matter what. Such economic disadvantage constitutes an Article III injury for all manufacturers of electric vehicles. There is no need for them to show a particular consumer would have purchased an electric vehicle from a specific manufacturer (as opposed to a gasoline vehicle) but for the extension of the tax credit. Rather, the reduced demand means electric-vehicles manufacturers must offer lower prices, improve their product, or increase advertising efforts to remain equally competitive relative to their gasoline-vehicle competitors. Thus, reduced demand for the manufacturer's product is itself an economic injury.

The same economic logic applies to the labor market, where workers supply labor and employers demand it. For borrowers, PSLF's financial subsidy in the form of debt cancellation allows

---

[8] 26 U.S.C. § 30D provides for such a tax credit that varies in amount based on various factors.

public service employers to offer higher effective compensation to workers relative to their non-qualifying competitors just as the hypothetical electric-vehicle tax credit allowed electric vehicles to be sold at relatively lower effective prices to consumers than they would be without the credit. Extending debt cancellation previously available only to borrowers who took and remained in public service jobs to all borrowers, regardless of what job they take (indeed regardless of whether they work at all), has the same competitive effect as extending the hypothetical tax credit to all vehicles. Just as the relative subsidy to purchase electric vehicles falls, so too does PSLF's financial incentive to take and remain in public service jobs, placing public service employers in a position of relative economic disadvantage.

Defendants argue that "it does not 'necessarily' follow that Mackinac is competitively disadvantaged" if "the financial incentive under PSLF to work at a public service employer is reduced," but that argument defies economic logic and common sense. *See* Def. Br. at PageID.239 (citation omitted). A core principle of labor economics is that "[a]s wages in one industry rise relative to wages in other industries, workers shift their labor to the relatively high-wage one[,]" and vice versa. Principles of Economics, Chap. 12-2: The Supply of Labor (Univ. of Minn. Librs. ed. 2016) (2012).[9] Lowering incentives under PSLF to work at public service jobs reduces the supply of labor for such jobs because it makes those jobs relatively less attractive: at any wage offer by a public service employer, borrowers are less willing to take and remain in public service jobs. This is a concrete economic injury because public service employers like Plaintiff must make up for the lost incentives by offering higher salaries or greater benefits to remain equally competitive as when its borrower-employees received the full PSLF subsidy. Being forced "to invest more time and resources" to remain equally competitive "is an actual, here-and-now injury." *Sherley*, 610 F.3d at 74.

---

[9] Available at: https://open.lib.umn.edu/principleseconomics/chapter/12-2-the-supply-of-labor/ (last visited Dec. 1, 2023).

### C.  The Suspension Reduces the Economic Advantage PSLF Offers

Government action that reduces the competitive advantage conferred by PSLF on public service employers, by definition, places such employers at a relative disadvantage in the job market as compared to their non-public service competitors, including for-profit companies in the private sector. The payment-and-interest suspension inflicts such competitive injury because it erodes PSLF benefits in at least two ways: (1) unlawful cancellation of PSLF-forgivable debt reduces the financial incentive for student-loan debtors to seek such forgiveness by working for public service employers; and (2) unlawfully counting 35 months of non-payments as monthly payments shortens the term during which PSLF incentivizes borrowers to work for public service employers. These injuries are not speculative because the suspension directly affects four of Plaintiff's current employees, ECF 22-1, Lehman Decl. ¶ 9, as well as all future student-loan debtors whom Plaintiff might seek to hire.

#### 1.  *Cancelling PSLF-Forgivable Debt Reduces the Competitive Advantage PSLF Confers*

The cancellation of interest during the 35-month suspension period reduces the amount of PSLF-forgivable debt for all borrowers nationwide and thereby reduces the size of the competitive benefits conferred on public service employers by PSLF. The magnitude of the PSLF subsidy benefiting public service employers varies based on the amount that would be eventually forgiven for each borrower-employee. The more PSLF-forgivable debt the borrower-employee has, the greater the subsidy. *Any* reduction in the borrower-employee's debt level reduces the subsidy at least a little bit. The 35-month payment-and-interest suspension reduced aggregate student-debt by $175 billion by cancelling interest that otherwise would have accrued. On average, this amounts to approximately $3,900 for each of the nation's 45 million borrowers. Advanced degree holders who tend to take on greater debt benefit the most, with recent law school graduates receiving over $40,000 in debt cancellation. *See supra* CRFB Analysis. Such cancellation reduces the PSLF-exclusive financial incentive

for a law school graduate to work at a public service employer like Plaintiff by $40,000, which is $4,000 per year over PSLF's ten-year service requirement.[10]

