# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

MACKINAC CENTER FOR PUBLIC POLICY,

        Plaintiff,

v.

U.S. DEPARTMENT OF EDUCATION, *et al.*,

        Defendants.

Case No. 1:23-cv-10795-TLL-PTM

## **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ....................................................................................................... 2

    I.    Mackinac's competitive-injury theory cannot support standing. ....................... 2

    II.   Mackinac has not demonstrated traceability ........................................... 8

    III.  Mackinac has not established redressability .......................................... 9

CONCLUSION ................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**

*Air Excursions LLC v. Yellen*,
  66 F.4th 272 (D.C. Cir. 2023) .................................................................................. 3, 5

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) ............................................................................................................ 4

*Block Commc'ns, Inc. v. FCC*,
  808 F. App'x 332 (6th Cir. 2020) ................................................................................ 4, 8

*Cato Institute v. Cardona*,
  2023 WL 5232910 (E.D. Mich. Aug. 14, 2023) ..................................................... 1, 5, 9

*Center for Biological Diversity v. Lueckel*,
  417 F.3d 532 (6th Cir. 2005) ........................................................................................ 10

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ..................................................................................................... 8

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ....................................................................................................... 10

*Ohio v. Becerra*, --- F.4th ----,
  2023 WL 8270957 (6th Cir. Nov. 30, 2023) ............................................................... 4, 7

*PSSI Glob. Servs., L.L.C. v. FCC*,
  983 F.3d 1 (D.C. Cir. 2020) ............................................................................................ 3

*Sherley v. Sebelius*,
  610 F.3d 69 (D.C. Cir. 2010) .......................................................................................... 5

*Simon v. Eastern Kentucky Welfare Rights Organization*,
  426 U.S. 26 (1976) ..................................................................................................... 9, 10

*Southwest Pennsylvania Growth Alliance v. Browner*,
  144 F.3d 984 (6th Cir. 1998) .......................................................................................... 3

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ..................................................................................................... 8

*Turaani v. Wray*,
    988 F.3d 313 (6th Cir. 2021) .......................................................................................... 7

*United States v. Students Challenging Regul. Agency Procs.*,
    412 U.S. 669 (1973) ........................................................................................................ 7

**INTRODUCTION**

Mackinac has not established that it has any cognizable interest in challenging federal student-loan policies concerning payment and interest-accrual that were adopted to prevent mass delinquency and default by federal student-loan borrowers during and after a once-in-a-lifetime pandemic. Therefore, just as it did in *Cato Institute v. Cardona*, No. 1:23-cv-11906, 2023 WL 5232910 (E.D. Mich. Aug. 14, 2023), the Court should find that Mackinac lacks standing to press its claims and dismiss this case.

Nothing in Mackinac's opposition brief undermines that conclusion. Remarkably, Mackinac does not even attempt to show that the student-loan policies it challenges in this case have resulted or will result in any *actual*—as opposed to purely theoretical—increase in the competition it faces as an employer in the labor market. Nor does it show in concrete terms how such an increase in labor-market competition would have any real-world impact on its business. Instead, Mackinac goes all in on its novel theory of competitive injury, rehashing its assessment of the formal economic implications of the challenged policies for a stylized rational decisionmaker seeking employment in the labor market. This academic exercise merely confirms the non-viability of Mackinac's novel theory, which bears little resemblance to the intuitive economic logic by which courts sometimes presume that an increase in competition will inflict a specific harm on competitors in a given market. And even if Mackinac could have identified a viable competitive injury, standing would still be lacking because

1

Mackinac fails to show that any such injury is traceable to Defendants and redressable by this Court. Accordingly, this case should be dismissed.

