UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MACKINAC CENTER
FOR PUBLIC POLICY,

                    Plaintiff,                      Case No. 1:23-cv-10795

v.                                     Honorable Thomas L. Ludington
                                         United States District Judge
U.S. DEPARTMENT OF EDUCATION, *et al*.

                    Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DISMISSING CASE WITHOUT PREJUDICE

To mitigate financial hardship caused by the COVID-19 pandemic, the Department of Education suspended federal student loan payments, froze interest accrual, and allowed borrowers enrolled in the Public Service Loan Forgiveness Program or Income-Driven Repayment Plans to progress towards loan forgiveness, even if these specific borrowers did not make qualifying monthly payments. Although the Department first announced this Suspension in March 2020, it extended the Suspension several times—during two different Presidential Administrations—until Congress terminated the Suspension in late 2023. As the Suspension was sunsetting, the Department promulgated a 12-month "On-Ramp" to assist borrowers as they transition back to regular student loan repayment. Under this ongoing On-Ramp, although loan payments are due and interest accrues, interest does not capitalize and borrowers are not penalized for partial, late, or missed payments.

Plaintiff Mackinac Center for Public Policy—a nonprofit located in Midland, Michigan—sued the Department and its officials alleging that the Suspension and On-Ramp reduced its ability to recruit and retain college-educated employees, and violated the Constitution and the

Administrative Procedure Act. But Plaintiff has not shown that the Department's Suspension or On-Ramp caused it concrete and particularized harm. And even if Plaintiff's alleged harm was concrete, particularized, *and* caused by the Department's debt-forgiveness programs, Plaintiff has not shown its alleged harm could be redressed by a favorable judicial decision. Plaintiff's claims will accordingly be dismissed for lack of Article III standing.

## I.

"Many people consider a college education the ticket to the American dream. Some take out loans to get their ticket. Paying back those loans can turn into a nightmare." *Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 347 (6th Cir. 2024). This nightmare only intensified during the COVID-19 pandemic.

### A. The Legislative and Executive Response to COVID-19

COVID-19's national and global impacts can hardly be overstated. Indeed, the extent of this impact continues to evolve. As of July 1, 2024, the Center for Disease Control reports that 1,193,615 Americans have died from COVID-19. *Trends in United States COVID-19 Deaths*, U.S. CENTS. FOR DISEASE CONTROL AND PREVENTION,https://covid.cdc.gov/covid-data-tracker/#trends_totaldeaths_select_00 (last updated July 3, 2024) [https://perma.cc/CDA7-B9BU]. The pandemic's economic impact has been equally devastating. By May 2020—just four months after the first case of COVID-19 in America—more than 26 million Americans sought unemployment benefits. *See CDC Museum COVID-19 Timeline*, U.S. CENTS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/museum/timeline/covid19.html (last updated Mar. 15, 2023) [https://perma.cc/X2Y9-KSDL]. At the height of the pandemic, the United States unemployment rate was at an all-time high. *See id.* Food insecurity similarly spiked. *See id.* (reporting 52 million Americans faced food insecurity by October 2020). Although nearly all

facets of the American economy suffered, the pandemic was "particularly damaging for small businesses, which represent the majority of businesses in the United States and employ nearly half of all private sector workers." Lauren Bauer et al., *Ten Facts About COVID-19 and the U.S. Economy*, BROOKINGS (Sep. 17, 2020) https://www.brookings.edu/articles/ten-facts-about-covid-19-and-the-u-s-economy/ (citing Small Business Association statistics, noting significant declines in small business revenue and employment, and predicting the closure of nearly 420,000 small businesses by July 2020) [https://perma.cc/3DH4-M4VM]. And, although nearly all Americans were personally impacted by COVID-19 in some way, the pandemic was particularly damaging for the poor and persons of color. *See id.* (explaining how the pandemic's public health and economic impacts compounded with greater societal inequities and disproportionately impacted Black, Hispanic, and American Indian communities).

To mitigate these impacts, the Legislature and Executive Branch took unprecedented action across two different Presidential Administrations. In his last year of office, former President Trump issued eight executive orders addressing COVID-19.[1] President Biden has issued another nine.[2] On March 6, 2020, while former President Trump was in office, Congress passed the Coronavirus Preparedness and Response Supplemental Appropriations Act (CPRSA) which provided federal

---

[1] *See* Exec. Order No. 13909, 85 Fed. Reg. 16227 (Mar. 18, 2020); Exec. Order No. 13910, 85 Fed. Reg. 17001 (Mar. 23, 2020); Exec Order No. 13911, 85 Fed. Reg. 18403 (Mar. 27, 2020); Exec. Order No. 13917, 85 Fed. Reg. 26313 (Apr. 28, 2020); Exec. Order No. 13922, 85 Fed. Reg. 30583 (May 14, 2020); Exec. Order No. 13927, 85 Fed. Reg. 35165 (June 4, 2020); Exec. Order No. 13945, 85 Fed. Reg. 49935 (Aug. 8, 2020); Exec. Order No. 13962, 85 Fed. Reg. 79777 (Dec. 11, 2020).
[2] *See* Exec. Order No. 13987, 85 Fed. Reg. 7019 (Jan. 20, 2021); Exec. Order No. 13994, 85 Fed. Reg. 7189 (Jan. 21, 2021); Exec. Order No. 13996, 85 Fed. Reg. 7197 (Jan. 21, 2021); Exec. Order No. 13997, 85 Fed. Reg. 7201 (Jan. 21, 2021); Exec. Order No. 13998, 85 Fed. Reg. 7205 (Jan. 21, 2021); Exec. Order No. 14002, 85 Fed. Reg. 7229 (Jan. 22, 2021); Exec. Order No. 14042, 85 Fed. Reg. 50985 (Sep. 9, 2021); Exec. Order No. 14099, 85 Fed. Reg. 30891 (May 9, 2023); Exec. Order No. 14122, 85 Fed. Reg. 27355 (Apr. 12, 2024).