Put another way, law school graduates receive the $40,000 cancellation regardless of where they work, even at for-profit law firms. The suspension therefore effectively extends a portion of PSLF-exclusive debt forgiveness valued at $4,000 per year to all employers, including Plaintiff's non-PSLF-qualifying competitors. This increases the competition Plaintiff faces in the labor market. Plaintiff must either make up that annual $4,000 shortfall by offering additional compensation or benefits of equivalent value, or else be less competitive in attracting law school graduates in comparison to for-profit employers and other non-PSLF-qualifying employers.

In *Sherley*, an agency expanded a previously limited grant application opportunity to certain researchers' competitors. 610 F.3d at 70–71. The court held that the researchers' need to "invest more time and resources to craft a successful grant application" in response to increased competition "is an actual, here-and-now injury." *Id.* at 74. Here, the suspension extends a portion of debt-cancellation benefits that had previously been limited to PSLF-qualifying employer to Plaintiff's competitors. Just like the researchers in *Sherley*, Plaintiff must now invest more time and resources to recruit and retain college-educated employees. That is likewise an actual, here-and-now competitive injury.

Such an injury is far from speculative because the suspension directly affects four of Plaintiff's current employees. Lehman Decl. ¶ 9. These employees had significant portions of their PSLF-forgivable loans cancelled and thus each has less incentive under PSLF to continue working for Plaintiff for a full 10 years, rather than seeking new work with a non-PSLF-qualifying employer (likely at higher pay) or exiting the job market. Put another way, the financial subsidy that Plaintiff receives from these four employees under PSLF is lower than it would be but for the debt cancellation

---

[10] For the simplicity of calculations, this example ignores present-value, tax effects, inflation, etc.

effectuated by the payment-and-interest suspension, so Plaintiff must invest additional time and resources to make up for that shortfall if it is to remain an equally competitive employment option.

Defendants speculate that the suspension may paradoxically *increase* borrowers' incentive to work for public service employers like Plaintiff. Their first assertion—that "individuals who receive relief" because of the suspension "have increased incentives to pursue public service employment as a result of decreased debts due to student loans" is pure conjecture and contrary to economic logic. *See* Def. Br. at PageID.239 (internal quotation marks and omitted). Consider the above typical recent law school graduate with student debt. As a result of the suspension, the graduate received $40,000 in debt cancellation and is now $40,000 less incentivized to seek loan forgiveness under PSLF.[11] Under the suspension, the graduate receives $40,000 that is not conditioned on any obligations. Without the suspension, PSLF promises the graduate the same amount, but only if he works for a public service employer for 10 years. According to Defendant, the unconditional benefit somehow provides a stronger incentive to work for a public service employer than a benefit in the same amount that is explicitly conditioned on working for a public service employer. Such assertion defies belief.[12]

Moreover, Defendants provide no reason why debt relief would induce borrowers to forsake "higher-paying careers" to specifically take "low-paying [PSLF-qualifying] public service positions," Def. Br. at PageID.238, as opposed to jobs at non-PSLF-qualifying non-profit organizations, such as a "partisan political organization[,]" *see* 34 C.F.R. § 685.219(b). Thus, even granting Defendants'

---

[11] Again, this example ignores present-value, tax effects, and inflation, etc.