## ARGUMENT

**I. Mackinac's competitive-injury theory cannot support standing.**

In lieu of specific allegations demonstrating an injury-in-fact, Mackinac doubles down on its novel theory of "competitive injury." Pl.'s Br. at 11. Mackinac's theory appears to break down into three distinct propositions. Mackinac first asserts that Defendants' forbearance policies have reduced the financial incentive provided by Public Service Loan Forgiveness (PSLF) for federal-student loan borrowers to work in public service. *See* Pl.'s Br. at 11; *see also id.* at 15 (providing economic analysis to support this assertion). Now that those "financial incentives are reduced," Mackinac further "predicts" that federal-student loan borrowers "will be less willing to take and keep jobs with public service employers." *Id.* at 11. In turn, Mackinac reasons that, to overcome borrowers' newly reduced interest in public service, public service employers will be required "to invest more time and resources to recruit them and to offer additional compensation or benefits to attract and retain them." *Id.* Mackinac concludes, relying on the same abstract economic analysis that infects its amended complaint, that Defendants' policies impose an "economic disadvantage" on it and other public service employers when they "compet[e] against for-profit and other non-PSLF-qualifying competitors in the labor market." *Id.* Yet Mackinac's theory of competitive injury cannot provide the basis for its claim to standing in this case.

At the outset, Mackinac is mistaken as to the standards that govern in assessing the sufficiency of an alleged competitive injury. Citing the Sixth Circuit's decision in *Southwest Pennsylvania Growth Alliance v. Browner*, 144 F.3d 984 (6th Cir. 1998), Mackinac claims that "a party has competitive standing to challenge government action that places it in a position of 'economic disadvantage' relative to its competitors." Pl.'s Br. at 12. Following this logic, Mackinac contends that Defendants' policies "tak[e] away a statutorily conferred competitive advantage enjoyed by . . . public service employers," Pl.'s Br. at 11—i.e., the incentives provided by PSLF for borrowers to work in public service—and so "necessarily confer[] an advantage on that group's competitors, thus increasing the competition faced by" public service employers," Pl.'s Br. at 12. But in fact, the indirect conferral of an economic advantage (or disadvantage) on a competitor does not give rise to a competitive injury. *See Air Excursions LLC v. Yellen*, 66 F.4th 272, 280 (D.C. Cir. 2023) ("An agency action does not confer competitor standing if it merely creates a skewed playing field." (cleaned up)). Notably, this renders large portions of Mackinac's brief inconsistent with precedent. *Compare* Pl.'s Br. at 15 (reasoning that hypothetical extension of electric vehicle tax credit to gasoline vehicles would reduce demand for electric vehicles, creating "economic disadvantage" that "constitutes an Article III injury for all manufacturers of electric vehicles"), *with PSSI Glob. Servs., L.L.C. v. FCC*, 983 F.3d 1, 11 (D.C. Cir. 2020) (noting "a party cannot establish competitor standing merely by claiming that a rival's favorable tax treatment has created an 'unfair competitive atmosphere.'").

3

Mackinac overreads *Growth Alliance*. There, the challenged agency action had lifted certain regulatory restrictions on Ohio businesses in competition with the Pennsylvania plaintiffs. *See* 144 F.3d at 988. At the same time, the agency maintained restrictions on the Pennsylvania plaintiffs, requiring that they "pay the higher costs" associated with the regulations. *Id.* Thus, *Growth Alliance* merely applied the traditional rule in competitive injury cases: that "plaintiffs suffer an economic injury 'when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them.'" *Block Commc'ns, Inc. v. FCC*, 808 F. App'x 332, 336 (6th Cir. 2020) (quoting *Sorenson Comm's, LLC v. FCC*, 897 F.3d 214, 226 (D.C. Cir. 2018).[1] That sort of "economic disadvantage," *Growth Alliance*, 144 F.3d at 988, is not present here: Defendants' policies have no direct effect on the regulatory landscape governing private-sector employers, or even of PSLF-qualifying employers, and instead simply provide limited relief to borrowers that are indisputably not competitors of Mackinac.

Mackinac's contrary assertion echoes the "boundless theory of standing" that the Supreme Court rejected in *Already, LLC v. Nike, Inc.*, in which "a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful." 568 U.S. 85, 99 (2013). Mackinac would have this Court allow it to challenge any government action that had the indirect effect of "reduc[ing] demand" for its "product." Pl.'s Br. at 15. But *Already* makes clear that a plaintiff's injury must

---

[1] The Sixth Circuit recently reaffirmed this test. *See Ohio v. Becerra*, --- F.4th ----, 2023 WL 8270957, at *13 (6th Cir. Nov. 30, 2023) (citation omitted).