agencies with $8.3 billion in emergency funding to respond to the COVID-19 pandemic. CPRSA, Pub. L. No. 116-123, 134 Stat. 146 (2020). Less than two weeks later, Congress passed the Families First Coronavirus Response Act which required certain public and private employers to provide employees combatting COVID-19 with paid sick leave or expanded family and medical leave. Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 178 (2020). On March 27, 2020, Congress passed the Coronavirus Aid, Releif, and Economic Security Act (the "CARES Act") with overwhelming bipartisan support. *See* CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020). The CARES Act provided a total of $2.2 trillion to stimulate nearly all facets of the American economy. *See generally id.* Among other reforms, the CARES Act:

1. Authorized the "single largest element of U.S. Pandemic relief[:]" the Paycheck Protection Program ("PPP") which allowed small business owners to apply for low-interest loans to assist in affording payroll and other specified costs, Susan C. Morse, *Emergency Money: Lessons from the Paycheck Protection Program*, 55 U. MICH. J.L. REFORM 175, 176 (2021); *see also* CARES Act, Pub. L. No. 116-136, § 1102(a), 134 Stat. 281, 286-93 (2020) (codified at 15 U.S.C. § 636(a)(36)) (establishing the PPP);

2. Provided eligible individuals with credit against their 2020 personal income taxes, CARES Act, Pub. L. No. 116-136, § 2201, 134 Stat. 281, 335–40 (2020);

3. Allocated $1 billion to health centers for the "prevention, diagnosis, and treatment of COVID-19," CARES Act, Pub. L. No. 116-136, § 3211, 134 Stat. 281, 368 (2020);

4. Authorized the FDA to approve rule changes for over-the-counter drugs without following full notice and comment procedures, *see* CARES Act, Pub. L. No. 116-136, § 3851, 134 Stat. 281, 435–52 (2020);

5. Established a Higher Education Emergency Relief Fund to assist college students who struggled to afford textbooks, food, housing, and child care, CARES Act, Pub. L. No. 116-136, § 6002, 134 Stat. 281, 567–68 (2020);

6. Placed a temporary moratorium on eviction filings, CARES Act, Pub. L. No. 116-136, § 4024, 134 Stat. 281, 492–94 (2020); and

7. Allocated $8 billion to federally-recognized tribal governments to assist their efforts to combat COVID-19 within American Indian communities. CARES Act, Pub. L. No. 116-136, § 5001, 134 Stat. 281, 502–03 (2020).

In April 2020, Congress allocated an additional $483 billion to enhance the PPP. *See* Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620 (2020). In December 2020, Congress provided an additional $900 billion in stimulus to relieve COVID-19's public health and economic impacts. *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Division M—Coronavirus Response and Releif Supplemental Appropriations Act, 2021, 134 Stat. 1182, 1909–49 (2020). In March 2021, after President Biden assumed office, Congress passed the American Rescue Plan Act and authorized an additional $1.9 trillion in COVID-19 relief funding. *See generally* American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4 (2021).

These Legislative and Executive actions are a mere sample of the federal government's sweeping and multifaceted response to the COVID-19 pandemic, and provide crucial context for the response challenged here: two specific policies promulgated by the Department of Education (the "Department") which provided financial relief to individual student-loan borrowers.

### B. Background on Federal Student Loans

"Title IV of the Higher Education Act of 1965 governs federal student loans." *Cato Inst. v. Cardona*, 689 F. Supp. 3d 456, 458 (E.D. Mich. 2023), *aff'd sub nom. Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343 (6th Cir. 2024). Under federal student loan programs, the federal government loans federal capital directly to borrowers. Alexandra Hegji, Kyle D. Shohfi & Rita R. Zota, Cong. Rsch. Serv., R47196 *Federal Student Loan Debt Cancellation: Policy Considerations* (2022) at 2. A federal student loan borrower "assumes a contractual obligation to use the loan proceeds to pay for postsecondary educational expenses and to repay the loan, with

interest[.]" *Id.* But student loans may be forgiven under two Congressionally authorized loan forgiveness programs: the Income-Driven Repayment (IDR) model and the Public Service Loan Forgiveness (PSLF) Program. *See* 20 U.S.C. §§ 1098e(b) (authorizing IDR forgiveness), 1087e(m) (authorizing PSLF forgiveness).

Under all IDR plans, a borrower's debt will be eventually forgiven, so long as the borrower makes qualifying payments each month, "at an amount . . . intended to be affordable based on [the student's] income and family size." *Income-Driven Repayment Plans*, FED. STUDENT AID, https://studentaid.gov/manage-loans/repayment/plans/income-driven#monthly-payments (last visited June 20, 2024) [https://perma.cc/9V66-BPSC]. A borrower can choose between four IDR plans, each with specific monthly repayment amounts and forgiveness timelines of either 20 or 25 years. *See* 34 C.F.R. § 685.209(a)–(c); 34 C.F.R § 685.221.

The PSLF Program, on the other hand, was enacted in 2007 "to encourage individuals to enter and continue in full-time public service employment." 34 C.F.R. § 685.219(a). The PSLF Program accomplishes this purpose by forgiving a borrower's student loan balance if the borrower makes 120 monthly qualifying payments while "employed in a public service job."[3] 20 U.S.C. § 1087e(m)(1). Qualifying payments include any payments made under an IDR plan or a standard repayment plan. *See* 20 U.S.C. § 1087e(m)(1)(A).