[12] It is also not supported by economic logic. Read charitably, Defendants essentially claim that borrowers have a "backward-bending" labor supply function, which is a theoretical possibility wherein a significant income increase—here debt cancellation—"induces those individuals to work less," or as Defendants claim, to take lower paying non-profit jobs. *See* Principles of Economics, Chap 12-2: The Supply of Labor, *supra*. But "backward-bending" labor supply exists only as a theoretical "exception" to the general rule that "workers shift their labor to the relatively high-wage" sector. *Id.* Defendants' offer no reason to depart form the general principle and instead would have an exception swallow the rule by applying the "backward-bending" labor supply function to all for-profit jobs.

nonsensical premise that unconditional benefits provide stronger incentives than conditional ones, the reduction of PSLF incentives would still leave Plaintiff at an economic disadvantage relative to its non-PSLF-qualifying non-profit competitors, which is a cognizable competitive injury.

Defendants next claim that because "receiving credit towards PSLF during the suspension puts a borrower who worked in public service during that period closer to the loan forgiveness threshold," it is "more valuable for that borrower to remain in public service for the rest of the required 10-year period." Def. Br. at PageID.238. To begin, this argument rests upon the premise that borrowers are in fact motivated by PSLF's promise of debt forgiveness. Thus, it *supports* Plaintiff's position that reducing the amount of PSLF-forgivable debt discourages borrowers from taking and staying in public service jobs. Moreover, the fact that one aspect of the challenged suspension (counting non-payments as PSLF monthly payments) may partially offset the competitive injury inflicted by another aspect of the challenged suspension (cancelling the accrual of interest on student debt) does not change the fact that Plaintiff has standing to challenge the latter aspect. In any event, as explained below, crediting non-payments as monthly payments inflicts separate economic injuries that are independently sufficient for competitive standing by shortening the PSLF term and by removing borrowers from the labor pool that PSLF incentivizes.

### 2. *Counting Non-Payments as Payments Shortens PSLF's Statutory Tenure Requirements*

By crediting borrowers with 35 months of non-payment toward PSLF's payment-and-service requirements, Defendants unlawfully amended PSLF by artificially shortening the statute's 10-year tenure and payment requirements. For borrowers nationwide, including some of Plaintiff's current employees, this reduces their 120-month payment-and-service obligation under PSLF to just 85 months. But for this wave of Defendants' administrative wand, such borrowers would need to make qualifying monthly payments while working for a public service employer for an additional 35 months before earning forgiveness. Treating 35 months of non-payments as if those payments were made

destroys the incentive for borrowers to work those extra 35 months for public service employers, thereby reducing the statutory competitive advantage that PSLF confers on such employers over non-PSLF-qualifying employers. Put another way, affected borrowers can now work an extra 35 months for non-PSLF-qualifying employers, such as a high-paying for-profit company, and still be entitled to PSLF loan forgiveness.

Relatedly, crediting 35 months of non-payments toward loan forgiveness under PSLF and IDR prematurely takes student loan debtors out of the pool of borrowers whom PSLF incentivizes to work for public service employers. For example, but for the 35-month credit, the 53,000 borrowers whose student-loan debt the Department cancelled in October 2023 under PSLF would still have PSLF-forgivable debt and thus be incentivized to work for public service employers like Plaintiff. The same is true for 804,000 borrowers whose debt was forgiven in August 2023. Cheyenne Haslet, *Biden administration begins cancelling student loan debt for 804,000 borrowers*, ABC News (Aug. 14, 2023).[13]  Many more such premature cancellations will follow as IDR and PSLF participants prematurely reach their total monthly-payment requirements with the assistance of receiving credit for their 35 months of non-payment. Reducing the pool of subsidized borrowers whom PSLF incentivizes to work for public service employers is yet another way Defendants' suspension-related policies erode PSLF benefits.

The fact that many public service employers share Plaintiff's competitive injury does not reduce it nor otherwise affect Plaintiff's standing. *Adams*, 10 F.3d at 924 ("[T]he Commissioner cannot carry the day on the claim that appellants' injury-in-fact is shared with so large a class (all out-of-state producers selling to Massachusetts dealers) that their respective shares of the aggregate injury will be minimal."). "To deny standing to persons who are in fact injured simply because many others are also

---

[13] Available at: https://abcnews.go.com/Politics/biden-administration-begins-wiping-student-loan-debt-804000/story?id=102264052 (last visited Dec. 1, 2023).

injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 688 (1973).