4

be "more particularized and more concrete than the mere assertion that something unlawful benefited the plaintiff's competitor." 568 U.S. at 99. Mackinac attempts to distinguish *Already*, asserting that its competitors' allegedly unlawful benefit "comes directly at the expense of public service employers" like Mackinac. Pl.'s Br. 22. But that was also the case in *Already*, where Nike allegedly benefited from the ability to "register and brandish invalid trademarks to intimidate smaller competitors" like the plaintiff in that case with the threat of an infringement suit. *Already*, 568 U.S. at 98.

Setting aside the governing standards, Mackinac also fails to show how the policies it challenges in this case will subject it to an increase in competition. As this Court has already recognized, this information "must be apparent from the nature of the challenged action itself . . . or from the well-pleaded allegations of the plaintiff's complaint." *Cato Inst.*, 2023 WL 5232910, *7 (E.D. Mich. Aug. 14, 2023) (quoting *Air Excursions*, 66 F.4th at 280). And while Mackinac invokes "'core economic postulates' such as 'supply and demand,'" as support for its claim to face increased competition, Pl.'s Br. at 14 (quotation omitted), Mackinac's case is far too novel for that approach. The cases Mackinac relies upon for its competitive injury theory generally concern direct regulation of competitors, or competition between product-sellers in a particular market rather than between consumers of employee labor. *Cf. Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) ("increased competition almost surely injures a seller in one form or another"). In other words, this case does not present a well-established example of agency action increasing competition. *Cf. Air Excursions*, 66 F.4th at 280

5

("Agency action may increase competition, for example, if it allows new entrants into a fixed regulated market, if it lifts price controls on a firm's competitor and therefore permits price competition that would not otherwise occur, or if it reimburses a firm's competitor for selling its product or service at discounted rates." (quotations omitted)).

It is fatal to Mackinac's claims, then, that it fails to plausibly allege any concrete increase in competition. Mackinac asserts that "[a]ny reduction" in a borrower-employee's debt level creates a corresponding increase in competition between PSLF-qualifying public service employers and their competitors, Pl.'s Br. at 17, but that categorical, conclusory statement does not show that marginal changes in the financial employment incentives for borrowers meaningfully affects employer-recruitment and retention. The decision to take, or leave, a job is influenced by many factors. Pay is one, but so too are location, lifestyle, and commitment to the employer's mission. *See, e.g.*, Mackinac Ctr. for Pub. Policy, *Careers at the Mackinac Center*, https://perma.cc/M8MV-QT75 ("Above all, potential candidates should possess a deep respect for human rights and receive satisfaction from making a positive impact on society."). Mackinac does not attest that any of its employees or prospective employees have changed their careers based on the policies at issue here. *Cf.* Lehman Decl. ¶ 9 (stating only that a small number of Mackinac employees intend to seek Public Service Loan Forgiveness). Nor does it ever claim—much less substantiate—that it is has had to raise salaries or benefits to retain or attract staff. *See generally id.* ¶¶ 1–12.

6

Similarly, Mackinac is wrong when it claims that the challenged policies "shorten[] the term during which PSLF incentivizes borrowers to work for public service employers." Pl.'s Br. at 17; *see also id.* at 20–23. No borrower can obtain debt relief through PSLF without having worked in public service for (at least) 10 years. Mackinac appears to object that, for some borrowers, up to 35 months of non-payment may count toward the statutory 120 months of payment a borrower must make to qualify for forgiveness, but even those borrowers must have spent all of those 120 months (10 years) in public service. Likewise, crediting months of non-payment towards forgiveness progress does not "prematurely take student loan debtors out of the pool" of incentivized borrowers. Pl.'s Br. at 21. Those borrowers will have participated in the program for at least 10 years, and their timely acceptance of debt forgiveness in no way reduces Mackinac's pool of potential employees.