Separate from *forgiveness*, loan servicers and lenders can grant borrowers *forbearance* to prevent the borrower's default or to permit the borrower to resume their repayment obligation after

---

[3] Federal statute defines "public employment" as a job "in emergency management, government . . ., military service, public safety, law enforcement, public health . . . , public education, social work in a public child or family service agency, public interest law services . . . , early childhood education . . . , public service for individuals with disabilities, public service for the elderly, public library sciences, school-based library sciences and . . . services, or at an organization . . . described in section 501(c)(3) of title 26[.]" 20 U.S.C. § 1087e(m)(3)(i).

default. 34 C.F.R. § 682.211(a)(1). "Forbearance" is defined as "permitting the temporary cessation of payments, allowing an extension of time for making payments, or temporarily accepting smaller payments than previously scheduled." *Id*. As the Department warns, forbearance only allows a student to "temporarily stop making payments." *Student Loan Forbearance*, FED. STUDENT AID, https://studentaid.gov/manage-loans/lower-payments/get-temporary-relief/forbear ance#request-a-forbearance   (last   visited   June   20,   2024) [https://perma.cc/S7JG-L569]. Historically, a borrower still accrued interest on their student loans during any granted forbearance period. *Id*. And, because forbearance temporarily suspends monthly loan payments, periods of forbearance have historically not been credited against a borrower's forgiveness timeline under an IDR plan or the PSLF Program. *See* 34 C.F.R. § 685.219(c)(1)(iii) and 20 USC § 1087e(m)(1)(A) (describing qualifying payments for PSLF); 34 C.F.R. § 682.215(f) (describing the requirements for forgiveness under an IDR plan). In other words, while a borrower was granted forbearance, they were relieved from the obligation to make monthly payments, but their loans still accrued interest and they could not progress towards loan forgiveness.

### C. The Department's Suspension and On-Ramp

On March 20, 2020, in the wake of COVID-19, former President Trump and the Department announced that borrowers could contact their student loan servicers and request up to two months of forbearance. Katie Lobosco, *Trump Allows Borrowers to Suspend St udent Loan   Payments for Two Months*, CNN (Mar. 20, 2020, 1:43 PM), https://www.cnn.com/2 020/03/20/politics/student-loan-payments-suspend-coronavirus/index.html [https://perma.cc/2ZU 9-DF6N]. During this "Suspension," unlike normal periods of forbearance, loan interest would not accrue. *Id.*

The Suspension was extended one week later, when Congress passed the CARES Act. In addition to the $2.2 trillion stimulus, *Cares Act: Higher Education Emergency Releif Fund*, U.S. DEP'T OF EDUC., https://www2.ed.gov/about/offices/list/ope/caresact.html (last updated Apr. 19, 2024) [https://perma.cc/GP2E-JM3R], the CARES Act directed the Secretary of Education to suspend federal student loan payments through September 30, 2020. CARES Act, Pub. L. No. 116-136, § 3513(a), 134 Stat. 281, 404 (2020). The CARES Act further detailed that, during this Suspension, federal student loans would not accrue interest, *and* borrowers enrolled in either IDR plans or the PSLF Program would progress toward loan forgiveness, regardless of whether they made their qualifying monthly payments. *Id.* § 3513(b)–(c).

The Department then extended the Suspension six more times, through August 31, 2022. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2364 (2023) ("Over a year and a half passed with no further action beyond keeping the repayment and interest suspensions in place."); *see also* Continued Student Loan Payment Relief During the COVID-19 Pandemic, 85 Fed. Reg. 49585 (Aug. 8, 2020); Abigail Johnson Hess, *Federal Student Loan Payments Have Been Deferred Through December*, CNBC (Aug. 24, 2020, 12:14 PM), https://www.cnbc.com/2020/08/24/federal-student-loan-payments-have-been-deferred-through-december.html [https://perma.cc/R2DJ-L7NC]; Federal Student Aid Programs, 86 Fed. Reg. 5008-01, 5008 (Jan. 19, 2021); Elissa Nadworny, *Education Department Extends Student Loan Payment Freeze Through January*, NPR (Dec. 4, 2020, 6:42 PM), https://www.npr.org/sections/coronavirus-live-updates/2020/12/04/943293547/education-dept-extends-student-loan-payment-freeze-through-january [https://perma.cc/Q8DS-JNJL]; Press Release, U.S. Dep't of Educ., At the Request of President Biden, Acting Secretary of Education will Extend Pause on Federal Student Loan Payments (Jan. 21, 2021); Press Release, U.S. Dep't of Educ., Biden Administration Extends Loan Pause Until January 31, 2022

(Aug. 6, 2021); Press Release, U.S. Dep't of Educ., Biden-Harris Administration Extends Student Loan Pause Through May 1, 2022 (Dec. 22, 2021); Press Release, U.S. Dep't of Educ., Biden-Harris Administration Extends Student Loan Pause Through August 31 (Apr. 6, 2022).