Nor is it relevant that borrowers could "leave Mackinac for other public service employers without losing their ability to seek PSLF forgiveness[,]" *see* Def. Br. at PageID.239, because the Article III injury here is a competitive disadvantage as compared to for-profit employers in the private sector (and other non-qualifying employers). In *Growth Alliance*, a consumer's ability to switch between different Pennsylvania firms did not change the fact that each Pennsylvania firm suffered an Article III injury by being placed at a competitive disadvantage compared to Ohio firms across the border. 144 F.3d at 988. A borrower's ability to switch between public service employers likewise does not change the fact that the suspension reduces each public service employer's statutory competitive advantage compared to its non-public-service competitors.

Plaintiff's theory of standing is not "boundless" under *Already, LLC v. Nike, Inc.*, which rejected the argument that a competitor's trademark that was unenforceable against a party somehow inflicts a competitive injury against that party because the "mere assertion that something unlawful benefited the plaintiff's competitor" was not enough. 568 U.S. 85, 99 (2013), cited at Def. Br. at PageID.240. Defendants' other case on this point, *Air Excursions*, held that "a competitor's receipt of a windfall" payment, by itself, falls short of competitor standing where the plaintiff failed to link that windfall to a competitive injury, such as the competitor lowering its prices.[14] 66 F.4th at 280, cited at Def. Br. at PageID.237. Unlike *Already* and *Air Excursions*, Plaintiff does not simply allege that its competitors benefit unlawfully from the suspension, but rather that such benefit comes directly at the expense of public service employers like Plaintiff. The suspension reduces the strength and duration

---

[14] The record in *Air Excursions* indicated that the competitor's "owners used funds …. to reduce their equity stake in the company, which is inconsistent with an inference that [the competitor] used the [pandemic-relief] funds to subsidize its pricing decisions[.]" 66 F.4th at 279.

of PSLF's incentives for student loan debtors to work for public service employers. Plaintiff thus has alleged that it has been placed at an "economic disadvantage" relative to its for-profit competitors, which is sufficient for competitive standing under binding precedent. *Growth Alliance*, 144 F.3d at 988

## II.   PLAINTIFF'S COMPETITIVE INJURY IS TRACEABLE TO DEFENDANTS' SUSPENSION

Plaintiff's injury is traceable to Defendants. *See Lujan*, 504 U.S. at 560–61. Cancellation of interest during the payment-and-interest suspension is the "but for" cause of the reduction in the amount of PSLF-forgivable debt, which inflicts competitive injury by reducing borrowers' incentives to work for public service employers. And counting 35 months of non-payments as "monthly payments" shortens PSLF's payment-and-service term, which is a second source of competitive injury.

Defendants argue Plaintiff's competitive injury "rest[s] upon speculation about the decisions of independent actors," *i.e.*, its current employees and future potential hires. Def. Br. at PageID.243 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013)). Not so. Standing can be based on the "predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). "Indeed, most 'competitor standing' cases depend on [using] core economic postulates" to predict third parties' "probable market behavior." *Adams*, 10 F.3d at 923. Plaintiff's standing theory is based on sound economic logic: While individuals have varied reasons for their employment decisions, it is hardly speculative to say financial incentives play a major role.

By contrast, Defendants' traceability arguments are all speculative. They posit that some borrowers, including Plaintiff's current employees, may be motivated to pursue a public service career even if PSLF incentives diminish. Def. Br. at PageID.242. Conversely, according to Defendants, a borrower may leave public service for reasons unrelated to PSLF incentives. *Id.* The Sixth Circuit's decision in *Growth Alliance* again illustrates the irrelevance of Defendants' assertions on this count. Customers may have had many reasons to do business with an Ohio versus Pennsylvania firm, or vice versa—perhaps they lived close to or had a good relationship with a particular firm. But a third-party