Further, Mackinac errs by assuming that it has "no need to link the reduced incentives under PSLF to specific financial loss." Pl.'s Br. at 14. A plaintiff in federal court cannot establish standing by simply offering "an ingenious academic exercise in the conceivable." *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 (1973). Instead, the plaintiff must allege "specific, concrete facts showing a demonstrable injury" to itself that is traceable to the defendant and redressable by a court. *Turaani v. Wray*, 988 F.3d 313, 318 (6th Cir. 2021) (quotation omitted). And as the Sixth Circuit has made clear, that is just as true in a case concerning competitive injuries as it is in any other case. *See, e.g., Ohio*, --- F.4th ----, 2023 WL 8270957, at *15

7

(awarding relief only to party that "provided the requisite facts and affidavits" to support "assertion that the [challenged rule] would cause them to suffer the competition-based harm"); *id.* at 14 n.16 ("[O]nly Ohio submitted a declaration providing concrete evidence that it would face increased competition as a result of the 2021 Rule."); *Block Commc'ns*, 808 F. App'x at 337 (rejecting contention that standing was "self-evident" and calling for the "specific facts . . . necessary for us to find [the petitioners] have suffered competitive disadvantage sufficient to confer standing.").

At bottom, Mackinac's theory does not satisfy the bedrock requirement of Article III standing that a plaintiff's injury—even one that stems as a matter of "economic logic" from increased competition, *id.*—must be "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). And because the amended complaint lacks any specific allegations identifying any such concrete harm that Mackinac has actually suffered or imminently will suffer in the real world—as opposed to the hypothetical, assumption-filled world of an economics classroom—Mackinac has not plausibly alleged any injury-in-fact.

## II. Mackinac has not demonstrated traceability

Mackinac's claims also fail for lack of traceability. While standing "can be based on the 'predictable effect of Government action on the decisions of third parties,'" Pl.'s Br. at 23 (quoting *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2556 (2019), Mackinac's claims do not present such predictable circumstances.

8

*Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976), demonstrates why traceability is lacking here. In that case, low-income individuals and organizations representing their interests challenged a revenue ruling that allowed favorable tax treatment to a non-profit hospital that offered only emergency-room services to indigent patients. *Id.* at 32-34. They alleged that the revenue ruling "had 'encouraged' hospitals to deny services to indigents." *Id.* at 42. The Supreme Court held that the challengers did not have standing because it was "purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." *Id.* at 42–43.

So too here. Borrowers weigh many factors when choosing an employer—location, lifestyle, and mission, among others—and they may weigh them differently at different stages of life. *Cf. Cato Institute*, 2023 WL 5232910, at *8 (emphasizing that "a borrower is never required to continue participation in the PSLF Program or to remain employed by any specific qualified employer"). To the extent that Mackinac is harmed when borrowers who benefit from Defendants' policies decline to pursue employment with it, that harm results from "the decisions of individual borrowers, independent third parties to this case." *Id.*

### III. Mackinac has not established redressability

For substantially similar reasons, Mackinac cannot establish that it is "likely, as opposed to merely speculative, that [its alleged competitive injury] will be redressed by

9

a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks omitted); *Center for Biological Diversity v. Lueckel*, 417 F.3d 532, 538 (6th Cir. 2005) (explaining that causation and redressability are "[c]losely related"). If any harm to Mackinac resulting from borrowers' employment decisions are not fairly traceable to Defendants, there is little reason to expect relief against Defendants would alleviate that harm. "[I]t is just as plausible" that current or prospective employees who receive or are credited with progress toward loan forgiveness, or are placed into forbearance as they transition back to repayment, will remain as dedicated to public service as they were before. *Simon*, 426 U.S. at 43.

Mackinac emphasizes that it seeks only a "$1 nominal unwinding" of Defendants' policies as to each affected borrower. Pl.'s Br. at 25. But with respect to that request, it is wholly unclear how such nominal unwinding would offer any relief for injuries of the sort that Mackinac seeks to redress. And to the extent that borrowers are likely to be less interested in pursuing an employment relationship with the specific entities that prevent them from obtaining timely loan forgiveness, receiving credit for progress towards forgiveness, or avoiding the consequences of delinquency or default as they transition back to repayment, it is more than conceivable that the relief Mackinac requests will exacerbate the very recruitment and retention harms it seeks to avoid.

## CONCLUSION

For the reasons stated above, and in Defendants' opening brief, the Court should dismiss Mackinac's amended complaint for lack of standing and close this case.

Dated: December 18, 2023						Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cody T. Knapp*
CODY T. KNAPP (NY #5715438)
Trial Attorney
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
Telephone: (202) 532-5663
Facsimile: (202) 616-8470
E-mail: cody.t.knapp@usdoj.gov

*Counsel for Defendants*