On August 24, 2022, the Department further extended the Suspension through December 31, 2022. Press Release, U.S. Dep't of Educ., Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment (Aug. 24, 2022). Unlike earlier extensions, the Department also announced it would cancel certain federal student loan debts for certain borrowers under the Higher Education Releif Opportunities for Students (HEROES) Act.[4] *See Biden*, 143 S. Ct. at 2364; *see also*; Memorandum Re: The Secretary's Legal Authority for Debt Cancellation from Lisa Brown, General Counsel, U.S. Dep't of Educ, to Miguel Cardona, Secretary, U.S. Dep't of Educ. (Aug. 23, 2022). A group of states quickly challenged this *cancellation*—but not the *Suspension*—as unconstitutional, in excess of the Department's statutory authority. *See Biden*, 143 S. Ct. at 2365. Although the district court determined the state plaintiffs lacked Article III standing, the Eighth Circuit concluded that one state—Missouri—likely had standing given its relationship to a state-sponsored nonprofit participant in the student-loan market, and issued a nationwide preliminary injunction blocking the Department's efforts to cancel student loan debt. *Id.*

The Department appealed to the Supreme Court and, while the *cancellation* appeal was pending, further extended the repayment and interest *Suspension* until 60 days after the Supreme Court's decision. *See* Press Release, U.S. Dep't of Educ., Biden-Harris Administration Continues

---

[4] Enacted in response to the 9/11 terrorist attacks, the HEROES Act vests the Secretary of Education with the authority to "waive or modify any statutory or regulatory provision applicable to student financial assistance programs under Title IV of the [Higher Education] Act [of 1965] as the Secretary deems necessary in connection with a war or other military operation or national emergency[.]" HEROES Act, Pub. L. No. 108–76, §2(a)(1), 117 Stat. 904 (2003).

Fight for Student Debt Relief for Millions of Borrowers, Extends Student Loan Repayment Pause (Nov. 22, 2022). And Congress soon after passed the Fiscal Responsibility Act of 2023, which definitively terminated the repayment and interest Suspension "[s]ixty days after June 30, 2023." Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 271(a)–(c), 137 Stat. 10, 33–34.

On June 30, 2023, the Supreme Court agreed with the Eighth Circuit's conclusion that the Missouri nonprofit had Article III standing, and held that the HEROES Act did not authorize the Department to categorically *cancel* student loan debt. *Biden v. Nebraska*, 143 S. Ct. 2355, 2368–75 (2023). Importantly, the Court expressly noted its opinion did not address the "temporary *[S]uspensions* of loan repayments and interest accrual" because any "challenge to the [S]uspensions may involve different considerations with respect to both standing and the merits." *Id.* at 2355, n. 5 (emphasis added). As explained below, that precise challenge is now before this Court. And, as the Supreme Court predicted, this challenge does involve different considerations, at least with respect to standing.

Immediately following the Supreme Court's ruling, knowing the Suspension would expire and borrowers would resume regular monthly payments in October 2023, the Department announced a "12 month 'on ramp' to repayment, running from October 1, 2023 to September 30, 2024" to "protect the most vulnerable borrowers" as they transition to a normal payment schedule (the "On-Ramp"). *FACT SHEET: President Biden Announced New Actions to Provide Debt Relief and Support for Student Loan Borrowers*, WHITE HOUSE (June 30, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/30/fact-sheet-president-biden-announces-new-actions-to-provide-debt-relief-and-support-for-student-loan-borrowers/ [https://perma.cc/M4YP-QZ73]. "While payments will be due and interest will accrue during this"

ongoing On-Ramp, "interest will not capitalize[5] at the end of the on-ramp period" and "borrowers will not be reported to credit bureaus, be considered in default, or referred to collection agencies for late, missed, or partial payments during the on-ramp period." *Id.* (noting the On-Ramp "gives borrowers who cannot make monthly payments right away the necessary time to adjust").

### D. Procedural History

On October 6, 2023, Plaintiff Mackinac Center for Public Policy[6]—a §501(c)(3) nonprofit based in Midland, Michigan—filed its Amended Complaint against Defendants (1) the Department; (2) Secretary of Education Miguel Cardona; and (3) Chief Operating Officer of Federal Student Aid Richard Cordray.[7] ECF No. 22.

In Count I, Plaintiff alleges that the Suspension violated the Article I Appropriations Clause because "[c]ancelling interest that would have otherwise accrued" and "[c]ounting non-payments"

---

[5] As the Department explains, "[w]hen interest capitalizes, the unpaid interest is added to the principal amount of [a] student loan. Capitalization increases [a] loan's principal balance, and interest is charged on the new, larger balance[.]" *What is interest capitalization on a student loan?*, U.S. DEP'T OF EDUC. OFF. OF FED. STUDENT AID, https://studentaid.gov/help-center/answers/article/what-is-loan-capitalized-interest (last visited June 24, 2024) [https://perma.cc/HC5L-DPVF]; *see also* ECF No. 22 at PageID.182 (noting that, during the 12-month on-ramp, "unpaid interest each month will not be added to the principal of the loan, *i.e.*, it w[ill] not compound" (emphasis in original)).

[6] Plaintiff describes itself as "a nonprofit research and educational institute that advances the principles of free markets and limited government" by "challeng[ing] government overreach and advocat[ing] for free-market approaches to public policy[.]" Our Purpose, MACKINAC CENT. FOR PUB. POL'Y, https://www.mackinac.org/about (last visited June 24, 2024) [https://perma.cc/9RDM-DDML].

[7] Plaintiff filed its initial complaint, challenging only the ongoing Suspension, on April 6, 2023. ECF No. 1. On May 11, 2023, Plaintiff filed a motion for a preliminary injunction, seeking to stop the Suspension. ECF No. 9. But, in September 2023, after Congress passed the Fiscal Responsibility Act and placed a definitive end-date on the Suspension, Plaintiff withdrew its motion for a preliminary injunction and the Parties agreed to allow Defendants additional time to respond to the initial complaint, "so that . . . the [P]arties [could] engage in further discussions that may resolve this case[.]" ECF No. 16 at PageID.150. But the case was not resolved, and Plaintiff accordingly filed an Amended Complaint, which asserted an additional challenge to the post-Suspension On-Ramp, the following month. *See* ECF No. 22.