23

buyer's choice in selecting which firm in Ohio or Pennsylvania to shop at did not prevent the Sixth Circuit from finding competitive injury. *Growth Alliance*, 144 F.3d at 988. That is because lower regulatory costs for Ohio firms helped each of them lure customers away from each Pennsylvania firm. *Id.* For the same reason, the fact that third-party borrowers may choose whether to work for a public service or for-profit employer does not prevent competitive injury here. Reduced PSLF financial incentives make each public service employer, including Plaintiff, relatively less attractive as an employer and less able to compete against for-profit employers in the recruitment and retention of college-educated workers. Such reasoning does not "extend well beyond 'the basic laws of economics,'" as Defendants contend. *See* Def. Br. at PageID.243 (citation omitted). To the contrary, a core principle of labor economics is that workers' willingness to take a job is directly related to the financial incentives offered.

At bottom, the economic injury Plaintiff alleges need not be tied to any specific decision that Plaintiff's current/future employees may make. Rather, the alleged injury is "economic disadvantage." All else equal, reducing the strength and duration of PSLF incentives economically disadvantages Plaintiff compared to its non-PSLF-qualifying competitors. Defendants' unlawful administrative payment-and-interest suspension and related policies are the "but for" cause of that disadvantage.

## III.   PLAINTIFF'S COMPETITIVE INJURY IS REDRESSABLE

Plaintiff suffers a competitive injury because the payment-and-interest suspension shortens PSLF's payment-and-service requirements. A declaration that the suspension is unlawful and an order halting Defendants from continuing to count 35 months of non-payments as monthly payments for purposes of federal loan-forgiveness programs would directly redress that injury by restoring PSLF's full payment-and-service requirements. Article III redressability is satisfied on this basis alone.

The reduction of PSLF financial incentives through unlawful cancellation of PSLF-forgivable debt is also redressable. To start, declaratory and injunctive relief would prevent Defendants from

24

enacting a new payment-and-interest suspension period[15] and halt the ongoing post-suspension policies that unlawfully cancel PSLF-forgivable debt. Unwinding the illegal cancellation of PSLF-forgivable debt would also provide retrospective relief by restoring PSLF incentives that Defendants eroded. In recognition that such unwinding would be disruptive and unfair to millions of borrowers who have relied on Defendants' unlawful actions, Plaintiff seeks only $1 of nominal unwinding for each affected borrower. Such nominal retrospective relief would not, as Defendants contend, "inflict devastating financial hardship on borrowers" nor "*amplify* any recruiting and retention challenges[,]" *see* Def. Br. at PageID.245 (emphasis in original), especially since they each already received thousands of dollars of cancelled interest. Rather, the nominal sum would restore Plaintiff's interest in benefiting from financial incentives statutorily conferred by PSLF, which satisfies Article III's redressability requirement. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) ("[F]or the purpose of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right.").

## CONCLUSION

For the foregoing reasons, Plaintiff satisfies the requirements of Article III standing. *See Lujan*, 504 U.S. at 560–61. The Court should deny Defendants' motion to dismiss.

December 4, 2023                                      Respectfully submitted,

                                                     */s/ Sheng Li*

PATRICK J. WRIGHT                                    SHENG LI
Vice President for Legal Affairs                     Litigation Counsel
MACKINAC CENTER FOR PUBLIC POLICY                    RUSSELL G. RYAN
130 W. Main Street                                   Senior Litigation Counsel
Midland, MI 48640                                    NEW CIVIL LIBERTIES ALLIANCE
(989) 430-3912                                       1225 19th Street NW, Suite 450
                                                     Washington, DC 20036
                                                     (202) 869-5210
                                                     Sheng.Li@ncla.legal

---

[15] Section 271 of the FRA does not prevent Defendants from enacting an administrative suspension independently from the CARES Act, which they claim to have done in March 2020, before the CARES Act was enacted, *see* 85 Fed. Reg. 79,856, and in August 2020, under the economic hardship provision of the HEA, *see* 85 Fed. Reg. 49,585.

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 4, 2023, a true and correct copy of the foregoing and exhibits attached thereto were filed electronically through the Court's CM/ECF system, to be served on counsel for all parties by operation of the Court's electronic filing system.

*/s/ Sheng Li*
Sheng Li