toward forgiveness "is economically the same as canceling debt" owed to the United States, without Congressional authorization. *Id.* at PageID.189–91. In Count II, Plaintiff argues that "federal student loan debts constitute property belonging to the United States" and, thus, the Suspension released or disposed of federal property without Congressional authorization, in violation of the Article IV Property Clause. *Id.* at PageID.191–92. In Count III, Plaintiff alleges (a) Defendants violated the Article I Vesting Clause by extending the CARES Act's Suspension without Congressional authorization; and (b) to the extent the HEROES Act allowed this extension, that the HEROES Act violates principles of bicameralism and presentment. *Id.* at PageID.192–93. In Count IV, V, and VI, Plaintiff alleges the Suspension—and each extension of it—violated the Administrative Procedure Act (APA) because they exceeded the Department's statutory authority, were arbitrary and capricious, and did not involve notice-and-comment or negotiated rulemaking, respectively. *Id.* at PageID.194–201. In Count VII,[8] Plaintiff alleges the Department's On-Ramp exceeded statutory authority in violation of the APA. *Id.* at PageID.201–02. Lastly, in Count VIII,[9] Plaintiff alleges the On-Ramp violates both the Appropriations and Property Clauses. *Id.* at PageID.203.

In sum, Plaintiff's Complaint alleges the following:

| Count | Claim | Action |
|---|---|---|
| I | Violation of the Appropriations Clause; U.S. CONST. art. I, § 9. | Suspension |
| II | Violation of the Property Clause; U.S. CONST. art. IV, § 3. | Suspension |
| III | Violation of the Vesting Clause; U.S. CONST. art. I, § 1. | Suspension |
| IV | Exceeding Statutory Authority; Administrative Procedure Act | Suspension |
| V | Arbitrary and Capricious Agency Action; Administrative Procedure Act | Suspension |
| VI | Failure to Utilize Procedure; Administrative Procedure Act | Suspension |
| VII | Exceeding Statutory Authority; Administrative Procedure Act | On-Ramp |
| VIII | (1) Violation of the Appropriations Clause; U.S. CONST. art. I, § 9 and (2) Violation of the Property Clause; U.S. CONST. art. IV, § 3 | On-Ramp |

---

[8] Erroneously labeled "Count VIII" in the Amended Complaint. *See* ECF No. 22 at PageID.201.
[9] Erroneously labeled "Count IX" in the Amended Complaint. *See* ECF No. 22 at PageID.203.

In November 2023, Defendants filed a joint motion to dismiss under Civil Rule 12(b)(1) for lack of subject matter jurisdiction. ECF No. 25.

## II.

"Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994); *see also Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). A *facial* attacks challenges "the sufficiency of the pleading itself" and, when asserted, reviewing courts accordingly "take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *Ritchie*, 15 F.3d at 598 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235–37 (1974). "A *factual* attack, on the other hand, is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction." *Id.* (emphasis in original). A reviewing court need not presume the truth of a plaintiff's factual allegations and is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* Under both categories, the plaintiff bears the burden of establishing that subject matter jurisdiction exists. *Cartwright*, 751 F.3d at 760.

## III.

In their Motion to Dismiss, Defendants assert a facial attack and argue that, even assuming all facts within the Amended Complaint as true, Plaintiff has not established Article III standing to sue. *See* ECF No. 25 at PageID.234–45; *see also Blankenship v. Louisville-Jefferson Cnty. Metro Gov't, Kentucky*, No. 3:23-CV-235-RGJ, 2024 WL 1221180, at *3 (W.D. Ky. Mar. 21, 2024) (classifying a 12(b)(1) motion to dismiss for lack of Article III standing which does not factually dispute plaintiff's injuries as asserting a facial challenge).

### A. Relevant Law

Article III standing is "built on a single basic idea—the separation of powers." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021); *Raines v. Byrd*, 521 U.S. 811, 820 (1997). By confining judicial review to the resolution of "cases" and "controversies," Article III prevents litigants from using the judicial process to "usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *see also* U.S. CONST. art. III, § 2. Neither case nor controversy exist unless the plaintiff has standing—a personal stake in the dispute. *TransUnion*, 594 U.S. at 423; *Raines*, 521 U.S. at 819; *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 38 (1976); *Food & Drug Admin. v. All. for Hippocratic Med.*, No. 23-235, 2024 WL 2964140, at *5 (U.S. June 13, 2024) ("As Justice Scalia memorably said, Article III standing requires a plaintiff to . . . answer a basic question: 'What's it to you?'"). Notably, "a party generally lacks standing to challenge the government's provision of benefits to a third party" such that, if a plaintiff is not the object of the government action it challenges, it "faces an uphill battle" when attempting to establishing Article III standing. *Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 351 (6th Cir. 2024) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)).

 "The fundamentals of standing are well-known and firmly rooted in American constitutional law." *All. for Hippocratic Med.*, 2024 WL 2964140, at *5 (U.S. June 13, 2024). To establish Article III standing, a plaintiff must show:

> (1) [it] has suffered an 'injury-in-fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant[s]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 581 (6th Cir. 2016) (internal quotations omitted). At the pleading stage, a plaintiff must "clearly allege facts that demonstrate each element of standing." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir. 2020)

(citing Spokeo, 578 U.S. at 338, 136 S. Ct. at 194). "General or conclusory allegations will not do." *Cato* at 463. Each element will be addressed in turn.

### B. Injury in Fact

The first element to establish Article III standing is an injury-in-fact. To satisfy this element, a plaintiff must show that a concrete injury "actually exist[s]." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016), *as revised* (May 24, 2016). Although standing can exist even when the alleged injury is difficult to prove or measure, the injury must affect the plaintiff in a personal and individual way. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992); *Spokeo*, 578 U.S. at 341–42; *Gamboa v. Ford Motor Co*., 381 F. Supp. 3d 853, 886 (E.D. Mich. 2019). A general harm that affects the entire citizenry is insufficient. *Simpson-Vlach v. Michigan Dep't of Educ*., 616 F. Supp. 3d 711, 724 (E.D. Mich. 2022), *aff'd*, No. 22-1724, 2023 WL 3347497 (6th Cir. May 10, 2023).

Plaintiff is a non-profit employer, not a student-loan borrower. Accordingly, Plaintiff argues the "competitor standing" doctrine applies to its case such that the Department's Suspension and On-Ramp caused it concrete and particularized harm by placing it at an "economic disadvantage" relative to for-profit, private employers which Plaintiff alleges it competes with to recruit and retain college-educated employees. ECF Nos. 22 at PageID.182–89; 27 at PageID.265– 77.

The doctrine of competitor standing recognizes that some plaintiffs "suffer an economic injury when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 351 (6th Cir. 2024) (internal quotations omitted); *see also Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008) (noting the doctrine of competitor standing "relies on

economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors"). Although the competitor standing doctrine "supplies the link between increased competition and tangible injury" it "does not, by itself, supply the link between the challenged conduct and increased competition." *Cardona*, 102 F. 4th at 351 (quoting *Air Excursions LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023)). "The latter must be apparent from the nature of the challenged action itself . . . or from the well-pleaded allegations of the plaintiff's complaint." *Id.*

A plaintiff seeking to establish competitor standing sufficient to satisfy Article III must show (1) that the challenged government action results in "an actual or imminent increase in competition, which . . . will almost certainly cause an injury in fact;"[10] *Yellen*, 66 F.4th at 279–80 (quoting *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010)) and (2) that the plaintiff is, in fact, "a direct and current competitor" in the market whose "bottom line may be adversely affected by the challenged government action." *Id.*; *KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004); *Mendoza v. Perez*, 754 F.3d 1002, 1013 (D.C. Cir. 2014). Neither showing is satisfied here.

In attempt to make its competitor standing showing, Plaintiff (a) argues that the PSLF Program confers it—and all public employers—certain recruitment and retention advantages; and then (b) asserts its own understanding of "economic logic" to argue that the Department's Suspension and On-Ramp allowances (suspending interest accrual and payments, counting

---

[10] Notably, increased competition can be presumed if: "(1) the government's actions allowed new persons or entities to enter a 'fixed regulated market;' (2) the government created 'price competition' by lifting 'price controls' on competitors; or (3) the government reimburses a 'competitor for selling its product or service at discounted rates.'" *Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 352 (6th Cir. 2024) (quoting *Yellen*, 66 F.4th at 280). Plaintiff does not argue increased competition can be presumed in this case. Nor could it, because the Suspension and On-Ramp plainly do not allow new entities to enter some unspecified market, do not lift price controls, and do not reimburse any entities Plaintiff alleges it competes with.

nonpayments, and minimizing collateral consequences of nonpayment) reduce these advantages by decreasing borrower's "PSLF forgivable debt," such that (c) Plaintiff and other public employers are placed at a competitive disadvantage compared to private employers. *See* ECF No. 27 at PageID.255–56, 265–67, 269–70, 277. But Plaintiff's competitor standing argument has already been rejected by both this Court and the Sixth Circuit Court of Appeals.

In August 2023, Plaintiff challenged the Department's April 2022 "One-Time Account Adjustment." *See Cato* at 460–61. Under this Adjustment, if an IDR plan or PSLF Program borrower's payment history included either 12 consecutive or 36 cumulative months of forbearance, the Department credited these months of forbearance towards the borrower's individual forgiveness timeline. *Id.* Plaintiff, alongside a national non-profit, sued the *same* Defendants as here, alleged largely the *same* claims, and advanced the *same* theory of competitor standing: that the challenged student-loan forgiveness action reduced its PSLF Program incentives to recruit and retain college-educated employees by "reduc[ing] the amount of a borrower's PSLF-cancellable debt." *Compare Cato* at 460–61 *with* ECF No. 22; *see also Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 353 (6th Cir. 2024).

But the undersigned dismissed that case for lack of Article III standing and specifically rejected Plaintiff's competitor standing argument. *Cato* at 455–56. This Court concluded that Plaintiff did not show how the Adjustment worked an "actual or imminent increase" in Plaintiff's competition because (1) Plaintiff did not allege any of its employees actually received credit under the Adjustment and, (2) "even if Plaintiff[] could show" that the Adjustment "concretely increased their labor costs or decreased the effectiveness of their recruitment efforts, Plaintiff[] [did] not show how this would increase competition and no such increase is obvious." *Id.* at 466.

The Sixth Circuit agreed on appeal, noting:

> Plaintiff[] [did] not allege[] any facts showing how the adjustment affect[ed] [its] ability to "recruit and retain college-educated employees." [It] [did] not identif[y] any current employee that has received credit under the adjustment, nor . . . [that it] expect[s] to imminently hire any employee who has received such credit. Furthermore, [it] [did] not allege[] that any employees have stopped working . . . (or stated an intention to do so) based on the adjustment. And [it] [did] not identif[y] [its] competitors beyond saying private employers that hire college-educated workers.

!

*Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 353 (6th Cir. 2024) (internal citations omitted).

The same result here. Although Plaintiff attempts to rely on its own theories of "economic logic," it does not allege "any facts showing how the [Suspension and On-Ramp] affect[ed] [its] ability to 'recruit and retain' college-educated employees." *Id.* Although Plaintiff alleges that four of its 45 employees are PSLF Program participants and it plans to hire more participants in the future, ECF No. 22 at PageID.166–67, Plaintiff does not allege that any employee refrained from making payments during the Suspension, had months of nonpayment counted toward forgiveness during the Suspension, or made partial or late payments during the On-Ramp. To the extent that the Suspension automatically paused every borrower's loan interest from accruing, Plaintiff does not allege that this pause—or any other aspect of the Suspension or On-Ramp—actually caused any of its employees to stop working or altered their employment plans. And even if Plaintiff had pleaded these facts to support its theories of "economic logic," Plaintiff's competitor standing argument fails because Plaintiff has not sufficiently alleged *who* it competes with—beyond all private employers who hire college-educated employees—and has not explained *how* these unidentified competitors benefit from the Suspension or On-Ramp—beyond speculating that all private employers effectively received recruitment and retention advantages because borrowers

with less debt will be more likely to work in the private sector. *See* ECF Nos. 22 at PageID.183–89; 27 at PageID.271–77.

Plaintiff turns to *Southwest Pennsylvania Growth Alliance v. Browner*, which held that an association representing Pennsylvania manufacturers had competitor standing to sue the United States Environmental Protection Agency (EPA) and challenge its attainment-designation of some Ohio land, which lifted restrictions on the designated land and put Pennsylvania manufacturers at relative economic disadvantage compared to Ohio businesses. 114 F.3d 984, 988. Plaintiff argues that, in light of *Growth Alliance*, it does not "need to link" the PSLF invectives allegedly reduced by the Suspension and On-Ramp "to specific factual loss." ECF No. 27 at PageID.268.

But the Sixth Circuit has already rejected this argument, and rejected Plaintiff's reliance on *Growth Alliance*, too:

> Plaintiff['s] reliance on . . . *Growth Alliance* is misplaced for two reasons. First, unlike . . . *Growth Alliance*, Plaintiff[] do[es] not claim that the [Suspension or On-Ramp] will cause an economic disadvantage by lifting restrictions on private employers. Nor can [it] because the [Suspension and On-Ramp] ha[ve] nothing to do with restrictions on private employers. Second, Plaintiff[] claim[s] that private employers' recruitment and retention efforts will flourish thanks to the [Suspension and On-Ramp], which means increased competition in the market to hire college-educated employees. But the mere fact that Plaintiff['s] competitors may benefit from the adjustment is insufficient to establish competitor standing. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013) ("[S]tanding [must be] based on an injury more particularized and more concrete than the mere assertion that something unlawful benefited the plaintiff's competitor." (citations omitted)); *see also Air Excursions*, 66 F.4th at 280 ("[A]n agency action does not confer competitor standing if it merely creates a skewed playing field, by, for example, providing a windfall to a competitor." (internal quotation marks and citations omitted)).

*Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 354 (6th Cir. 2024) ("If we recognized Plaintiff's purported economic disadvantage concept, we would create a 'boundless theory of standing.' That we cannot do. Economic disadvantage is not enough, nor is speculation." (internal citations omitted) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013))).

In sum, Plaintiff has not shown that the Suspension or On-Ramp resulted in an actual or imminent increase in Plaintiff's competition to recruit and retain employees. Indeed, Plaintiff has not sufficiently shown *who* it competes with nor *how* these unidentified competitors benefit from the Suspension or On-Ramp. Thus, Plaintiff has not shown a concrete, particularized injury-in-fact sufficient for Article III standing. The Supreme Court recently emphasized that the injury-in-fact element of Article III standing "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Food & Drug Admin. v. All. for Hippocratic Med.*, No. 23-235, 2024 WL 2964140, at *6 (U.S. June 13, 2024). Plaintiff's Amended Complaint does not survive this screening.

### C. Causation

The second element of Article III standing is similarly unsatisfied. Even if Plaintiff's allegedly reduced retention and recruitment advantages were sufficiently concrete and particularized, Plaintiff has not shown that the Department's Suspension or On-Ramp *caused* this reduction.

"To satisfy the causation requirement," a plaintiff "must show that [its] injuries are 'fairly traceable to the challenged acts of the . . . [d]efendants." *Simpson-Vlach v. Michigan Dep't of Educ.*, 616 F. Supp. 3d 711, 736 (E.D. Mich. 2022), *aff'd*, No. 22-1724, 2023 WL 3347497 (6th Cir. May 10, 2023). At the pleading stage, this showing is "'relatively modest'" and "less demanding than the standard for proving tort causation*." Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) (quoting *Bennett v. Spear,* 520 U.S. 154, 171 (1997)). But, a plaintiff plainly does not have standing if the injury "'results from the independent action of third party not before the court.'" *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 796 (6th Cir. 2009) (quoting *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 42 (1976)).

Here, Plaintiff argues that, "but for" the Department's Suspension (which froze interest accrual, and counted months of non-payment as qualifying payments towards forgiveness), it would not have, as alleged, a reduced ability to recruit and retain college-educated employees. ECF No. 27 at PageID.277. Not so.

For starters, Plaintiff's causation argument necessarily rests on the wholly speculative assumption that *if* a PSLF Program borrower has less loan debt or fewer months until their loans are forgiven, *then* they are less incentivized to work in the public sector. Plaintiff argues this speculation is acceptable because "standing can be based on the 'predicable effect of Government action on the decisions of third parties.'" ECF No. 27 at PageID.277 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)). But the "effect" Plaintiff identifies is anything but "predictable." Each person uniquely considers numerous factors when deciding where and when to work, and weighs these factors differently. For some, location is paramount. Some seek an ideal work-life balance. Many individuals working within the public sector have a genuine interest in and passion for the service work they do, which may or may not be outweighed by private-sector pay, which may or may not be greater than rates paid by an individual's public employer. Plaintiff's self-proclaimed "economic logic" that public service employees will be less incentivized to work in the public sector merely because they have less student loans or are approaching loan forgiveness is unconvincing *See Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 42 (1976) (holding plaintiff did not have standing to challenge defendant's policy when the plaintiff asserted speculative inferences to support causation and contrary inferences were "just as plausible").

Relatedly, Plaintiff's alleged speculative economic injury—even if concrete and particularized—"would be caused by Plaintiff['s] own employees or prospective employees," not the challenged Suspension or On-Ramp allowances. *See Cato* at 467. As this Court noted when

holding Plaintiff had not shown sufficient causation for Article III standing to challenge student-loan-forgiveness plans in the past:

> Plaintiff[] ignore[s] the fact that a borrower is never *required* to continue participation in the PSLF Program or to remain employed by any specific qualified employer. Indeed, although a PSLF participant is required to make 120 qualifying monthly payments while working for a qualified employer for forgiveness, they need not do so consecutively. [For example,] [a] borrower who has worked for a PSLF employer for 7 years, making proper monthly qualifying payments, could simply quit, drop PSLF participation, enter the private sector, or switch qualified public employers at any time, regardless of the [challenged student-loan-forgiveness plan]. The inverse is also true. Even those [who benefit from the challenged forgiveness plan] could choose to remain employed with their current [PSLF-]qualified employer.

*Cato* at 467 (internal citations omitted).

The injury Plaintiff alleges is not "fairly traceable" to Defendants' Suspension or On-Ramp. If anything, the injury is fairly traceable to the decisions of individual PSLF Program participants, who are independent third parties to this case. *See Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 356 (6th Cir. 2024) ("At bottom, how the [challenged student loan forgiveness plan] impacts Plaintiff[] is up to individuals who are not parties to this lawsuit."); *see also New World Radio, Inc. v. F.C.C.*, 294 F.3d 164, 172 (D.C. Cir. 2002) (concluding plaintiff's "'chain of events' argument depends on the independent actions of third parties, distinguishing its case from the 'garden variety' of competitor standing cases which require a court to simply acknowledge a chain of causation 'firmly rooted in the basic law of economics.'" (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C.Cir.1989))). Accordingly, Plaintiff has not demonstrated causation, the second element for Article III standing.

### D. Redressability

Relatedly, Plaintiff has also not shown the third and final element for Article III standing: redressability.

To satisfy this element, a plaintiff must show that each remedy it requests will redress some portion of its alleged injury. *Nader v. Blackwell*, 545 F.3d 459, 471 (6th Cir. 2008); *Fofana v. Albence*, 454 F. Supp. 3d 651, 661 (E.D. Mich. 2020). Relevantly, to redress the alleged recruitment and retention disadvantages Plaintiff argues were caused by the Department's Suspension and On-Ramp, Plaintiff seeks (1) a "judgment requiring the Department, to the extent practical, to nominally unwind by $1 per affected borrower" the suspended payments and unaccrued interest provided to borrowers throughout the Suspension; and (2) an injunction to "halt the 12-month" ongoing On-Ramp. ECF No. 22 at PageID.204.

Defendants argue that "unwinding" the Suspension and halting the On-Ramp would not restore any alleged recruitment or retention advantage to Plaintiff, even if this alleged injury was concrete and caused by Defendants.[11] ECF No. 25 at PageID.244–45. Plaintiff responds, vaguely, that this "nominal sum would restore Plaintiff's interest in benefiting from" PSLF recruitment and retention and advantages. ECF No. 27 at PageID.279. But how does forcing borrowers to pay an extra dollar incentivize them to work for public employers like Plaintiff? This Court does not know because Plaintiff does not say.

---

[11] Defendants also point out that "in many instances," unwinding the Suspension may "inflict devastating financial hardship on borrowers" throughout the nation. ECF No. 25 at PageID.245. Plaintiff replies that devastating financial hardship is unlikely because it only seeks a nominal $1 unwinding per affected borrower. ECF No. 27 at PageID.279. Regardless of potential financial impact, this Court is hesitant to provide the nationwide relief Plaintiff seeks. *See Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, C.J., concurring) (noting "nationwide injunctions or universal remedies" "take the judicial power beyond its traditionally understood uses, permitting district courts to order the government to act . . . toward nonparties in the case" and suggesting that "[a]t a minimum, a district court should think twice—and perhaps twice again—before granting" such relief); *see also Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring) (noting universal remedies and nationwide injunctions "are beginning to take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch" and questioning whether district courts have the authority to issue these forms of relief in the first instance).

At bottom, Plaintiff has not shown redressability, largely for the same reasons that Plaintiff has not shown causation. *See Food & Drug Admin. v. All. for Hippocratic Med.*, No. 23-235, 2024 WL 2964140, at *6 (U.S. June 13, 2024) (noting "the second and third standing requirements . . . are often flip sides of the same coin." (internal quotations and citations omitted)). In between the Department's Suspension and On-Ramp—on one hand—and Plaintiff's alleged economic injury—on the other—lies the individual borrower-employee. The *employee*, not the *Department*, decides where to work, and how long to work there. And no employee is predictably motivated towards public interest work simply because their student loan balance increases by one dollar.

In sum, Plaintiff has not shown any of the three elements necessary to afford it Article III standing. It has not shown a concrete and particularized harm. And, even if it had shown a concrete or particularized harm, Plaintiff has not demonstrated how this harm was caused by the Department's challenged forgiveness programs, nor how this harm would be sufficiently redressed through the relief it seeks.

## IV.

Accordingly, it **ORDERED** that Defendants' Motion to Dismiss, ECF No. 25, is **GRANTED.**

Further, it is **ORDERED** that the above-captioned case is **DISMISSED WITHOUT PREJUDICE**, for lack of Article III standing.

**This is a final order and closes the above-captioned case.**

Dated: July 18, 2024                          s/Thomas L. Ludington
                                              THOMAS L. LUDINGTON
                                              United States District Judge